# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ADAM BROWN, on Behalf of Himself and All Others Similarly Situated, | § § § | NO. 1:23-CV-00374-DAE |
| *Plaintiffs*, | § § § | |
| vs. | § § | |
| LEARFIELD COMMUNICATIONS, LLC, SIDEARM SPORTS, LLC, THE UNIVERSITY OF TEXAS AT AUSTIN, AND THE UNIVERSITY OF TEXAS AT AUSTIN ATHLETICS, | § § § § § § § | |
| *Defendants*, | § § § | |
| United States of America | § § | |
| *Intervenor*. | | |

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

On July 26, 2023, the Court granted University of Texas at Austin's ("UT") Motion to Dismiss based on sovereign immunity. (Dkt. # 37.) The remaining Defendants filed this Motion to Dismiss on September 6, 2023. (Dkt. # 39.) On September 20, 2023, the United States intervened to defend the constitutionality of the Video Privacy Protection Act. (Dkt. # 42.) On October 4, 2024, Plaintiffs filed a response to the Motion to Dismiss. (Dkt. # 44.) On November 1, 2023, Defendants replied. (Dkt. # 46.) The parties then periodically

1

sent the Court supplemental authority whenever a new relevant VPPA decision
was issued anywhere in the country.  (Dkt. # 48, 49, 51, 54, 55.)  On January 19,
2024, the Court held a hearing on the matter.  Following the hearing, the Court
ordered supplemental briefing on <u>Saunders v. Hearst Television, Inc.</u>, a recent
decision on the Video Privacy Protection Act.  No. 23-cv-10998-RGS, 2024 WL
126186 (D. Mass. Jan. 11, 2024).  Both parties submitted their supplemental
briefings on January 23, 2024.  (Dkt. # 58, 59.) Upon careful consideration of the
arguments asserted in the filings—as well as the arguments presented at the
hearing—the Court GRANTS Defendants' Motion to Dismiss without prejudice.
(Dkt. # 39.)

BACKGROUND

Learfield Communications, LLC and Sidearm Sports, LLC
("Defendants") operate websites for schools and universities including the Texas
Longhorns Website ("Team Website" or "Longhorns Website").  Defendants invite
visitors on the Team Website to subscribe to emailed newsletters.  (Dkt. # 1 at ¶¶
31-32.)  The visitors allegedly provide their personally identifiable information
("PII") in exchange for email newsletters, which highlight content from the Team
Website and redirect subscribers to the Team Website's videos and articles.  (<u>Id.</u> at
¶ 3).

Learfield added Facebook's "Pixel" software on the Longhorns Website. (Dkt. # 1 at ¶ 69.) The Pixel enables Facebook to track its users' activity on other websites. (Id. at ¶ 79.) When a user logs into Facebook, Facebook generates a "c_user" cookie and stores it on the user's device. (Id. at ¶ 76.) That cookie "contains a user's nonencrypted Facebook User ID number ('UID')." (Id.) Then, if that user interacts with the Longhorns Website, the site sends Facebook metadata that "may" include a video title and a c_user cookie if one is in place on the user's device. (Id. at ¶ 84.) If someone can access the metadata and find the c_user ID, he can append the c_user ID to a URL (www.facebook.com/[UID here]) to reach the corresponding Facebook profile. (Id. at ¶ 77.)

Brown is one of many subscribers to a Texas Longhorns newsletter operated by Defendants (the "Longhorns Website")[1] that provides users with access to videos, clips, and other content related to the university's athletics. (Id. at ¶ 15.) Brown alleges that the Longhorns Website does not disclose that subscribers' personal identifying information ("PII") will be captured by the site's Facebook Pixel and then transferred to Facebook, purportedly exposing the subscribers' PII to "any person of ordinary technical skill who received that data." (Id. at ¶ 4.) Brown contends that co-defendants Sidearm Sports, LLC and Learfield Communications, LLC purposefully implanted the Pixel in order to

---

[1] The website is located at https://texassports.com/.

3

gather marketing data, and that such acts constitute a violation of the Video Privacy Protection Act ("VPPA"). (Id. at ¶ 9.) Brown alleges Defendants chose not to seek requisite consent, or any form of consent for that matter. (Id. at ¶ 10.) Brown filed the instant class action lawsuit on April 3, 2023. (Dkt. # 1.)

## LEGAL STANDARD

Rule 12(b)(1), under which Defendants raise its claim of sovereign immunity, governs dismissal for lack of subject matter jurisdiction. See F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature."). In ruling on a motion to dismiss under Rule 12(b)(1), the court may rely on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts and the court's resolution of disputed facts." MCG, Inc. v. Great W. Energy Corp., 896 F.2d 170, 176 (5th Cir. 1990). Any dismissal under Rule 12(b)(1) on the basis of Eleventh Amendment sovereign immunity must be without prejudice. Warnock v. Pecos Cty., Tex., 88 F.3d 341, 343 (5th Cir. 1996).

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." In analyzing a motion to dismiss for failure to state a claim, the court "accept[s] 'all well pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" United States ex rel. Vavra v. Kellogg Brown & Root, Inc., 727 F.3d

343, 346 (5th Cir. 2013) (quoting In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007)).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

Pursuant to Federal Rule of Civil Procedure 12(b)(7), failure to join a necessary party is grounds for dismissal. Federal Rule of Civil Procedure 19(a) provides that a party is necessary if: "(A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (1) as a practical matter impair or impede the person's ability to protect the interest; or (2) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."

Rule 19(b) further provides, "[i]f a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." The factors to consider include: "(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19.

<u>DISCUSSION</u>

I.    <u>Defendants do not possess sovereign immunity.</u>

The Eleventh Amendment commands that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or in equity, commenced or prosecuted against one of the United States[.]" U.S. Const. amend. XI. In other words, federal suits against a state or state agency are generally barred. <u>See</u> <u>Moore v. La. Bd. Of Elementary and Secondary Educ.</u>, 743 F.3d 959, 963 (5th Cir. 2014).

When confronted with an entity asserting Eleventh Amendment immunity as an arm of the state, the Court applies the test established in <u>Clark v.</u>

<u>Tarrant County</u>, 798 F.2d 736 (5th Cir. 1986).  A proper inquiry under <u>Clark</u>

considers six factors:

> (1) whether the state statutes and case law characterize the agency as an arm of the state;
> (2) the source of funds for the entity;
> (3) the degree of local autonomy the entity enjoys;
> (4) whether the entity is concerned primarily with local, as opposed to statewide, problems;
> (5) whether the entity has authority to sue and be sued in its own name; and
> (6) whether the entity has the right to hold and use property.

<u>Anderson v. Red Riv. Waterway Comm'n</u>, 231 F.3d 211, 214 (5th Cir. 2000).

None of the six factors is dispositive.  "Rather than forming a precise test, [the

<u>Clark</u> ] factors help us balance the equities and determine as a general matter

'whether the suit is in reality a suit against the state itself.'"  <u>Laje v. R.E.</u>

<u>Thomason Gen. Hosp.</u>, 665 F.2d 724, 727 (5th Cir. 1982); <u>Williams v. Dallas Area</u>

<u>Rapid Transit</u>, 242 F.3d 315, 319 (5th Cir. 2001).

 Applying these factors, the Court finds that Defendants Learfield

Communications, LLC and Sidearm Sports, LLC are not an arm of the State.

Government contractors are not blanketly immune as if they were a state.  <u>Clark</u>,

798 F.2d at 744–45.  The first factor considered in <u>Clark</u> favors Plaintiffs in that

Defendants cannot cite any Texas law or regulation that considers them to be an

arm of the state.  <u>Id.</u>

Most importantly, Defendants are not controlled or funded by the State; in fact, they have full operational control of the team websites. Id. (Dkt. # 56 at ¶ 52.) Defendants use their own code to track users, including the Pixel. (Id.) Moreover, Defendants generate their own revenue through advertising on their websites. (Id.)

While Defendants say that any damages awarded against them would require money to be paid jointly by the state and Learfield, it does not explain why that would be. (Dkt. # 39 at 3.) Based on these facts, the Court concludes that Defendants are not immune.

II.    The claims do not fail because Brown failed to join a party.

Defendants next argue that UT is indispensable party that cannot be joined; therefore, the claims must be dismissed.

Defendants have the burden of showing that UT is indispensable to this action or must be joined. U.S. v. Rutherford Oil Corp., 2009 U.S. Dist. LEXIS 40233, at *8 (S.D. Tex. May 13, 2009).

Defendants first argue that UT is necessary "because Plaintiffs' claims concern allegedly concerted conduct" by all Defendants—thus inhibiting the court from "accord[ing] complete relief" and subjecting Learfield to "a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." (Dkt. # 39 at 4.)

This argument is not persuasive because it has long been the rule that "it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." Temple v. Synthes Corp., 498 U.S. 5, 7 (1990).

Defendants next argue that allowing the action to proceed without UT risks impairing its interest in the website. (Dkt. # 39 at 4.) That is not persuasive either. Plaintiffs challenge the Longhorns Website's use of Facebook's Pixel. Defendants do not explain how or why UT has an interest in the continued use of Pixel, or any interest in the data it collects. Nor do Defendants explain how judgment against it would undermine UT's interest in anything. This is unlike the cases Defendants cite, in which the property of a nonparty could be impacted. See Lee v. Anthony Lawrence Collection, LLC, 47 F.4th 262, 269 (5th Cir. 2022), cert. denied, 143 S. Ct. 1054 (2023) (involving another party's "battle of ownership" of a trademark). UT does not purport to have ownership interest or control over the Pixel or the data it collects. In short, Defendants have not shown that the Court should dismiss based on the unavailability of any indispensable party.

### III. Plaintiffs fail to plausibly plead a VPPA claim under Rule 12(b)(6)

Congress enacted the Video Privacy Protection Act ("VPPA") in response to a profile of then-Supreme Court nominee Judge Robert H. Bork that was published by a Washington, D.C. newspaper during his confirmation hearings. S. Rep. No. 100–599, at 5 (1988), reprinted in 1988 U.S.C.C.A.N. 4342–1. The

profile contained a list of 146 films that Judge Bork and his family had rented from a video store.  Id.  Members of Congress denounced the disclosure as repugnant to the right of privacy.  Id. at 5–8.  Congress then passed the VPPA "[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials."  Id. at 1.

To effectuate this purpose, Congress in the VPPA created a civil remedy against a "video tape service provider" for "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).

To state a claim under the VPPA, plaintiff must allege that defendant (1) is a video tape service provider; (2) who knowingly disclosed to any person; (3) personally identifiable information; (4) concerning any consumer.  See 18 U.S.C. 2710(b)(1).  A "video tape service provider" is defined as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).  "Personally identifiable information" is defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. 2710(a)(3) (emphasis added).  Finally, a "consumer" is defined as "any renter,

10

purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).

Defendants argue that Plaintiffs have failed to state a claim upon which relief can be granted. Defendants maintain that Plaintiffs' claims fail because (1) Plaintiffs are not "consumer[s]" protected by the VPPA, (2) Defendants are not "video tape service provider[s]," and (3) Plaintiffs do not allege a knowing disclosure of personally identifiable information. Defendants separately challenge the constitutionality of the VPPA.

A. <u>Plaintiffs have not plausibly alleged that they are consumers.</u>

To date, the Court is aware of two almost identical VPPA adjudications against Defendants. <u>See</u> <u>Edwards v. Learfield Communications et al.</u>, No. 1:23-cv-65, 2023 WL 8544765 (N.D. Fla. Oct. 6, 2023); <u>Peterson v. Learfield Communications LLC, et al.</u>, No. 8:23-cv-146, 2023 WL 9106244 (D. Neb. Dec. 8, 2023). These cases involve Defendants' management of websites for the University of Florida and University of Nebraska-Lincoln. In each case, the court held that Plaintiffs failed to allege that they were consumers under the VPPA.

As the third court to decide this issue, the undersigned recognizes the importance of having consistent outcomes across the federal judiciary and is wary of disturbing even the non-binding precedent set forth in each case. <u>Mast. Foos & Co. v. Stover Manufacturing Co.</u>, 177 U.S. 485, 488 ("Comity is not a rule of law,

but one of practice, convenience, and expediency.  It is something more than mere courtesy, which implies only deference to the opinion of others, since it has a substantial value in securing uniformity of decision and discouraging repeated litigation of the same question.")  Both the Northern District of Florida and the District of Nebraska thoughtfully and thoroughly interpreted the meaning of "consumer" under the VPPA.  While the undersigned ultimately comes to the same conclusion as those district courts, its analysis somewhat differs.

In order to state a claim, Plaintiffs must plead they are consumers under the VPPA.  Neither party asserts that Plaintiffs are "renters" or "purchasers," but they instead focus on whether Plaintiffs qualify as a "subscribers."  (Dkt. # 39 at 7).

To begin, the VPPA does not state what it means to be a "subscriber of goods or services from a video tape service provider."  See generally, 18 U.S.C. § 2710.

Courts have reached differing definitions of what it means to "subscribe" within the meaning of the VPPA.   On the one hand, the Eleventh Circuit held that a plaintiff who merely downloaded an app to watch video clips was not a "subscriber" within the meaning of the VPPA, reasoning that "'subscription' involves some type of commitment, relationship, or association (financial or otherwise) between a person and an entity," such as "payment,

12

registration, commitment, delivery, expressed association, and/or access to restricted content." Ellis v. Cartoon Network, Inc., 803 F.3d 1251, 1256 (11th Cir. 2015) (citation omitted). In Ellis, the court stated that a person who "is free to delete the app without consequences whenever he likes, and never access its content again" is not a subscriber under the VPPA, noting that "downloading [ ] an app, we think, is the equivalent of adding a particular website to one's Internet browser as a favorite, allowing quicker access to the website's content." Id. at 1257. However, the Ellis court stated that "payment is not a necessary element of subscription." Id. at 1256

On the other hand, the First Circuit appears to require only consideration from the alleged subscriber in the form of providing personal information. Yershov v. Gannett Satellite Info. Network, Inc., 820 F.3d 482, 487 (1st Cir. 2016). The First Circuit held that merely providing some personal identifying information could constitute the "consideration" necessary for a "subscription." Id.

The main disagreement between the Eleventh Circuit and the First Circuit regards the type of consideration required for a user to be considered a "subscriber" within the meaning of the VPPA: the Eleventh Circuit requires "payment, registration, commitment, delivery, [ ] or access to restricted content," which appears to preclude the possibility that mere provision of personal

13

information could serve as consideration, <u>Ellis</u>, 803 F.3d at 1256, whereas the First Circuit has held that there could be "consideration in the form of [personal] information," <u>Yershov</u>, 820 F.3d at 489.  As the District of Nebraska surveyed, "Both courts require some exchange of 'consideration' between the alleged 'subscriber' and the video tape service provider, <u>see</u> <u>Yershov</u>, 820 F.3d at 489, but neither requires the 'subscriber' to provide monetary consideration.  <u>See</u> <u>Ellis</u>, 803 F.3d at 1256; <u>Peterson v. Learfield Communications LLC, et al.</u>, No. 8:23-cv-146 (D. Neb. Dec. 8, 2023)

 With that background, the Court now turns to how the Nebraska District Court and Northern District of Florida interpreted the word "subscriber" in cases nearly identical to the one at hand.

 In <u>Peterson v. Learfield Communications LLC, et al.</u>, the Nebraska District Court used Black's Law Dictionary which defines "subscribe," in relevant part, as "to agree in writing to furnish money or its Equivalent."  No. 8:23-cv-146, 2023 WL 9106244 at *14 (D. Neb. Dec. 8, 2023).  The court then found that in 1988, when Congress passed the VPPA, Plaintiff's exchange of personal information for email updates from Defendants—was likely not considered a "subscription."  <u>Id.</u> at *16.  The court held that in 1988, a "subscription" was commonly understood to mean "the right to receive a periodical for a sum paid, usually for an agreed number of issues."  <u>Id.</u> (citing Random House Dictionary

1896 (2nd ed. 1987)).  Therefore, Plaintiff's mere exchange of personal

information and occasional clicks on links contained in the newsletters to videos

on the Team Website did not suffice to make Plaintiff a "subscriber."  Id. at *17.

        While the Court ultimately concurs with the Nebraska District Court,

it does not fully agree with its interpretation of the law.  For one, the Nebraska

District Court assumes that "subscription" has a new modern meaning.  See

Peterson, 2023 WL 9106244 at * 16 ("the word 'subscription' in modern parlance

has taken on a new meaning … The tests employed by the First Circuit and the

Eleventh Circuit may be more consistent with 'modern' definition of 'subscriber.')

The Nebraska District Court seems to believe that the gathering of data as a source

of monetary value is a 21st century phenomenon that did not exist at the time the

statute was enacted.  The reality is that free periodicals with alternative revenue

streams existed at the time the VPPA was enacted.  For instance, "Special Reports"

by Whittle Communications Inc, sought to be the exclusive magazine for waiting

rooms in 15,000 doctors' offices in 125 major markets.  Whittle relied on

advertisers to pay $1.2 million per page in each quarterly issue.  Doctors, who

spent hundreds of dollars on magazine subscriptions, could pay zero depending on

its agreement with Whittle.  See Eleanor R, The Doctor's Subscriptions, WASH.

POST. (March 11, 1988),

https://www.washingtonpost.com/archive/lifestyle/1988/03/11/the-doctors-

subscriptions/b178657f-63fe-43b6-926b-f595102df24c/.  Local branches of
PennySaver were also circulated to millions of Americans for free by relying on
advertising revenue and affiliating with free community papers to provide
neighborhood discounts and coupons.  See Our History, WARSAW PENNY SAVER,
https://www.warsawpennysaver.com/aboutus (last visited Jan. 15, 2024).  It is true
that these examples are not quite comparable to today's media market.  Moreover,
the Court does not deny that today's media market varies from the pre-internet era.
However, the existence of alternative revenue streams should caution courts in
projecting a narrow view of what legislators might have intended.  Whether or not
consumers paid, advertising revenue has always relied on the number of eyeballs
who subscribe, sign up, or read content.   In fact, the existence of alternative
business models foreshadows the media market of today.

      The Court also notes that the District of Nebraska's opinion adopted
one dictionary definition of "subscribe" but disregarded others.  Indeed, as the First
Circuit noted, the definition of "subscribe," as Merriam–Webster provides is "to
enter one's name for a publication or service." Yershov, 820 F.3d at 487.  The First
Circuit conceded that some dictionary definitions require payment, but not all of
them. Yershov, 820 F.3d 482, 487.  Because there are multiple definitions of
"subscribe," this Court does not rest its decision solely on the literal dictionary
definition.

This Court believes that imposing a monetary requirement fails to account for the way society now, and at the time of enactment, would have interpreted "subscriber."  A textual analysis must account for a real world understanding of what it means to be a subscriber.  See Bostock v. Clayton County, 140 S. Ct. 1731 (2020) (Kavanaugh, J., dissenting) ("As Justice Scalia explained, 'the good textualist is not a literalist.'  Or as Professor Eskridge stated: The 'prime directive in statutory interpretation is to apply the meaning that a reasonable reader would derive from the text of the law…'") (internal citations omitted).  When a website asks a user to "subscribe" to a newsletter, it is logical for courts to call the person who signs up a subscriber.  To find otherwise, discounts the intensions of both parties.

Lastly, imposing a monetary payment requirement disregards the VPPA's purpose to protect privacy.  By limiting the scope of what it means to be a subscriber, the VPPA's application in today's current media market would leave consumer privacy unprotected in a large swath of cases.  Neither consumers of today nor media corporations who provide both news and video would endorse such a limited reading of the word "subscriber."  The ordinary meaning of "subscribe" accounts for users who sign up to receive content, whether or not the consumer pays.  This is because the business model revolves around eyeballs, advertising revenue, and data collection, rather than solely monthly fees.

In another almost identical case filed against Defendants and the University of Florida, the court concluded that plaintiffs failed to state a claim because they were not consumers under the VPPA. Rather than relying on originalism, the Northern District of Florida Court weighed a series of factors identified in Ellis v. Cartoon Network, Inc., 803 F.3d 1251 (11th Cir. 2015). Factors that may show a subscription include "payment, registration, commitment, delivery, expressed association, and[] access to restricted content." Id. at 1256 (cleaned up).

This court concurs with the ultimate result of the Northern District of Florida. Moreover, the Court agrees that under the Ellis factors, the Northern District of Florida Court came to the correct conclusion. However, this Court offers another rationale as to why Plaintiffs are not subscribers under the VPPA.

In Ellis, the Eleventh Circuit found that downloading an app for free and using it to view [video] content at no cost is not enough to make a user of the app a 'subscriber.'" 803 F.3d at 1257. It was not enough to become a subscriber because it involved no durable commitment, and the user was free to delete the app without consequences. Id. Applying Ellis, the Northern District of Florida found that signing up for email updates did not make them "subscribers" because it did not involve a durable commitment. Edwards, No. 1:23-CV-65-AW-MAF, 2023 WL 8544765, at *6. Of import, plaintiffs did not allege they signed up for an

18

account, the emails were free, and they could opt out without consequence.  Id.
Plaintiffs did not allege they got "any real benefit in exchange" from signing up
because the newsletter was not exclusive content.  Id.  Therefore, under the Ellis
factors, the court found that plaintiffs were not subscribers.

Rather than relying on the Ellis factors alone (which the Court
believes is an independent and adequate ground to resolve the case) or pure
originalism, this Court adopts an alternative reasoning.

Defendants cite a litany of persuasive cases nationwide that cabin the
definition of consumer by reading the statute in its full context.  On these grounds,
the Court finds that Plaintiffs failed to plead that they were consumers under the
VPPA.

As stated in Carter v. Scripps Networks, LLC, No. 22-cv-2031 (PKC),
2023 WL 3061858, at *6 (S.D.N.Y. Apr. 24, 2023), "[t]he scope of a 'consumer,'
when read with sections 2710(b)(1) and (a)(4), and the definition of 'video tape
service provider,' . . . a reasonable reader would understand the definition of
'consumer' to apply to a renter, purchaser or subscriber of *audio-visual goods or
services*, and not goods or services writ large." Id. at *6.

The Carter court considered how the term "subscriber" is
contextualized within the statute.  Importantly, the definition of "consumer" relied
on the key phrase "video tape service provider."  In addition, the liability clause of

the VPPA also used the term "video tape service provider." <u>See</u> 18 U.S.C. § 2710(b)(1) ("[A] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person ...."). And a "video tape service provider" is defined under the VPPA as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded *video cassette tapes or similar audio visual materials* ...." 18 U.S.C. § 2710(a)(4) (emphasis added). Therefore, the <u>Carter</u> court held a consumer under the VPPA – and necessarily, a "renter, purchaser, or subscriber" under the VPPA – consumes (or rents, purchases, or subscribes to) *audio visual materials*, not just any products or services from a video tape services provider.

The 1988 Senate Report noted that the definition of personal identifiable information in Section 2710(a)(3) is drafted "to make clear that simply because a business is engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the bill. For example, a department store that sells video tapes would be required to extend privacy protection to only those transactions involving the purchase of video tapes and not other products." Senate Report 100-599, at 12.

This supports the Court's interpretation that the VPPA only applies to consumers (including subscribers) of audio video services.

20

Based on <u>Carter</u>, courts have dismissed VPPA claims when the plaintiff has subscribed to a newsletter. For example, in <u>Salazar v. National Basketball Ass'n</u>, the court held that a "consumer under the VPPA . . . consumes (or rents, purchases, or subscribes to) audio visual materials, not just any products or services from a video tape services provider." No. 1:22-cv-07935, 2023 WL 5016968, at *8-10 (S.D.N.Y. Aug. 7, 2023). Therefore, "[b]ecause Plaintiff does not allege that his newsletter subscription allowed him access to the videos on the NBA.com site that any member of the public would not otherwise have, Plaintiff has alleged that he was a "subscriber[ ] to newsletters, not [a] subscriber[] to audio visual materials." <u>Id.</u> The court further held that, "[e]ven if the Complaint did allege that the newsletter contained links to videos on the NBA.com website as Plaintiff asserts in a supplemental letter . . . links to video content which is generally accessible on the NBA.com website are insufficient to create a subscribership relationship (or exchange of value) vis-à-vis video services given the lack of allegations regarding exclusive content or enhanced access." <u>Id.</u>; <u>see also</u> Gardener v. MeTV, No. 22CV5963, 2023 WL 4365901 (N.D. Ill. Jul. 6, 2023) (relying on <u>Carter</u> to find that plaintiff was not a consumer where the allegations that plaintiffs "opened an account separate and apart from viewing video content on MeTV's website" was insufficient to render them "subscribers" under the Act.); <u>Jefferson v. Healthline Media, Inc.</u>, No. 3:22-CV-05059-JD, 2023 WL 3668522, at

21

*3 (N.D. Cal. May 24, 2023) (allegations that plaintiff entered her name and email address to "subscribe to Healthline's email list" did not make plaintiff a consumer because "the VPPA limits its scope to subscribers of 'goods or services' from a video tape service provider").

Plaintiffs argue that Carter and its progeny misinterpret the VPPA. They assert the plain text of the VPPA defines "consumer" to mean "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). Plaintiffs believe Carter impermissibly narrowed this definition, holding that a consumer is a person who subscribes to goods or services constituting "audio visual materials." Essentially, the Carter court read "goods and services" in the plain text of the statute to mean "audio visual materials." Plaintiffs ask this Court to read the statute liberally and to encompass "all parts of the economic output of society." Lebakken v. WEBMD, LLC, 2022 U.S. Dist. LEXIS 201010, at *8 (N.D. Ga. Nov. 4, 2022).

Plaintiffs' position, however, has been disfavored as of late. A growing body of case law continues to adopt Carter. See e.g., Tawam v. Feld Ent. Inc., No. 23-CV-357-WQH-JLB, 2023 WL 5599007 at *5 (S.D. Cal. July 28, 2023) ("Plaintiffs signed up for an email mailing list provided by Defendant and separately viewed videos on Defendant's website. These allegations are not sufficient to plausibly support the existence of a nexus between the alleged

22

subscription and the video content at issue."). Ultimately, this Court agrees with the trend of courts adopting a narrow definition of the VPPA. It only makes sense that in the context of the law and its purpose that the alleged subscription be related to audio visual content. Even some of the cases that Plaintiffs cite are not persuasive. For instance, in <u>Harris v. Pub. Broad. Serv.</u>, the Northern District of Georgia did not have to decide on whether goods or services had to be related to video because Plaintiff adequately alleged a subscription to Defendant's video services. Specifically, she alleged "[a]fter becoming a digital subscriber, viewers have access to a variety of Pbs.[org]'s Video and Audio Media on Defendant's digital platform." No. 1:22-cv-2456, 2023 WL 2583118 at *10 (N.D. Ga. Mar. 20, 2023).

Plaintiffs' other attempts to distinguish the present matter from <u>Carter</u> are not persuasive. Upon an order for supplemental briefing, both parties thoroughly briefed <u>Saunders v. Hearst Television, Inc.</u>, No. 23-cv-10998-RGS, 2024 WL 126186 (D. Mass. Jan. 11, 2024) and <u>Li v. Georges Media Group LLC</u>, No. 23-1117, 2023 WL 7280519 (E.D. La. Nov. 3, 2023).

In <u>Hearst</u>, the court followed the First Circuit's approach by reading the definition of video service provider and consumer expansively. The Court found that to keep up with the reality of our times, the VPPA should include Internet video streamers, not just physical media. <u>Hearst</u>, 2024 WL 126186, at *6.

The <u>Hearst</u> court found that providing an "email address to the . . . app and . . . enable[ing] geolocation services and push notifications" were "adequate consideration to use Hearst's apps to obtain subscriber status under the VPPA." <u>Id.</u> at *7.

In <u>Hearst</u>, plaintiffs alleged that Hearst was a "television station." Plaintiffs downloaded an app in which videos were readily available and embedded into the content. As the <u>Hearst</u> court noted, the videos were viewed and the data was transferred only when the video was seen on the app. <u>Id.</u> at *3. In this case, it is not pleaded that the videos were watched by virtue of Plaintiffs signing up for the e-newsletter. In fact, those videos were accessible whether or not Plaintiffs subscribed to the newsletter at all.

In this case, Plaintiffs fail to allege a factual nexus or relationship between the subscription (i.e., Website benefits) and the Defendants' allegedly actionable video content. <u>See e.g.</u>, <u>Gardener v. MeTV</u>, No. 22 CV 5963, 2023 WL 4365901, at *4 (N.D. Ill. July 6, 2023) ("The Court does not agree, however, with Plaintiffs' argument that the allegations that [they] opened an account separate and apart from viewing video content on MeTV's website is sufficient to render them 'subscribers' under the Act."); <u>see also</u> <u>Carter</u>, 2023 WL 3061858, at *6 (stating that "a customer's non-video transactions play no part in a defendant's liability

under the VPPA"); <u>Kuzenski v. Uproxx</u> LLC, No. 223CV00945WLHAGR, 2023 WL 8251590, at *1 (C.D. Cal. Nov. 27, 2023).

In the case at hand, Plaintiffs do not allege that the videos are in the newsletter. Rather the newsletter links to videos on the website which the public can access without signing up for the newsletter. (Dkt. # 1 at ¶ 3.) The Complaint does not include facts that plausibly allege that their status as newsletter subscribers was a condition to accessing the site's videos, or that it enhanced or in any way affected their viewing experience.

The fact that the newsletter solely contains links to videos is not dispositive of the case. As Plaintiffs' counsel made clear at oral argument, it is custom for newsletters to simply attach a link to be transferred to a video webpage. However, the link in this case does not direct the subscriber to any exclusive content behind a paywall that is only accessible because the user provides valuable data in exchange for a subscription. The link transfers to an open domain that can be accessed by anyone whether or not they subscribe to the newsletter. This makes the present matter distinguishable from <u>Li</u>, in which the Eastern District of Louisiana courts' brief analysis noted that plaintiffs had exclusive access behind a paywall to watch pre-recorded videos. <u>Li v. Georges Media Grp. LLC</u>, No. CV 23-1117, 2023 WL 7280519, at *3 (E.D. La. Nov. 3, 2023).

In this case, there is no allegation that a user must log in to watch the video, and Plaintiff does not allege that the video content he accessed was exclusive to a subscribership. Plaintiffs were subscribers to newsletters, not subscribers to audio visual materials.

As the Nebraska District Court rightfully noted, this suggests how a newsletter oddly fits within the statute of the VPPA:

> "this case illustrates the uncomfortable fit of the VPPA to free video streaming services. If Plaintiff accessed free videos on the Team Website by simply typing 'huskers.com' into his web browser, he would undoubtedly not be a 'renter, purchaser, or subscriber of goods or services,' meaning he and members of his class would have no VPPA claim for having his PII allegedly disclosed to Facebook. However, because Plaintiff 'subscribes' (in a modern sense unforeseen by the statute) to a free newsletter that contains links to these free videos, which anyone can freely access on the Team Website without first subscribing to the newsletter, Plaintiff argues that he and all other newsletter subscribers are entitled to relief under the VPPA, including not less than $2,500 in liquidated damages to each class member and injunctive relief. That argument fails not only as a matter of statutory interpretation but also as a matter of common sense."

Peterson, 2023 WL 9106244 at *19. The current action presents the same uncomfortable fit that the Nebraska District Court recently described. For this reason, the Court finds Plaintiffs are not a consumers under the statute.

Before concluding, there is no denying that the First Circuit's opinion in Yershov v. Gannett Satellite Info. Network, Inc., could lead to an alternative result. 820 F.3d 482, 485 (1st Cir. 2016). Both the Nebraska District Court and

Northern District of Florida Court similarly had trouble distinguishing itself from Yershov.  However, the First Circuit in Yershov did not address the argument of whether a subscriber had to subscribe to the audio-visual content.   Therefore, the Court's rationale least disrupts the First Circuit's approach.  The Court also notes the more recent approach taken by federal courts across the country since the First Circuit decided Yershov.

There is clearly a Circuit split on this issue and a great deal of inconsistency throughout the federal courts.  Indeed, this inconsistency poses consequences to personal privacy in the era of rapid accumulation of data by tech companies.  As such, clarity from Congress would be prudent and go a long way in providing courts with a more definite understanding of whether e-newsletters that simply link to publicly accessible videos fall under the VPPA.

Due to the circuit split, the Court emphasizes its opinion should not be construed to mean that all newsletters are exempt from the VPPA.  This Court does not foreclose the possibility of the VPPA applying to the reality of our times that most video is consumed through Internet streaming.  The Court recognizes that Learfield's websites stream video.  The Court is deciding the case under the facts presented here that the subscriber of this particular newsletter was not signing up for audio-visual content.

Therefore, the Court dismisses the claims for failure to state a claim under Rule 12(b)(6). As the Nebraska District Court and Northern District of Florida did, this Court reaches its conclusion without having to resolve whether Defendants are not "video tape service provider[s]," and whether defendants knowingly disclosed personally identifiable information.

IV.   <u>Judicial restraint requires the court to avoid deciding whether the VPPA unconstitutionally restricts free speech.</u>

The Court need not resolve whether the VPPA unconstitutionally restricts free speech. <u>Cf.</u> <u>Camreta v. Greene</u>, 563 U.S. 692, 705 (2011) (noting a "longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them") (<u>quoting</u> <u>Lyng v. Northwest Indian Cemetery Protective Assn.</u>, 485 U.S. 439, 445 (1988)).

CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss without prejudice.

**IT IS SO ORDERED**.

**DATED**: Austin, Texas, January 29, 2024.

_____
David Alan Ezra
Senior U.S. District Judge

28