# EXHIBIT 3

2024 WL 324121
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

NICOLE PILEGGI, Plaintiff,
v.
WASHINGTON NEWSPAPER
PUBLISHING COMPANY, LLC, Defendant.

Civil Action No. 23-345 (BAH)
|
Filed 01/29/2024

### MEMORANDUM OPINION

BERYL A. HOWELL United States District Judge

*1  Plaintiff Nicole Pileggi brings this putative class action against defendant Washington Newspaper Publishing Company, LLC, publisher of the Washington Examiner, seeking statutory damages and declaratory and injunctive relief for alleged violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), due to defendant's alleged knowing and unconsented-to disclosure to Facebook, the social media platform operated by Meta Platforms, Inc. ("Meta"), of plaintiff's personally identifiable information ("PII") associated with information regarding her online viewing of audio visual material. Defendant now moves to dismiss plaintiff's amended complaint for lack of subject matter jurisdiction and for failure to state a claim, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See* Def.'s Mot. & Mem. Supp. Mot. Dismiss ("Def.'s Mem."), ECF No. 21. For the reasons below, defendant's motion is granted and plaintiff's Amended Complaint, ECF No. 20, is dismissed for failure to state a claim.

### I. BACKGROUND

The relevant statutory, factual, and procedural background necessary to resolving defendant's instant motion to dismiss is summarized below.

#### A. Video Privacy Protection Act

The VPPA was enacted in 1988, long before the advent of streaming audio visual content over the internet, following a local weekly newspaper's publication of a profile of then Supreme Court nominee "Robert H. Bork based on the titles of 146 films his family had rented from a video store," with the aim "[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." Video Privacy Protection Act of 1988, S. Rep. 100-599, at 1, 5 (1988). [1] To this end, the VPPA prohibits "[a] video tape service provider [from] knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). Enumerated exceptions are provided to this prohibition, allowing, for example, disclosure when the consumer has provided "informed, written consent," *id.* § 2710(b)(2)(B), which is expressly prescribed to be "(i) [ ] in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; (ii) at the election of the consumer ... given at the time the disclosure is sought; or ... in advance for a set period of time"; and "(iii) the video tape service provider has provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election," *id.* § 2710(b)(2)(B)(i)–(iii).

The VPPA sets out several key definitions relevant here. First, a "consumer" protected by the nondisclosure prohibition is defined as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *Id.* § 2710(a)(1). Second, "personally identifiable information" subject to the nondisclosure prohibition is defined as "includ[ing] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3). Finally, a "video tape service provider" required to comply with the nondisclosure prohibition is defined as "any person, engaged in the business ... of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials, ..." *Id.* § 2710(a)(4). Enforcement is facilitated by authorizing "[a]ny person aggrieved by any act of a person in violation of" the VPPA to "bring a civil action in a United States district court," *id.* § 2710(c)(1), to recover actual damages not less than liquidated damages of $2,500, punitive damages, attorney's fees and costs, and "such other preliminary and equitable relief as the court determines to be appropriate," *id.* § 2710(c)(2).

#### B. Factual Background

**\*2** Defendant operates Washington Examiner, "a conservative media company that, along with publishing internet news articles and a weekly magazine, delivers online video content to consumers on its website." Am. Compl. ¶ 4. Washington Examiner also offers a "free email newsletter" that "regularly include[s] information about audio visual materials on [its] website[,] hyperlinks to this video content," and "embedded videos." *Id.* ¶¶ 4, 15. Users may "subscribe to its content by signing up for its newsletter and/or paying for [a] digital subscription[ ]" by "provid[ing] personal information, including their email addresses and ZIP codes." *Id.* ¶ 34.

Washington Examiner uses on its website a tracking tool, called Meta Pixel, which is "a snippet of code that, when embedded on a third-party website, tracks users' activities as users navigate through the website." *Id.* ¶¶ 36–37, 46 (citing *Meta Pixel*, Meta for Developers, https://developers.facebook.com/docs/meta-pixel/ (last visited Jan. 25, 2024)). Meta Pixel "tracks and reports [ ] video watching history to third parties, including Facebook," which is "operated by Meta." *Id.* ¶ 36. To perform this function, Meta Pixel "collect[s] interactions website visitors have with the site," and sends the data to Facebook, "along with ... information" that "enables Facebook to match [ ] website visitors to their respective Facebook User accounts." *Id.* ¶¶ 37, 49 (quotation marks omitted) (citing *Get Started*, Meta for Developers, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Jan. 25, 2024)). "Meta Pixel tracks this data regardless of whether a user is logged into Facebook." *Id.* ¶ 49. "To obtain the code for the pixel, a website owner must ... tell Facebook what kind of events the site wants to track," and "Facebook then returns the pixel code for the site administrator to embed into the website." *Id.* ¶ 52.

Washington Examiner "chose to configure the Meta Pixel" so that "Facebook receive[s] the URL of each page consumers ... visited, including information indicating that the page contained a video and the title of that video, together with the consumer's Facebook ID," all "without Class members' knowledge or consent." *Id.* ¶ 56. According to plaintiff, Washington Examiner benefits from "disclosing private information about its subscribers," in the form of "enhanced online advertising services" from Facebook and by "selling to advertisers the opportunity to market to its subscribers." *Id.* ¶¶ 67–68.

Plaintiff "has visited the Washington Examiner website and watched videos on the site since at least 2018," *id.* ¶ 17, and also maintained a Facebook account since "approximately 2017," *id.* ¶¶ 16–17. When plaintiff "clicked on pages containing videos" on Washington Examiner's website, "the videos were generally displayed at the top of the page, above the text of any article, and the videos began to play automatically." *Id.* ¶ 17. On an unspecified date, plaintiff subscribed to Washington Examiner's newsletter by "provid[ing] [ ] her personal information, including her email address and ZIP code." *Id.* ¶ 14.

Although plaintiff "never consented to any sharing of her personal information or video watching history with any third party," Washington Examiner "sent information regarding [her] activity on Washington Examiner's site to Facebook on at least 24 occasions," *id.* ¶¶ 19–20, and this information "allowed Facebook to identify [plaintiff] and learn the internet addresses or [URLs] of the pages she had visited" on Washington Examiner's website, including "the titles of videos [plaintiff] had watched," *id.* ¶ 21. These videos "concerned political topics, including controversial issues and opinions that are unpopular among certain people with more liberal political views." *Id.* ¶ 18.

**\*3** Plaintiff alleges that these disclosures to Facebook "violated [her] privacy interests" and "deprived [her] of the economic value of [her] private video watching history." *Id.* ¶¶ 63, 69. Since "discover[ing]" Washington Examiner's "disclos[ure] [of] her private video watching information" in 2022, *id.* ¶ 23, plaintiff has "continue[d] to desire to watch videos on Washington Examiner's website" and "will continue to suffer harm if the website is not redesigned," *id.* ¶ 24.

### C. Procedural Background

Plaintiff sued defendant in February 2023, and filed the operative Amended Complaint in May 2023, on behalf of herself and a putative class comprising "[a]ll Facebook account holders in the United States who subscribed to Washington Examiner's newsletter and/or paid digital subscription and viewed video content on the Washington Examiner website from February 7, 2021 to the present." Am. Compl. ¶ 70; Compl., ECF No. 1. She alleges, in a single claim, that Washington Examiner violated the VPPA by "knowingly disclos[ing] personally identifiable information" to Meta that "identified Plaintiff" and members of the putative class "as having requested or obtained specific video materials and/or services from Washington Examiner"

"without their consent." Am. Compl. ¶ 81. Plaintiff, on behalf of herself and the putative class, seeks damages "not less than $2,500 per person," punitive damages, attorney's fees and costs, injunctive and declaratory relief, and "such other relief as this Court may deem just and proper." *Id.* at 23–24.

Defendant's pending motion to dismiss the Amended Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), is now ripe for resolution. *See* Pl.'s Resp. Def.'s Mot. Dismiss ("Pl.'s Opp'n"), ECF No. 22; Def.'s Reply Supp. Mot. Dismiss ("Def.'s Reply"), ECF No. 23.

## II. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of demonstrating the court's subject-matter jurisdiction over the claim at issue. *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023) (citing *Kareem v. Haspel*, 986 F.3d 859, 865 (D.C. Cir. 2021)); *see also Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (Federal courts' "authority under the Constitution is limited to resolving 'Cases' or 'Controversies[,]' Art. III, § 2."). When considering a motion to dismiss under Rule 12(b)(1), the court must determine jurisdictional questions by accepting as true all uncontroverted material factual allegations contained in the complaint and "constru[ing] the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged." *Hemp Indus. Ass'n v. DEA*, 36 F.4th 278, 281 (D.C. Cir. 2022) (second alteration in original) (quoting *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)). Absent subject-matter jurisdiction, the court must dismiss the case. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506–07 (2006) (citing *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)).

To survive a Rule 12(b)(6) motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 572 U.S. 744, 757–58 (2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible when the plaintiff pleads factual content that is more than " 'merely consistent with' a defendant's liability" and "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007)); *see also Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("Plausibility requires 'more than a sheer possibility that a defendant has acted unlawfully.' " (quoting *Iqbal*, 556 U.S. at 678)).

\*4 In deciding a motion under Rule 12(b)(6), a court must consider the whole complaint, accepting all factual allegations in the complaint as true, "even if doubtful in fact," and construing all reasonable inferences in the plaintiff's favor, *Twombly*, 550 U.S. at 555–56; *see also Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022), unless "such inferences are unsupported by the facts set out in the complaint," *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (citation omitted); *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). In determining whether a complaint fails to state a claim, a court may consider only the facts alleged in the complaint and "any documents either attached to or incorporated in the complaint and matters of which the court may take judicial notice." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (alterations in original accepted and citation omitted).

## III. DISCUSSION

Defendant raises two grounds for dismissal, arguing, first, that subject matter jurisdiction is lacking because plaintiff lacks standing by failing to allege a " 'concrete harm' from a purported statutory violation," Def.'s Mem. at 8 (citations omitted), and, second, that plaintiff's "allegations ... do not state a claim under the VPPA" for several independent reasons, *id.* at 1–2. District courts should be assured of their jurisdiction before considering the merits and thus the jurisdictional issue is addressed first. *See Hancock v. Urb. Outfitters, Inc.*, 830 F.3d 511, 513 (D.C. Cir. 2016) ("The district court erred at the outset when it bypassed the jurisdictional question of [plaintiffs'] standing and dove into the merits of this case. In doing so, the district court stepped where the Constitution forbade it to tread.").

For the reasons set out below, while plaintiff has Article III standing to raise her VPPA claim, she has failed to state a claim under the VPPA, and defendant's Rule 12(b)(6) motion to dismiss is accordingly granted.

### A. Standing

To establish Article III standing, plaintiff must plausibly plead and, ultimately, prove three elements: (1) that plaintiff suffered an "injury in fact" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks and citations omitted); (2) that plaintiff's injury is "fairly [ ] trace[able] to the challenged

action of the defendant," meaning that "there must be a causal connection between the injury and the conduct complained of," *id.* (quotation marks and citation omitted); and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision," *id.* (quotation marks and citation omitted); *see also Brown*, 600 U.S. at 561; *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 338 (2016). As the Supreme Court clarified in *TransUnion LLC v. Ramirez*, violation of a statutory prohibition on certain conduct does not automatically produce an injury sufficient to satisfy Article III's standing requirement because "an injury in law is not an injury in fact." 594 U.S. 413, 427 (2021). To determine whether a statutory infraction amounts to a concrete injury under Article III, *TransUnion* instructs that the harm must bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," *id.* at 425 (citing *Spokeo*, 578 U.S. at 340–41), such as "reputational harms, disclosure of private information, and intrusion upon seclusion," *id.* (collecting cases).

Defendant argues that plaintiff fails to satisfy the first prong of the standing test by insufficiently pleading any injury-in-fact since plaintiff has alleged neither tangible economic harm nor any cognizable intangible harm. Def.'s Mem. at 8–12. In defendant's view, plaintiff's alleged harm of the "disclos[ure] [of] private [ ] information," Am. Compl. ¶¶ 23, 63, is "at most a statutory injury and lack[s] a close relationship to a traditional tort," Def.'s Mem. at 9. Plaintiff analogizes the violation of the VPPA's statutory disclosure prohibition to the common-law torts of invasion of privacy and intrusion upon seclusion, Pl.'s Opp'n at 12–13, and contends that such "disclosure of her information to a third party in violation of a federal statute [ ] [was] the same injury that the Supreme Court held [was] a 'concrete harm' " in *TransUnion, id.* at 6 (citing *TransUnion LLC*, 594 U.S. at 442). In fact, "[c]onsistent with [*TransUnion*], every federal court that has considered this question has held that consumers whose private information is disclosed to third parties in violation of the VPPA have Article III standing." *Id.* at 6–7 (collecting cases). Plaintiff is correct.

 *5  Prior to *TransUnion*, courts "consistently found that plaintiffs satisf[ied] the concreteness requirement of Article III standing where they allege[d] a deprivation of their privacy rights under the VPPA," even where no harm beyond the disclosure itself was alleged. *Salazar*, 2023 WL 5016968, at *5 (citing *Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 666–67 (S.D.N.Y. 2015) (collecting cases)); *see also Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 984 (9th Cir. 2017) ("[E]very 18 U.S.C. § 2710(b)(1) violation present[s] the precise harm and infringe[s] the same privacy interests Congress sought to protect by enacting the VPPA" and "Plaintiff need not allege any further harm to have standing." (quotation marks and citations omitted)); *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1341 (11th Cir. 2017) ("[Plaintiff] has satisfied the concreteness requirement of Article III standing, where the plaintiff alleges a violation of the VPPA for a wrongful disclosure."); *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 274 (3d Cir. 2016) (concluding "the harm is [ ] concrete in the sense that it involves a clear *de facto* injury, *i.e.*, the unlawful disclosure of legally protected information[,]" and "Congress has long provided plaintiffs with the right to seek redress for unauthorized disclosures of information that, in Congress's judgment, ought to remain private"); *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014) ("By alleging that [defendant] disclosed their personal information in violation of the VPPA, [plaintiffs] have met their burden of demonstrating that they suffered an injury in fact that success in this suit would redress.").

*TransUnion* does not mandate a different conclusion, as many courts to consider the issue have held.[2] These courts have reasoned that the alleged unlawful "disclosure of [a plaintiff's] information to a third party," Pl.'s Opp'n at 6, bears "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," *TransUnion LLC*, 594 U.S. at 425 (citation omitted), including the common-law tort of intrusion upon seclusion that the Supreme Court in *TransUnion* expressly identified as among the "intangible harms" "qualify[ing] as concrete injuries under Article III," *id.*; *see Salazar*, 2023 WL 5016968, at *5 (collecting cases); *accord Eichenberger*, 876 F.3d at 983 (in pre-*TransUnion* case, recognizing that "privacy torts do not always require additional consequences to be actionable" and "[t]he VPPA functions in the same way" (citing RESTATEMENT (SECOND) OF TORTS § 652B, cmt. b)); *Perry*, 854 F.3d at 1340–41 (in pre-*TransUnion* case, finding alleged "violation of the VPPA for a wrongful disclosure" "similar" to the tort of intrusion upon seclusion, where "[t]he intrusion itself makes the defendant subject to liability, even though there is no publication or other use," and plaintiff "has satisfied the concreteness requirement of Article III standing" (citation omitted)). This reasoning is persuasive.[3]

 *6  Defendant makes two counter arguments, both of which are easily dispatched. First, defendant contends that plaintiff's claimed injury of "disclosure of private information"

without reputational harm, Def.'s Reply at 3, "arises only from the *public* disclosure of private information," while plaintiff alleges "only that Facebook's computers learned information," Def.'s Reply at 3 (emphasis in original) (citations omitted). This narrow construction of plaintiff's claimed injury under the VPPA does not square with the statutory text of the VPPA's disclosure prohibition, which bars disclosure of relevant PII "to any person," 18 U.S.C. § 2710(b)(1), without also requiring that such disclosure be "public" or in some way broadly disseminated or accessible.

This reading of the statutory text is consistent with the intended purpose of the statute "to preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials," S. Rep. 100-599, at 1, and is consistent with recognized parameters of the tort of intrusion upon seclusion, which subjects to liability for invasion of privacy, a person "who intentionally intrudes ... upon the solitude or seclusion of another or his private affairs or concerns, ... if the intrusion would be highly offensive to a reasonable person," RESTATEMENT (SECOND) OF TORTS § 652B. Such invasion of privacy may include "opening [ ] private and personal mail ... even though there is no publication," *id.*, cmt. b, and thus "does not depend upon any publicity given to the person whose interest is invaded," *id.*, cmt. a; *see also Salazar*, 2023 WL 5016968, at *6 (finding plaintiff's VPPA "claim that Defendant purposefully shared his private viewing information with a third party without Plaintiff's knowledge or consent is akin to that type of intrusion into his privacy" " 'even though there is no publication or other use of any kind of the ... information outlined' " (quoting RESTATEMENT (SECOND) OF TORTS § 652B, cmt. b, and citing *Feldman*, 659 F. Supp. 3d at 1015–16 (similar)). [4]

 *7  Second, while acknowledging that "other courts have" found Article III standing by analogizing a plaintiff's alleged harm of disclosure of private information to the tort of intrusion upon seclusion, Def.'s Reply at 3, defendant nonetheless strains to distinguish these cases because none "addressed the effect of a website's privacy policy disclosures on such an alleged injury," *id.*; *see also* Def.'s Mem. at 9–11. In this regard, defendant describes its privacy policies, in effect from September 2018 to April 2023 and posted and accessible on Washington Examiner's website, as making clear "that the Washington Examiner and certain third parties employ cookies and similar technologies—like the Meta Pixel—for targeted advertising and other promotional activities." Def.'s Mem., Christopher Reen Decl. ¶¶ 2–5, ECF

No. 21-1. Pointing to the absence of any allegations that plaintiff "was unaware of [the policies], that the Washington Examiner's alleged conduct conflicted with their terms, or that she attempted to express her lack of consent by exercising the opt-out rights those policies describe," Def.'s Reply at 4, defendant argues that plaintiff consented to "the disclosure of personal information" by continuing to visit Washington Examiner's website, *id.* at 5 (citation omitted). At the same time, defendant concedes that a finding of implicit consent by plaintiff due to the affirmative disclosures in Washington Examiner's privacy policies "would not also satisfy the VPPA's unusual consent requirement." Def.'s Mem. at 10; *see also* Def.'s Reply at 5. Nonetheless, characterizing the VPPA's "unusual consent provision" as "not the normal standard for consent on the internet," Def.'s Mem. at 9, defendant discounts a statutory violation of the VPPA, in the context of the posted privacy policies, as "not alleg[ing] the type of 'sufficiently offensive conduct' " required to plead the tort of intrusion upon seclusion, Def.'s Reply at 3. Put another way, defendant's reasoning is that so long as a provider of online audio-visual materials also posts a privacy policy, even one providing only a limited opt-out for certain PII disclosures that is far less protective than the consumer's "informed, written consent" opt-in requirement under the VPPA, the consumer lacks standing as an aggrieved party to invoke the private right of action set out in this statute. *See* 18 U.SC. §§ 2710(b)(2)(B), (c).

Defendant cites no authority for the novel proposal that the VPPA's explicit opt-in consent requirement be disregarded, and other courts considering a plaintiff's alleged implicit consent due to posted privacy policies in the context of a VPPA standing inquiry have properly analyzed the issue using the statutory requirements for consent under the VPPA. *See, e.g., Salazar*, 2023 WL 5016968, at *6 (concluding that "[a]t the pleading stage, Plaintiff has set forth enough to allege that was offensive to a reasonable person," where "Plaintiff alleges that he never consented to nor was provided with any written notice that Defendant was sharing his" information, and "the tracking pixel functionality [was] not necessary for the functioning of the NBA website but instead was employed without his consent sole[ly for the] purpose of enriching Defendant and Facebook" (internal quotation marks and citations omitted) (last alteration in original)). [5]

This reasoning accords with Congress's 2012 amendment to the statute, which "clarif[ied] that video tape service providers may obtain informed, written consent of consumers on an ongoing basis via the Internet." *Ellis v. Cartoon Network, Inc.*,

803 F.3d 1251, 1253 (11th Cir. 2015) ("Congress amended the VPPA in 2012 'to reflect the realities of the 21st century.' " (quoting 158 Cong. Rec. H6849–01 (Dec. 18, 2012))). With this recent amendment, Congress had the opportunity but did not alter the requirements for such consent. *See* VPPA Amendments Act of 2012, 126 Stat. 2414, Pub. L. 112-258 (2013); *see also* Golden v. NBCUniversal Media, LLC, No. 22-cv-9858 (PAE), 2023 WL 5434378, at *4 n.5 (S.D.N.Y. Aug. 23, 2023) (noting the amendment "clarif[ied] that a video tape service provider may obtain a consumer's informed, written consent on an ongoing basis and that consent may be obtained through the internet" (citation omitted) (alteration in original)). As plaintiff correctly argues, accepting defendant's reasoning would "undo the balance Congress struck" by "effectively negat[ing] the VPPA's consent requirement" for purposes of the standing inquiry. Pl.'s Opp'n at 10–11. [6]

**\*8** In sum, plaintiff has sufficiently alleged that defendant "disclosed [her] personally identifiable information" without her consent, *see* Am. Compl. ¶¶ 19, 20, 56, 60, 62, 69, 81, and that Meta Pixel, as deployed by defendant, was "not necessary to a website's function" but "solely benefit[ed] website owners and their third-party partners," *id.* ¶ 52. As another court recently found on similar facts, at this pleading stage, plaintiff has "set forth enough to allege that [such disclosure] was offensive to a reasonable person," where a "reasonable person could find it offensive that private and personal details of their viewing preferences were shared with a third party without their consent so that commercial parties could profit from targeted advertisements that were then sent to them." *Salazar*, 2023 WL 5016968, at *6. This sufficiently alleges a concrete injury to establish standing. *See* TransUnion LLC, 594 U.S. at 429–30.

### B. Sufficiency of VPPA Claim

Defendant contends that plaintiff fails to establish the threshold element for any VPPA claim, namely: that plaintiff qualifies as a "consumer" authorized to bring an action for violation of this statute. Def.'s Mem. at 13. As noted, *see supra*, Part I.A, the VPPA creates a private right of action for a "consumer"—defined as "any renter, purchaser, or subscriber of goods or services from a video tape service provider," 18 U.S.C. § 2710(a)(1)—to bring suit against a "video tape service provider"—defined as "any person, engaged in the business ... of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," *id.* § 2710(a)(4)," for "knowingly disclos[ing]" the consumer's "personally identifiable information," *id.* § 2710(b)(1), which includes information "identif[ying] a person as having requested or obtained specific video materials or services from a video tape service provider," *id.* § 2710(a)(3). In resolving the instant motion, defendant's status as a "video tape service provider" is assumed, without deciding. [7]

**\*9** Plaintiff, indisputably, is neither a "renter" nor "purchaser" of "goods or services from a video tape service provider" and thus to qualify as a "consumer" under the VPPA, she contends that she is a "subscriber"—a term not further defined in the statute. *See* 18 U.S.C. § 2710(a)(1). Plaintiff does not dispute that to be a "subscriber," the VPPA requires subscribing to "audio-visual goods or services, and not goods or services writ large," Pl.'s Opp'n at 19 (quoting *Carter*, 2023 WL 3061858, at *6); *see* Def.'s Mem. at 16–18; Def.'s Reply at 8–9. Defendant contends that plaintiff's subscription to its newsletter fails to satisfy this standard, absent allegations that plaintiff's "status as a newsletter subscriber was a condition to accessing the site's videos, or that it enhanced or in any way affected [her] viewing experience." Def.'s Reply at 8 (quoting *Carter*, 2023 WL 3061858, at *6 (cleaned up)); Def.'s Mem. at 16–18. Plaintiff responds that she has sufficiently alleged that "Washington Examiner's newsletter had a strong connection to its video services," and that by subscribing to its newsletter, she "was asking Washington Examiner to regularly deliver audio-visual content directly to her." Pl.'s Opp'n at 19. The ubiquity of the concomitant delivery of audio-visual material with written word news and commentary, and the First Amendment implications of tracking such information identified to a particular user, as recognized in the crafting of the VPPA, *see* S. Rep. 100-599, at 4 (noting that "[p]rotecting an individual's choice of books and films is a second pillar of intellectual freedom under the [F]irst [A]mendment"), underscores the importance of this question. For the reasons explained in more detail below, however, defendant has the better of the argument. [8]

While the D.C. Circuit has not had an opportunity to consider the issue, the meaning of "subscriber" in the VPPA has been considered by two other courts of appeals, in the context of determining whether the downloading and use of a free mobile app is sufficient to allege subscriber status. Although diverging in their holdings on this issue, the First and Eleventh Circuits recognized that "one can be a 'subscriber' without making a monetary payment," *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 488 (1st Cir. 2016); *Ellis*, 803 F.3d at 1256, and that subscription requires a distinct

relationship with a video tape service provider, *see Ellis*, 803 F.3d at 1257–58 (holding that "downloading an app for free and using it to view content at no cost is not enough to make a user of the app a 'subscriber,' " absent an "ongoing commitment or relationship between the user and the entity which owns and operates the app"); *Yershov*, 820 F.3d at 489 (finding plaintiff qualified as a VPPA subscriber, but recognizing that subscription requires "a relationship [with the video tape service provider] that is materially different from what would have been the case had *USA Today* simply remained one of millions of sites on the web that [plaintiff] might have accessed through a web browser"). The Eleventh Circuit offered additional guideposts, "based on the ordinary meaning of the term 'subscriber,' " *Ellis*, 803 F.3d at 1256, interpreting the term to "involve[ ] some type of commitment, relationship, or association (financial or otherwise) between a person and an entity," *id.*, and identifying a non-exclusive list of factors indicative of "subscriber" status: "payment, registration, commitment, delivery, expressed association, and/or access to restricted content," *id.* (citations and brackets omitted). Likewise, courts have generally found that "subscriber" requires "a factual nexus or relationship between the subscription provided by the defendant and the defendant's allegedly actionable video content." *Tawam v. Feld Ent. Inc.*, No. 23-cv-357 (WQH) (JLB), 2023 WL 5599007, at *5 (S.D. Cal. July 28, 2023) (collecting cases); *see also Gardener v. MeTV*, No. 22-cv-5963, 2023 WL 4365901, at *4 (N.D. Ill. July 6, 2023) ("The Court does not agree ... that the allegations that [plaintiffs] opened an account separate and apart from viewing video content on MeTV's website is sufficient to render them 'subscribers' under the Act." (citation omitted)). Plaintiff has failed to allege these indicia of a subscriber relationship.

*10 While plaintiff alleges that she subscribed to Washington Examiner's newsletter—which provides audio visual content but without use of the website tracking tool Meta Pixel—nowhere does she allege that this subscription had any connection to the audio-visual content she accessed on the separate Washington Examiner website, nor does she claim that, as a result of her newsletter subscription, she received "access to restricted [audio-visual] content," *Ellis*, 803 F.3d at 1256, that would establish her "commitment, relationship, or association," *id.*, to Washington Examiner's "audio-visual goods or services, and not [its] goods or services writ large," *Salazar*, 2023 WL 5016968, at *8 (quoting *Carter*, 2023 WL 3061858, at *6). Simply put, the "goods or services" plaintiff received as a result of her newsletter subscription were entirely independent of the audio-visual content that she consumed on Washington Examiner's website, which allegedly functioned with the Meta Pixel tracking tool.

Close examination of plaintiff's allegations reveals that she provided her email address and ZIP code only for her subscription to Washington Examiner's newsletter, Am. Compl. ¶ 14, and though the newsletter "regularly included information about audio visual materials on Washington Examiner's website[,] [ ] hyperlinks to this video content[,]" and "embedded videos," *id.* ¶ 15; *see also* Pl.'s Opp'n at 18–20, nowhere does plaintiff allege "that she ever clicked [ ] a link" to the video content included in the newsletter, or "watched any of" the embedded videos, Def.'s Mem. at 16–17. Merely alleging that she "visited the Washington Examiner website and watched videos on the site," Am. Compl. ¶ 17, wholly separate from her newsletter subscription, breaks the link between the service to which she was a subscriber and her accessing of audio-visual content, and that is fatal to her standing as a VPPA "subscriber." *See Golden*, 2023 WL 5434378, at *9 (plaintiff not a "subscriber" where "there is no connection between the emails from Today.com for which [plaintiff] signed up and the website and mobile app through which the [complaint] alleges she accessed the videos"); *Carter*, 2023 WL 3061858, at *6–7 (holding the "[c]omplaint does not plausibly allege that plaintiffs acted as 'subscribers' when they viewed videos on the hgtv.com" where "[p]laintiffs do not assert that they watched videos embedded in the newsletters themselves"); *Paramount Glob.*, 2023 WL 4611819, at *12 (similar).

Moreover, plaintiff fails to allege that her "status as newsletter subscriber[ ] was a condition to accessing the [Washington Examiner] site's videos, or that it enhanced or in any way affected [her] viewing experience." *Lamb*, 2023 WL 6318033, at *12 (quoting *Carter*, 2023 WL 3061858, at *6); *see also Ellis*, 803 F.3d at 1253 (identifying "access to restricted content" as among the "factors" indicative of "subscription[ ]" (citations omitted)). Again, assuming as true plaintiff's allegations that "video is central to Washington Examiner's website and business" because "when [plaintiff] visited pages on the site, 'videos were generally displayed at the top of the page, above the text of any article' " and "consumers must take affirmative steps to stop the video playback and scroll the window downward if they prefer to read instead of watch," Pl.'s Opp'n at 19–20 (quoting Am. Compl. ¶ 17), does not help make a VPPA claim since these allegations are insufficient to establish a link between what plaintiff subscribed to, *i.e.*, the newsletter,

and defendant's audiovisual content on its website. Indeed, plaintiff does not claim "that a newsletter subscription was required to access those videos, functioned as a login, or gave newsletter subscribers extra benefits as viewers." *Carter*, 2023 WL 3061858, at *6. Rather, plaintiff "had the same access to videos on the [ ] site as any other visitor" without a subscription. *Salazar*, 2023 WL 5016968, at *9 (citation omitted); *see also Kuzenski v. Uproxx LLC*, No. 23-cv-945 (WLH) (AGR), 2023 WL 8251590, at *5 (C.D. Cal. Nov. 27, 2023) ("[A] link to a video from Defendant's Website does not create a subscription relationship because any user can access the video on the Website"); *Alex*, 2023 WL 6294260, at *4 ("Plaintiffs are no different than other visitors to the [ ] Websites as they did not gain access to exclusive content or receive extra benefits through their subscription"). [9]

 *11  These allegations, without more, fall short of establishing that plaintiff's subscription to Washington Examiner's email newsletter—consisting of written text along with "hyperlinks to [ ] video content" and "embedded videos," Am. Compl. ¶ 15—made plaintiff a subscriber to Washington Examiner's "audio-visual goods or services," Pl.'s Opp'n at 19 (citation omitted), rather than merely a subscriber to its other, "predominantly written, not video, good or service" that fall "outside the purview of the VPPA," *Heather v. Healthline Media, Inc.*, No. 22-cv-5059 (JD), 2023 WL 8788760, at *2 (N.D. Cal. Dec. 19, 2023); *see, e.g.*, *Tawam*, 2023 WL 5599007, at *5 (allegations that plaintiff "signed up for an email mailing list ... and separately viewed videos on Defendant's website" "are not sufficient to plausibly support the existence of a nexus between the alleged subscription and the video content at issue"); *Gardener*, 2023 WL 4365901, at *4–5 (similar).

By failing to link her newsletter subscription to the "viewing of [Washington Examiner's] video offerings," *Golden*, 2023 WL 5434378, at *11, or to allege that the "subscription allowed [ ] access to the videos on the [Washington Examiner] site that any member of the public would not otherwise have," *Salazar*, 2023 WL 5016968, at *9 (citations omitted), plaintiff has alleged only that she was a subscriber to Washington Examiner's newsletter, not to "audio-visual goods or services" provided by Washington Examiner, Pl.'s Opp'n at 19 (quoting *Carter*, 2023 WL 3061858, at *6). This is insufficient to make plaintiff a " 'consumer' ... of goods or services from a video tape service provider" entitled to bring a cause of action under the VPPA. 18 U.S.C. § 2710(a)(1). [10]

### IV. CONCLUSION
For the reasons stated above, plaintiff's Amended Complaint is dismissed, without prejudice, for failure to state a claim.

An order consistent with this Memorandum Opinion will be filed contemporaneously.

**All Citations**

Slip Copy, 2024 WL 324121

---

**Footnotes**

1   The article that triggered congressional focus on this issue was "The Bork Tapes" by Michael Dolan, WASH. CITY PAPER (Sept. 25–Oct. 1, 1987), which was intended to highlight the nominee's strict constructionist view that the U.S. Constitution affords no penumbral guarantee of privacy.

2   *See, e.g.*, *Lamb v. Forbes Media LLC*, No. 22-cv-6319 (ALC), 2023 WL 6318033, at *8 (S.D.N.Y. Sept. 28, 2023) (" '[A]t the pleading stage, [defendant's] alleged disclosure of plaintiffs' personal information and viewing activities describes [a] traditionally recognized harm' that is enough to confer standing." (quoting *Carter v. Scripps Networks, LLC*, No. 22-cv-2031 (PKC), 2023 WL 3061858, at *3 (S.D.N.Y. Apr. 24, 2023))); *Alex v. NFL Enterprises LLC*, No. 22-cv-09239 (ALC), 2023 WL 6294260, at *3 (S.D.N.Y. Sept. 27, 2023) ("Plaintiffs have sufficiently alleged they were injured when Defendants shared their private information and video watching data with Facebook without consent."), *appeal docketed*, No. 23-7455 (2d Cir. Oct. 20, 2023); *Salazar v. Nat'l Basketball Ass'n*, No. 22-cv-7935 (JLR), 2023 WL 5016968, at *6–7 (S.D.N.Y. Aug. 7, 2023) ("Here, Plaintiff alleges that NBA.com shared private information about ... his video viewership to a third party without his consent or knowledge .... [T]hese allegations [are] sufficient to establish concrete injury

(and standing) post-*TransUnion* because the 'disclosure of private information is a harm that courts have traditionally considered to be redressable.' " (citations omitted)), *appeal docketed*, No. 23-1147 (2d Cir. Aug. 10, 2023); *Salazar v. Paramount Glob.*, No. 22-cv-756, 2023 WL 4611819, at *7 (M.D. Tenn. July 18, 2023) ("Although Defendant attempts to make hay out of the Supreme Court's decision in *TransUnion* ... in *TransUnion*, the "Supreme Court concluded that plaintiffs whose information was disclosed to a third party suffered a concrete harm[.]" (citation omitted)), *appeal docketed*, No. 23-5748 (6th Cir. Aug. 21, 2023); *Adams v. Am.'s Test Kitchen, LP*, No. 22-cv-11309 (AK), 2023 WL 4304675, at *5–6 (D. Mass. June 30, 2023) ("[Plaintiff] alleges Defendants have violated her privacy rights under the VPPA by disclosing her [Facebook ID] ... and the video content name and its URL though their use of Pixel while she was a website subscriber.... Such allegations are sufficient to establish an injury in fact." (quotation marks and citation omitted)), *appeal docketed*, No. 23-1592 (1st Cir. July 24, 2023); *Martin v. Meredith Corp.*, 657 F. Supp. 3d 277, 283 (S.D.N.Y. 2023) ("[Plaintiff's] allegations that the defendants disclosed his private information to a third party without his consent are sufficient to confer standing." (citing *TransUnion LLC*, 594 U.S. at 425)), *appeal withdrawn*, No. 23-412, 2023 WL 4013900 (2d Cir. May 24, 2023); *Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1014–16 (D. Minn. 2023) (finding "this common law tradition" of intrusion upon seclusion "bears a close relationship to [plaintiff's] injury allegations" and "[t]hat seems enough at the motion-to-dismiss stage").

3   This finding that plaintiff's alleged privacy harms are sufficient at the pleading stage for standing renders addressing defendant's additional arguments regarding whether Washington Examiner also injured plaintiff's property and economic interests by profiting from disclosure of her private information, *see* Def.'s Mem. at 11; Def.'s Reply at 6, unnecessary.

4   Defendant cites two non-VPPA cases—*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1246 (11th Cir. 2022) (en banc), and *Crane v. Am. Bar Ass'n*, 663 F. Supp. 3d 747, 753 (E.D. Mich. 2023)—as support to argue that the injury of "disclosure of private information" requires "*public* disclosure," Def.'s Reply at 2–3 & n.2 (emphasis in original), but those cases, implicating distinct statutory schemes and common-law comparator torts, have no application here. *Hunstein* held that a debt collector's disclosure in alleged violation of the Fair Debt Collection Practices Act was not similar to the common-law tort of public disclosure as to constitute a concrete injury, where "the disclosure alleged [ ] lack[ed] the fundamental element of publicity," *Hunstein*, 48 F.4th at 1240, 1245–48, and the Eleventh Circuit later distinguished *Hunstein* on this basis, *see Drazen v. Pinto*, 74 F.4th 1336, 1345 (11th Cir. 2023) (whereas "the element of publicity was 'completely missing' " in *Hunstein*, "[h]ere [ ] none of the elements for the common-law comparator tort [of intrusion upon seclusion] are completely missing" (quoting *Hunstein*, 48 F.4th at 1245)). In *Crane*, the court held that the American Bar Association's disclosure of information in alleged violation of Michigan's Privacy Act was not sufficiently analogous to the common-law tort of invasion of privacy, where plaintiff "publicly advertised" the information. *Crane*, 663 F. Supp. 3d at 749, 752–53. Neither *Hunstein* nor *Crane* analogized the claimed statutory injury to the common-law tort at-issue here—*i.e.*, intrusion upon seclusion, for which "the 'intrusion itself' makes the defendant liable," *Eichenberger*, 876 F.3d at 983, 986 (quoting RESTATEMENT (SECOND) OF TORTS § 652B, cmt. b) (finding plaintiff "has Article III standing to bring his [VPPA] claim because 18 U.S.C. § 2710(b)(1) is a substantive provision protecting consumers' concrete interest in their privacy"); *see also* RESTATEMENT (SECOND) OF TORTS § 652B, cmt. a ("[Intrusion upon seclusion] does not depend upon any publicity given to the person whose interest is invaded or to his affairs.").

5   Defendant's reliance on two non-VPPA cases, *see* Def.'s Mem. at 12–13; Def.'s Reply at 3–4, that dismissed common-law intrusion upon seclusion claims for failure to allege "sufficiently offensive conduct" where plaintiffs were afforded notice of defendants' privacy policies, are inapposite, since neither case implicated the VPPA, let alone its consent provision. *See Manigault-Johnson v. Google, LLC*, No. 18-cv-1032 (BHH), 2019 WL 3006646, at *6 (D.S.C. Mar. 31, 2019) (dismissing common-law intrusion upon seclusion claim where plaintiffs failed to "allege that Defendants' conduct violated Defendants' privacy policies"); *Deering v. CenturyTel, Inc.*, No. 10-cv-63 (BLG) (RFC), 2011 WL 1842859, at *2–3 (D. Mont. May 16, 2011) (dismissing

intrusion upon seclusion claim where plaintiff "ha[d] been notified" via defendant's privacy policy "that his Internet activity may be forwarded to a third party" (citation omitted)).

6   Defendant urges that judicial notice be taken of its privacy policies, *see* Def.'s Reply at 4–5, but even if such notice were taken, those policies would be immaterial to the standing inquiry, where—as is uncontested, *see* Def.'s Mem. at 11—plaintiff has alleged defendant's failure to satisfy the VPPA's consent requirement.

7   Plaintiff alleges that Washington Examiner is a " 'video tape service provider' ... because it engaged in the business of delivering audio visual materials similar to prerecorded video cassette tapes," Am. Compl. ¶ 79 (quoting 18 U.S.C. § 2710(a)(4)), but defendant vigorously challenges whether the business of delivering news, including in the form of "video clips," fairly falls within this definition, *see* Def.'s Mem. at 13, 23–25 ("[T]he allegation that the Washington Examiner provides news through video clips, as well as text, does not make it a 'video tape service provider' under the VPPA because the video clips are not 'similar audio visual materials' to 'prerecorded video cassette tapes.' " (quoting 18 U.S.C. § 2710(a)(4)); Def.'s Reply at 14 ("[Plaintiff's] argument [ ] that the popularity of short-form videos today supports expanding the VPPA to cover *all* prerecorded videos reads 'similar' out of the statute and wrests the VPPA from its historical moorings." (emphasis in original)). This issue has not been addressed in this Circuit. Although the phrase "similar audio visual materials" has been interpreted as "medium-neutral," *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017) (citation omitted), and "to include new technologies for pre-recorded video content," *In re Hulu Priv. Litig.*, No. 11-cv-3764 (LB), 2012 WL 3282960, at *5–6 (N.D. Cal. Aug. 10, 2012) (citation omitted), treatment of the audio visual content available on Washington Examiner's website as "similar audio visual materials" to "prerecorded video cassette tapes," is an expansion from the statute's historical context, *see, e.g.*, S. Rep. 100-599, at 12 (identifying "laser discs, open-reel movies, or CDI technology" as examples of "similar audio visual materials"), and possibly beyond the scope of the textual tie requiring such content to be "similar" to a video cassette tape. Moreover, to qualify as a "video tape service provider" requires a defendant "to be engaged in the business of delivering video content" such that "the defendant's product must [be] ... significantly tailored to serve that purpose." *Sellers v. Bleacher Rep., Inc.*, No. 23-cv-368 (SI), 2023 WL 4850180, at *6 (N.D. Cal. July 28, 2023) (citation omitted). Based on the definitional prerequisite of "engaged in the business" of "delivery" of "similar audio visual materials," courts have rejected attempts to characterize "any company that creates its own video content, however ancillary to the company's purpose, [as] 'engaged in the business of' delivering audio visual content." *Markels v. AARP*, No. 22-cv-5499 (YGR), 2023 WL 6411720, at *3 (N.D. Cal. Aug. 29, 2023); *see also Sellers*, 2023 WL 4850180, at *6 (collecting cases). In any event, whether Washington Examiner, as a "media company that operates a news website and publishes a weekly magazine," Am. Compl. ¶ 31, meets this definitional prerequisite by making audio-visual content accessible on its website, need not be decided here, as this case is resolved on other grounds.

8   Given this conclusion, defendant's alternative bases for dismissal, namely: that (1) plaintiff is not a "consumer" because "[o]nly paying customers are consumers," Def.'s Mem. at 18–19; (2) defendant is not a "video tape service provider," *id.* at 13, 23; (3) defendant did not disclose "personally identifiable information" because plaintiff was not identified as "having requested or obtained specific video materials,' " *id.* at 4, 14–16 (quoting 18 U.S.C. § 2710(a)(3)) (emphasis omitted); and (4) defendant did not "knowingly disclose[ ]" the information of a consumer, *id.* at 13, 22–23, need not be resolved.

9   Plaintiff cites two cases for the proposition that plaintiff's "Washington Examiner newsletter subscription places her within the class of video-content consumers that the VPPA protects," Pl.'s Opp'n at 20 (citing *Harris v. Pub. Broad. Serv.*, 662 F. Supp. 3d 1327, 1333 (N.D. Ga. 2023), and *Goldstein v. Fandango Media, LLC*, No. 22-cv-80569, 2023 WL 3025111, at *4 (S.D. Fla. Mar. 7, 2023)), but these cases are factually distinguishable. In *Harris*, the plaintiff "registered for a PBS account" and received " 'restricted content' in the form of newsletters and email updates," *Harris*, 662 F. Supp. 3d at 1332, but, in contrast here, plaintiff "does

not allege that she established an account or that she took any action that gave her privileged access to [ ] the videos," Def.'s Reply at 9. In *Goldstein*, plaintiffs "had downloaded the Fandango App on their phones to purchase movie tickets," but as plaintiff acknowledges, *see* Pl.'s Opp'n at 20, no decision was rendered on "whether Plaintiffs [were] 'consumers' as defined in the VPPA," upon finding the factual record insufficient to resolve that issue, *Goldstein*, 2023 WL 3025111, at *4.

Though not cited by the parties, other decisions have found VPPA "subscriber" status adequately alleged where plaintiffs subscribed to a defendant's newsletter, consistent with plaintiff's position urged here. *See, e.g., Buechler v. Gannett Co., Inc.*, No. 22-cv-1464 (CFC), 2023 WL 6389447, at *2 (D. Del. Oct. 2, 2023) (rejecting argument that "because Plaintiffs' purported [newsletter] 'subscription' bears no connection to the video content available on *The Tennessean* website, it does not fall within the VPPA's ambit" (citation omitted)); *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1340 (N.D. Ga. 2022) (finding plaintiff a "subscriber" where she "exchanged her email address to receive the WebMD e-newsletter and [ ] also created her own WebMD account"). The reasoning of these decisions that a plaintiff's subscription to one part of defendant's business—a newsletter—may establish plaintiff's subscription to another business component, *i.e.*, defendant's website providing audio-visual content generally accessible without a newsletter subscription, is difficult to square with the VPPA's text requiring a "consumer" to be a "subscriber of goods or services," 18 U.S.C. § 2710(a)(1), obtained from a provider "engaged in the business ... of rental, sale, or delivery of ... similar audio visual materials," *id.* § 2710(a)(4) This text, as explained *supra*, Part III.B, strongly indicates the necessity of "a factual nexus or relationship between the subscription provided by the defendant and the defendant's allegedly actionable video content," *Tawam*, 2023 WL 5599007, at *5 (citations omitted). Thus, by contrast to plaintiff here, in cases where plaintiffs subscribed to or created an account for access to a defendant's website, providing access to videos with Meta Pixel embedded, courts have found a connection between the provision of plaintiffs' PII and the "goods or services" plaintiffs consumed sufficient to support the conclusion that the plaintiffs qualify as VPPA "subscribers." S*ee, e.g., Ghanaat v. Numerade Labs, Inc.*, No. 4:23-cv--833 (YGR), 2023 WL 5738391, at *5 (N.D. Cal. Aug. 28, 2023); *Jackson v. Fandom, Inc.*, No. 22-cv-4423 (JST), 2023 WL 4670285, at *3–4 (N.D. Cal. July 20, 2023).

10  Plaintiff requests an opportunity to amend her complaint a second time in the event "any deficiencies" are found. Pl.'s Opp'n at 24 n.6. To be sure, courts "should freely give leave when justice so requires," FED. R. CIV. P. 15(a)(2), but "Rule 15(a)—even as liberally construed—applies only when the plaintiff actually has moved for leave to amend the complaint; absent a motion, there is nothing to be freely given," *Schmidt v. United States*, 749 F.3d 1064, 1069 (D.C. Cir. 2014) (quoting *Belizan v. Hershon*, 434 F.3d 579, 582 (D.C. Cir. 2006)); *see also* Def.'s Reply at 14. Without a motion for leave to amend, plaintiff's VPPA claim must be dismissed. Defendant urges that dismissal with prejudice is warranted, *see* Def.'s Reply at 15, because "plaintiff could not possibly cure the deficiency by alleging new or additional facts," *United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 936 (D.C. Cir. 2017) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (quotation marks omitted)), but that conclusion seems premature on this record and therefore dismissal is without prejudice.