Adrian R. Bacon (SBN 280332)
**THE LAW OFFICES OF**
**TODD M. FRIEDMAN, P.C.**
21031 Ventura Blvd, Suite 340
Woodland Hills, CA 91364
Telephone: (323) 306-4234
Facsimile: (866) 633-0228
Email: abacon@toddflaw.com

*Counsel for Plaintiffs*

*[Additional Counsel listed on signature block]*

### UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF CALIFORNIA

EMILY HEERDE and MARK HAINES, on Behalf of Themselves and All Others Similarly Situated,

            Plaintiffs,

v.

LEARFIELD COMMUNICATIONS, LLC, SIDEARM SPORTS, LLC, and UNIVERSITY OF SOUTHERN CALIFORNIA

            Defendants.

**Case No.: 2:23-cv-04493-FLA-MAAx**

**AMENDED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

        Plaintiffs Emily Heerde and Mark Haines ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this class action complaint against defendants Learfield Communications, LLC and Sidearm Sports, LLC, (collectively, the "Defendants"). The Defendants controlled and operated University of Southern California's ("USC") college athletic program website, https://usctrojans.com/ (the "Trojans Website," as well as the websites of 173 NCAA Division 1 Teams (the "Team Websites")[1]). The Team

---

[1] The 173 Team Websites represent the sites that investigatory work performed on behalf of Plaintiffs confirmed the employment of the tracking tools (described) which underpin Plaintiffs' claims. To the extent Plaintiffs confirm additional sites

1

Websites, including the Trojans Website utilized tracking tools created by Google, Meta, Oracle, The Trade Desk, and comScore (collectively referred to as the tracking entities). The Defendants employed the tracking entities' tools to intercept communications between visitors and subscribers to the Team Websites. These tracking tools, as implemented by Defendants, resulted in the violation of California's Invasion of Privacy Act (CIPA) and the Video Privacy Protection Act (VPPA). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## <u>NATURE OF THE ACTION</u>

1.      This is a class action brought on behalf of all persons who: (i) visited https://usctrojans.com/ or any of the Team Websites operated by or based on the Teams' and Defendants guidelines, coding, and content; and, either (a) subscribed to the Team Websites before watching pre-recorded videos on the subscribed-to Team Website (the "subscribers"), or (b) used the search function (the "Search Bar") built into the Team Websites (the "visitors" or "users").

2.      The Team Websites provide users with access to articles, sports team statistics, and video content related to the university's athletics, including pre-recorded clips of games, interviews with players and team staff, sports analysts, and more.

3.      The Team Websites offer the option for users to subscribe to e-newsletters and/or ticket purchasing accounts. Newsletter subscribers are given email updates regarding the Teams and content on the Team Websites in exchange for their contact information. The newsletter email updates include links to the

---

operating under the same overarching purview and structure of the Defendants, they will seek to amend.

Team Websites, with direct links to articles and pre-recorded videos for subscribers to watch on the Team Websites.

4.    The Team Websites associated with each Team, such as the Trojan Website, benefit from the newsletters.  The subscriptions to newsletter emails provide increased traffic to the Team Websites and boosted revenue, allowing for easy segmentation and customization for marketing materials.

5.    The Team Websites, including the Trojans Website, do not disclose that subscribers' personal identifying information ("PII") would be captured by the Facebook Pixel (referred to as the "Pixel," discussed and defined herein), and then transferred to Facebook.  The Team Websites, including the Trojans Website, do not inform site subscribers or site visitors that their PII would be exposed, available and readily usable by any person of ordinary technical skill who received that data.

6.    The Team Websites, including the Trojans Website, also use Google's Programmable Search Engine (the "PSE") to implement search functions (the "Search Bar"), which allows visitors to type search queries or search terms (the "Search Terms") into the Search Bar to search for specific content on the Team Websites.  While the Search Bars appear to be under the control of the Team Websites, and the associated searches appear to be limited to the specific site on which the search is run, the Search Bars implemented by the Defendants are, in reality and without attribution, actually implementations of Google's PSE.  After typing and submitting Search Terms into the Search Bar, lists of results are obtained from the PSE and sent to visitors, while still veiling Google's management of the Search Bar.

7.    The Team Websites do not provide users or subscribers with notice that – and no opportunity to consent to – the Team Websites' use of a Search Bar would cause their Search Terms to be shared with various third parties.  The Team Websites do not provide users or subscribers with notice that – and no opportunity to consent to – the Team Websites' use of a search engine that itself is run by a

third-party (Google), which uses the Search Terms to benefit Google's own products separate from the services it renders to the Defendants, while sharing revenue from the advertising itself.

8. Data sharing policies for a service or subscription is an important factor for individuals deciding whether to provide personal information to that service.

9. Congress has recognized the immediate and irreversible harm caused by associating a person's personally identifiable information in conjunction with their video watching.

10. The Video Privacy Protection Act ("VPPA"), prohibits video tape service providers,[2] such as Defendants, from sharing PII tied to the title, description, or subject matter of pre-recorded audio video material[3] (the "Video Watching Data") without valid consent.[4]

11. Congress made clear that the harm to individuals impacted by VPPA violations occurs the moment, and each time, a subscriber's information is shared.

12. The Defendants purposefully implemented and utilized the Pixel, which tracks user activity on the Team Websites and discloses that information to Facebook to gather valuable marketing data. The Pixel cannot be placed on Team Websites without steps taken directly by or on behalf of the teams (*e.g.*, by a website manager). The Pixel cannot be placed on the Team Websites by Facebook without the knowledge and cooperation of the website owners. Here, the Pixel was employed on the Trojan's Website and could not have been placed there without purposeful action on the part of Defendants.

---

[2] 18 U.S.C. § 2710(a)(4).
[3] 18 U.S.C. § 2710(b)(2)(D)(II).
[4] 18 U.S.C. § 2710.

13. Defendants do not seek and have not obtained consent from subscribers to utilize the Pixel to track, share, and exchange their PII and Video Watching Data with Facebook.

14. Defendants knew that the Pixel resulted in users' PII and Video Watching Data being shared (resulting in VPPA violations), and that they failed to obtain users' consent to allow the Pixel to operate in a way that shares users' protected information with Facebook.

15. Subscribers of the Team Websites have been harmed as a result of violations of the VPPA. In addition to monetary damages, Plaintiffs seek injunctive relief requiring Defendants to immediately (i) remove the Pixel from the Team Websites, or (ii) add adequate notices, and obtain the appropriate consent from, subscribers.

16. Federal and California legislatures addressed citizens' privacy expectations when communicating with parties over wired communications.

17. Congress passed the Wiretap Act, which prohibits the unauthorized interception of electronic communications.

18. California passed the California Invasion of Privacy Act ("CIPA"), which attaches liability to any person who, willfully and without the consent of all parties to a communication, attempts to read or to learn the contents or meaning of any message or communication while it is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within California.[5]

19. Defendants purposefully implemented and utilized various marketing tools to intercept and read the Search Terms, including Google's advertising tools, Oracle's advertising tools, Facebook's Pixel, comScore's tracking tools, and The Trade Desk's Universal Pixel.

---

[5] Cal. Penal Code § 631(a).

20.    Users and subscribers of the Team Websites, including the Trojan's Website, are not notified that the Team Websites' search engines are managed by a third-party, and the Team Websites, including the Trojan's Website, do not obtain consent to share visitors' Search Terms with third parties contemporaneously with visitors' search requests.

21.    Defendants knew that the search engine used on the Team Websites would feed visitors' Search Terms to the tracking tools implemented by Team Defendants on the Team Websites, and that the Team Websites did not provide notice of or obtain consent as to such practices.

22.    Visitors of the Team Websites who used the Search Bars have been harmed by Defendants, resulting in violations of CIPA and the Wiretap Act.  In addition to monetary damages, visitor Plaintiffs seek injunctive relief requiring Defendants to immediately (i) remove the tracking tools from the Team Websites, or (ii) add appropriate and conspicuous disclosures about the nature of its Search Bar, and obtain the appropriate consent from visitors.

23.    Finally, Plaintiffs had their privacy interests, enshrined under Article 1, Section 1 of California's Constitution, violated.

24.    Visitors and subscribers of the Team Websites, such as Plaintiffs' subscription to the Trojans Website, have an interest in maintaining control over their private and sensitive information, such as their Search Terms, as well as an interest in preventing their misuse.

25.    Plaintiffs' claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons.  Plaintiffs seek relief in this action individually and on behalf of subscribers and other general users or visitors of the Team Websites for violations of the VPPA, 18 U.S.C. 2710, violations of CIPA, Cal. Penal Code § 631(a), violations of the Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e), and for violating privacy rights as established by California's Constitution.

26. Defendants violated the VPPA the moment, and each time, Plaintiffs and the class members they seek to represent in connection with their VPPA claims, requested, obtained, or watched a video on the Team Website and had their PII shared.

27. Defendants violated CIPA, the Wiretap Act, and visitors' privacy interests the moment, and each time, Plaintiffs and members of the Site User Class (as defined below) entered and submitted Search Terms via the Team Website's Search Bar and had their Search Terms intercepted by the tracking tools.

## **PARTIES**

28. Plaintiff Emily Heerde is a resident of California. In or about 2019, Ms. Heerde subscribed to the USC Trojans e-newsletter. During the sign-up process, Ms. Heerde was not provided an opportunity to review or consent to share her information, or consent to the use of the tracking tools, or to the sharing of any of her personal information such as her statutorily protected web watching information. Ms. Heerde watched prerecorded video content on the USC Trojans Website including football game recaps along with other sports related material, using a Chrome browser on a device that was signed into Facebook, as recently as October 2022 resulting in Ms. Heerde's PII and Video Watching Data being shared with Facebook. Ms. Heerde's Facebook profile included personally identifiable information, such as her name, gender, location, which colleges she attended, her fields of study at college, her family members, and pictures of her. Ms. Heerde also utilized the Website's search function to search for football schedules and apparel on the Website.    The Trojans Website search bar did not include the Google powered or enhanced by language when Ms. Heerde visited the Trojan's website, and utilized the search function.

29. Plaintiff Mark Haines is a resident of California. In or about 2015, Mr. Haines subscribed to the USC Trojans newsletter.  Mr. Haines also has a USC ticket account through the Team Website, which he has had for the last several years.

During the sign-up process, Mr. Haines was not provided an opportunity to review or consent to share his information, or consent to the use of the tracking tools detailed herein, or to the sharing of any of his personal information such as the statutorily protected web watching. Mr. Haines subsequently watched prerecorded video content on the Trojans Website including football and baseball highlights, using a Chrome web browser on a device that was signed into Facebook.  By way of example, as recently as April 2023, Mr. Haines recalls watching video content on the Trojans Website, resulting in Mr. Haines PII and Video Watching Data being shared with Facebook. Specifically, Mr. Haines watched the USC baseball highlights, including a specific instance from a walk-off win by the USC against UCLA on April 23, 2023, and various football game highlights in the fall of 2022, among viewing other sports content.  Mr. Haines also receives e-newsletter and has accessed the Team Website through the USC newsletter to view pre-recorded video content and to utilize the Team Website's search function. Mr. Haine's Facebook profile included personally identifiable information such as his name, location, gender, establishments that he frequents and has reviewed near his home, and pictures of him. Mr. Haines also utilized the Team Website's search function.  The search function can be used to find a variety of content, including videos on the Trojans Website.  Mr. Haines used the Trojans Website's search bar.  He was not aware that the search bar was not a product of USC or limited to the website; but rather, was actually a Google powered or enhanced search bar.

30.    Defendant Learfield Communications, LLC ("Learfield") was formed in the state of Delaware and is a collegiate sports marketing company with headquarters at 2400 Dallas Parkway, Suite 500 Plano, Texas 75093. Learfield works to connect companies, including Fortune 500 businesses and Interbrand's brands, to fans.  It "provide[s] solutions to [its] partners that include multimedia rights representation, licensing, broadcasting, ticketing, digital solutions, seat sales, in-venue technology, data and brand management, on-location signage, hospitality,

and social media."[6]  Defendant Learfield can be served by serving its registered agent, C T Corporation System, 350 North St. Paul, Suite 2900, Dallas, Texas 75201.

31.    Defendant Sidearm Sports, LLC ("Sidearm Sports") was formed in the state of Missouri with headquarters at 109 S. Warren Street, Suite 600, Syracuse, New York 13202, and an office shared with Learfield at 2400 Dallas Parkway, Suite 500, Plano, Texas 75093. Sidearm Sports provides "official websites, mobile apps, live streaming, stats and more" for "the biggest brands in sports."[7]  In 2014, Learfield purchased Sidearm Sports. Sidearm Sports manages websites and mobile platforms, as well as provides the hosting and infrastructure, for colleges and high schools.[8]  Sidearm Sports and Learfield (collectively "Defendants") packaged their services and offered them to prospective partners, including numerous colleges' sports team websites.[9] Sidearm Sports can be served by serving its registered agent in the state of Missouri, C T Corporation System, 120 South Central Avenue, Clayton, Missouri 63105 or its registered agent in the state of New York, C T Corporation System, 28 Liberty Street, New York, New York 10005.

32.    Non-party University of Southern California is a California-based private university with its principal place of business in Los Angeles, California. USC operates and promotes an institution of higher learning and its associated

---

[6] *Working at LEARFIELD*, LEARFIELD, https://www.learfield.com/working-at-learfield/ (last visited on August 9, 2024).

[7] *About Us: SIDEARM 101*, SIDEARM SPORTS, https://sidearmsports.com/history (last visited on August 9, 2024).

[8] *CBS Interactive Advanced Media, Learfield's Sidearm Sports Partners in College Sports*, SVG NEWS, https://staging.sportsvideo.org/2018/02/12/cbs-interactive-advanced-media-and-learfields-sidearm-sports-to-partner-in-college-sports/ (last visited on August 9, 2024).

[9] *Learfield Sports to Acquire Sidearm Sports*, LEARFIELD, https://www.learfield.com/2014/06/learfield-sports-to-acquire-sidearm-sports-2 (last visited on August 9, 2024).

collegiate sports teams, including through the development of websites and mobile apps.

33.    Tracking entity Google was incorporated in 1998 as a search engine provider and seeks to "organize the world's information and make it universally accessible and useful."[10]  Google's corporate headquarters are in Mountain View, California and has 70 offices across 50 countries.  Google typically monetizes its search engines with various forms of advertising.[11]

34.    Tracking entity Meta Platforms, Inc. ("Facebook") was incorporated in 2004.  Facebook is currently incorporated in the state of Delaware and has its headquarters in Menlo Park, California.  Facebook provides free social media services to users in exchange for providing users advertising, and also provides and sells marketing tools and advertising space to advertisers.

35.    Tracking entity Oracle is a software and cloud services provider founded in 1977.  Oracle has its headquarters in Austin, Texas, and provides a variety of services, including its marketing automation platform called Eloqua, which it purchased in 2012.[12]

36.    Tracking entity The Trade Desk ("Trade Desk") was founded in 2009 and is headquartered in Ventura, California. The Trade Desk specializes in the field of real-time programmatic marketing automation[13] and provides a platform for such

---

[10] *About Google*, GOOGLE, https://about.google/ (last visited August 9, 2024).

[11] *Google Search – Our approach to Search*, GOOGLE, https://www.google.com/search/howsearchworks/our-approach/ (last visited August 9, 2024) ("Ads are how Search remains accessible to everyone.")

[12] *Press Release: Oracle Buys Eloqua*, ORACLE, https://www.oracle.com/corporate/pressrelease/oracle-buys-eloqua-122012.html (last visited August 9, 2024).

[13] Programmatic advertising is an automated method of purchasing and fine-tuning digital advertising campaigns, eliminating the need for direct negotiations with publishers.[13] Its purpose is to leverage machine learning and AI optimization, replacing the need for human intervention.  Programmatic advertising allows

purposes.[14] The Trade Desk provides its advertising technologies to leading companies in the advertising industry, such as Walmart, Volkswagen, Samsung Electronics, and CIGNA Corporation.[15]

37. Tracking entity ComScore, Inc. ("comScore") is a leading analytics company that specializes in measuring and analyzing consumer behavior across various digital platforms.[16] Founded in 1999[17], comScore provides comprehensive insights into online audiences, advertising effectiveness, and e-commerce trends.[18] The company utilizes advanced methodologies and technologies to collect and analyze data, offering clients valuable information to optimize their marketing

---

advertisers to use an algorithm to determine the most effective allocation of their advertising budget. An advertiser may simply provide the programmatic advertising solution with details regarding their campaign, target audience, and key performance indicators, and let the algorithm handle the complex task of deciding how to allocate resources.   The result is that when a user visits a webpage, a communication is sent in real time to an ad exchange which is supplied through a demand side platform, such as the Trade Desk, to provide that user with an ad based on calculations as to what that user's impression is worth to each advertiser.

[14] *The Trade Desk: The Leading Independent Platform for Programmatic Advertising*, DIGITAL INITIATIVE, https://d3.harvard.edu/platform-digit/submission/the-trade-desk-the-leading-independent-platform-for-programmatic-advertising/ (last visited August 9, 2024).

[15] *List of The Trade Desk Customers*, APPS RUN THE WORLD, https://www.appsruntheworld.com/customers-database/products/view/the-trade-desk (last visited August 9, 2024).

[16] *Comscore: What They Do And How Their Rankings (Actually) Work*, EZOIC, https://www.ezoic.com/comscore-rankings-how-they-work/ (last visited August 9, 2024).

[17] *Comscore Celebrates a Decade of Innovation*, COMSCORE: BLOG (Dec. 16, 2009) https://www.comscore.com/lat/Prensa-y-Eventos/Blog/comScore-Celebrates-a-Decade-of-Innovation (last visited August 9, 2024).

[18] *Comscore: What They Do And How Their Rankings (Actually) Work*, EZOIC, https://www.ezoic.com/comscore-rankings-how-they-work/ (last visited August 9, 2024).

strategies and make data-driven decisions.[19] ComScore's measurement solutions cover diverse industries, serving digital publishers, television networks, movie studios, content owners, brand advertisers, agencies, and technology providers.[20] ComScore tracks more than three million unique websites across the world and promotes that it has "approximately two million worldwide consumers under continuous measurement."[21]

## JURISDICTION AND VENUE

38.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class Member is a citizen of a state different from at least one Defendant.

39.    This Court has personal jurisdiction over Defendants because Defendants purposefully directed its activities to California by selling tickets for and operating the website for a California-based athletic teams, and Defendants derive revenue in the State of California, including the Defendants' revenue generation from its management and operational control over the Trojans Website, as well as the revenue sharing, advertising sales, etc. that the Defendants derive from the Trojans Website.

40.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because both Plaintiffs reside in this District, and the harm occurred in this district, as the tracking tools were loaded onto Plaintiffs' devices in this District and caused the

---

[19]    *comScore Inc*, BLOOMBERG, https://www.bloomberg.com/profile/company/SCOR:US#xj4y7vzkg (last visited August 9, 2024).

[20]    *comScore, Inc. (SCOR)*, YAHOO! FINANCE, https://finance.yahoo.com/quote/SCOR/profile/ (last visited August 9, 2024).

[21] *ScorecardResearch (ComScore): What is it and what does it do?*, THE GUARDIAN, https://www.theguardian.com/technology/2012/apr/23/scorecardresearch-tracking-trackers-cookies-web-monitoring (last visited August 9, 2024).

interception and transmission of Plaintiffs' PII and Video Watching data in this district. In addition, USC's principal place of business is located in this District and Defendants conduct substantial business operations in this District. In connection with the Team Website, the video content, hosting of media accessible to subscribers, and associated coding, all originate and arise out of the Defendants' business operations in this District.

### COMMON FACTUAL ALLEGATIONS

**A.    Legislative Background**

**a.    The Video Privacy Protection Act**

41.    "The Video Privacy Protection Act follows a long line of statutes passed by the congress to extend privacy protection to records that contain information about individuals." S. Rep. No. 100-599 at 2 (1988). Starting with the Fair Credit Reporting Act of 1970, Congress sought to protect the "confidentiality of personal information" and passed multiple laws that "expanded and [gave] meaning to the right of privacy." *Id.*

42.    In 1977, Congress amended the Privacy Act, which mandated the creation of the Privacy Protection Study Commission ("the Commission"), which studied "'data banks, automated data processing programs, and information systems of governmental, regional, and private organizations, in order to determine the standards and procedures in force for the protection of personal information.'" *Id.* (quoting 95-38). The Commission concluded that an effective national information policy must: (i) minimize intrusiveness; (ii) maximize fairness; and (iii) create legitimate, enforceable expectations of confidentiality. *Id.* "As a general rule, the Commission recommended that organizations which maintained a confidential records system be placed under a legal duty not to disclose the record without the consent of the individual, except in certain limited circumstances. . . ." *Id.* at 2-3.

43.    In 1988, Congress was again forced to act when a Washington-based newspaper published a profile of Judge Robert H. Bork "based on the titles of 146

films his family had rented from a video store." *Id.* at 5. Senators took to the floor to denounce the act, with Senator Patrick Leahy noting that:

> In an era of interactive television cables, the growth of computer checking and check-out counters . . . all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch . . . I think it is something that we have to guard against.

*Id.* at 5-6.

44. Congress believed that these "information pools" created privacy interests that directly affected the ability of people to freely express their opinions, join in association with others, or enjoy the general freedoms and independence protected by the Constitution. *Id.* at 7.

45. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." *Id.* at 7-8 (statements of Sens. Simon and Leahy, respectively).

46. Senator Simon lamented that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." *Id.* at 6-7.

47. As a result, Senate Bill 2361 was drafted to "give meaning to, and thus enhance, the concept of privacy for individuals in their daily lives" by prohibiting "unauthorized disclosures of personal information held by video tape providers." *Id.* at 6.

48. When contemplating the VPPA, Congress noted Supreme Court precedent recognizing a privacy right in the lists that reveal personal beliefs and an individual's choice of books and films. *Id.* at 4.

49.    The VPPA regulates the disclosure of information about consumers' consumption of video content, imposing specific requirements to obtain consumers' consent to such disclosure. Under the statute, for each violation of the statute, a court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

50.    The statutory damages were deemed "necessary to remedy the intangible harm caused by privacy intrusions." *Id.* at 8.

51.    The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4). The VPPA was initially passed in 1988 for the purpose of protecting the privacy of individuals' video rental, purchase, and viewing data.

52.    In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

53.    During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy stated that "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social

networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[22]

54.    Defendants here are video service providers in that they provided pre-recorded audio-visual materials to Plaintiffs and Class Members on their Team Websites.

55.    The relationship between Plaintiffs and Defendants is precisely the type of relationship contemplated by the VPPA.

56.    In this case, Plaintiffs' personal viewing information was knowingly and systematically disclosed to Facebook, without obtaining their consent.

### b.    The Federal Wiretap Act

57.    The Federal Wiretap Act (the "Wiretap Act") was enacted in 1934 "as a response to Fourth Amendment concerns surrounding the unbridled practice of wiretapping to monitor telephonic communications."[23]

58.    The Wiretap Act primarily concerned the government's use of wiretaps but was amended in 1986, through the Electronic Communications Privacy Act ("ECPA"), to provide a private right of action for private intrusions as though they were government intrusions.[24]

---

[22] See *Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE JUDICIARY COMMITTEE SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW, *available at* https://www.judiciary.senate.gov/download/hearing-transcript_-the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last visited on August 9, 2024).

[23] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, WASHINGTON AND LEE JOURNAL OF CIVIL RIGHTS AND SOCIAL JUSTICE, *available at* https://scholarlycommons.law.wlu.edu/cgi/viewcontent.cgi?article=1541&context=crsj (last visited August 9, 2024).

[24] *Id.* at 192.

59.   Congress was concerned that technological advancements were rendering the Wiretap Act out-of-date, such as "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing."[25]

60.   As a result, the ECPA primarily focused on two types of computer services which were prominent in the 1980s: (i) electronic communications such as email between users; and (ii) remote computing services such as cloud storage or third party processing of data and files.[26]

61.   Title I of the ECPA amended the Wiretap Act such that a violation occurs when a person or entity: (i) provides an electronic communication service to the public; and (ii) intentionally divulges the contents of any communication; (iii) while the communication is being transmitted on that service; (iv) to any person or entity other than the intended recipient of such communication.

62.   While communicating on the Team Websites, users had the contents of their communications shared with Defendants and the tracking entities.

63.   The Defendants purposefully disclosed Plaintiffs' communications to the tracking entities to improve the effectiveness of the tracking entities' advertising and marketing or to place third-party ads on the Team Websites.

64.   Plaintiffs did not know of or consent to the dissemination of their communications to Defendants and the tracking entities.

65.   Defendants and the tracking entities were not parties to the communications, as Plaintiffs did not know of their involvement in the communications, and Defendants and the tracking entities used the intercepted communication for their benefit outside of the Team Websites.

---

[25] Senate Rep. No. 99-541, at 2 (1986).
[26] *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1103 (9th Cir. 2014).

17

### c.  California Invasion of Privacy Act

66.    CIPA was enacted in 1967 for the expressly stated purpose "to protect the right of privacy of the people of [California]."[27]  The California legislators were concerned about emergent technologies that allowed for the "eavesdropping upon private communications," believing such technologies "created a serious threat to the free exercise of personal liabilities and cannot be tolerated in a free and civilized society."[28]

67.    CIPA is regularly recognized as California's analog to the Federal Wiretap Act, comprised of the same general elements and protect against the same general harms.

68.    To protect people's privacy, legislators broadly protected wired and aural communications being sent to or received from California.[29]  Notably, for wired communications, California set out to prohibit (i) intentional wiretapping or (ii) willful attempts to learn the contents of wired communications, (iii) attempts to use or transmit information obtained through wiretapping, or (vi) aiding, agreeing with, employing, or conspiring with any person(s) to unlawfully do, permit, or cause the preceding three wrongs.[30]

69.    CIPA also prohibits the manufacture, assembly, sale, offer for sale, advertisement for sale, possession, or furnishment to another of devices which are primarily or exclusively designed or intended for eavesdropping upon the communication of another.[31]

70.    CIPA claims are often treated as analogous to Wiretap Act claims.

---

[27] Cal. Penal Code § 630
[28] *Id.*
[29] Cal. Penal Code § 631-32.
[30] *Mastel v. Miniclip SA*, 549 F. Supp. 3d 1129, 1134 (E.D. Cal. 2021) (citing *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978)).
[31] Cal. Penal Code § 635.

**B.**    **The Team Websites are Managed by Defendants**

        **a.**    **USC granted authority over the Trojan's Website to the Defendants**

71.    Learfield is a collegiate sports marketing company with headquarters at 2400 Dallas Parkway, Suite 500 Plano, Texas 75093. Learfield represents more than 200 of the nation's top collegiate properties including the NCAA, leading conferences, and many colleges and universities in the country.[32]

72.    Sidearm Sports is a provider of collegiate athletic web solutions with headquarters at 109 Warren Street, Suite 600, Syracuse, New York 13202. It manages websites and mobile platforms, as well as provide the hosting and infrastructure, for colleges and high schools.[33]

73.    In 2014, Sidearm Sports was purchased by Learfield,[34] which packaged their services and offered them to prospective partners, including numerous colleges' sports team websites.[35]    Sidearm Sports and Learfield implemented their web-based solutions for college teams, providing services ranging from digital marketing and web development to intellectual property rights service associated with partner schools' websites (referred to collectively as "Web Services").[36]

---

[32]    *Learfield    –    IMG    College*,    LADDERS, https://www.theladders.com/company/learfield-img-college-jobs (last visited on August 9, 2024).

[33] *CBS Interactive Advanced Media, Learfield's Sidearm Sports Partners in College Sports*, SVG NEWS, https://staging.sportsvideo.org/2018/02/12/cbs-interactive-advanced-media-and-learfields-sidearm-sports-to-partner-in-college-sports/ (last visited on August 9, 2024).

[34]    *Learfield    Sports    to    Acquire    Sidearm    Sports*,    LEARFIELD, https://www.learfield.com/2014/06/learfield-sports-to-acquire-sidearm-sports-2 (last visited on August 9, 2024).

[35] *Id.*

[36] *Working at LEARFIELD*, LEARFIELD, https://www.learfield.com/working-at-learfield/ (last visited on August 9, 2024).

74.    Defendants' Web Services are used for college sports websites across the nation.    Defendants run and operate the websites of 1,100 college and universities,[37] including 300 of the 320 schools in Division 1 Sports.[38]

75.    Defendants tout that they are a "trusted provider of official websites, mobile apps, live streaming, stats and more [for college teams]."[39] Defendants "offer[] [their] clients an easy-to-use interface" which includes "content streams and digital presence."[40]

76.    Defendants also offer turn-key Web Services to colleges allowing college teams to select from pre-designed websites, which they describe as "plug and play."[41]  Defendants, in effect, assume the license for the colleges' name and intellectual property for matters pertaining to the college websites.[42]  In essence the Defendants are assuming complete control over the operation of the Trojan Website.

77.    As part of an announced website redesign using Defendants Web Services, a private university stated that Defendants "will manage the website and

---

[37] *Sidearm Sports, which runs 1,100 college websites from Syracuse, makes big move*, SYRACUSE.COM, https://www.syracuse.com/business-news/2018/09/sidearm_sports_which_runs_1100_college_websites_from_syracuse_makes_big_move.html#:~:text=Eighteen%20years%20later%2C%20his%20company,schools%20in%20Division%201%20sports (last visited on August 9, 2024).

[38] Work at SIDEARM: Openings, Sidearm Sports, https://sidearmsports.com/openings?gh_jid=5533939003 (last visited on August 9, 2024).

[39] *About Us: SIDEARM 101*, SIDEARM SPORTS, https://sidearmsports.com/history (last visited on August 9, 2024).

[40] *Learfield Sports to Acquire Sidearm Sports*, LEARFIELD, https://www.learfield.com/2014/06/learfield-sports-to-acquire-sidearm-sports-2 (last visited on August 9, 2024).

[41] *Our Services: Turn-Key Websites*, SIDEARM SPORTS, https://sidearmsports.com/turnkey/ (last visited on August 9, 2024).

[42] *Id.*

mobile platforms while providing the hosting and infrastructure for all of the schools."[43]

78.     Defendants offer a "streaming platform [that] deploys an original solution where fans [are] able to find live, original ***and pre-recorded*** content all in one central location."[44] Defendants state that their "[s]treaming [platform] is our single most opted in product for our partners."[45]

79.     In 2018, Learfield announced a partnership with CBS Interactive Advanced Media to produce and operate more than 1,100 college and high school athletic websites, and a source of thousands of pre-recorded audio visual materials. Additionally, the partnership would allow for the streaming of more than 14,000 live events each year,[46] many of which may be archived and viewed after the live stream.

80.     Colleges that have used Defendants' Web Services have noted that using Defendants "[offers] more revenue generation opportunities."[47]

81.     One public university website described Defendants' Web Services to include the integration of "records on [their] home page to display a snapshot of each team's performance, a social media wall that integrates engaging content onto

---

[43] *LMU Athletics Launches Website Redesign with SIDEARM Sports*, LOYOLA MARYMOUNT                    UNIVERSITY                    ATHLETICS, https://lmulions.com/news/2018/8/1/baseball-lmu-athletics-launches-website-redesign-with-sidearm-sports (last visited on August 9, 2024).
[44] *Our     Services:     SIDEARM     Streaming*, SIDEARM     SPORTS, https://sidearmsports.com/streaming/ (last visited on August 9, 2024).
[45] *Id.*
[46] *CBS Interactive Advanced Media and Learfield's Sidearm Sports to Partner in College Sports*, LEARFIELD, https://www.learfield.com/2018/02/cbs-interactive-advanced-media-learfields-sidearm-sports-partner-college-sports/ (last visited on August 9, 2024).
[47] *See, e.g.*, *YSU Athletics Joins SIDEARM Sports Family*, YOUNGSTOWN STATE UNIVERSITY SPORTS, https://ysusports.com/news/2022/5/17/general-ysu-athletics-joins-sidearm-sports-family.aspx (last visited on August 9, 2024).

the website, and embedded videos and photo galleries to aid in storytelling through a visual medium."[48]

82.    A private school announced their partnership with Defendants in 2019 stating that "Sidearm Streaming will provide an All-Access homepage for *video content*, which will house live webcasts, *archived game content*, highlights, features, and interviews with players and coaches."[49]

83.    With respect to ownership rights, Defendants' contracts state that:

> *b. Scope of Relationship between College Teams and Sidearm*
> Sidearm shall be the owner of the [Web Services] and any and all intellectual property rights therein contained (including but not limited to all patents, trademarks, know how, and business models), and, in further consideration for the rights granted herein to Client, Client hereby assigns to SIDEARM any and all rights, title and interest, including, without limitation, patents, copyrights, trade secrets and proprietary rights, in and to the materials created or developed by SIDEARM hereunder and required to be delivered to Client in connection with the Service (the "Deliverables"). The Deliverables shall not be deemed to be "works made for hire" under the U.S. (or any other jurisdiction's) copyright laws. Client agrees to give SIDEARM reasonable assistance to perfect such assignment of such rights, title and interest. Client will not and will not allow others to reverse engineer, decompile, disassemble or otherwise attempt to derive the source code of any SIDEARM Service or Deliverable, except to the extent allowed under any applicable law.[50]

---

[48] *A New Era of CSUSBAthletics.com*, CAL STATE SAN BERNADINO ATHLETICS, https://csusbathletics.com/news/2022/12/14/general-a-new-era-of-csusbathletics-com.aspx (last visited on August 9, 2024).

[49] *King's Athletics Partners With SideArm Streaming, BlueFrame Technology*, KINGS COLLEGE ATHLETICS, https://kingscollegeathletics.com/news/2019/8/2/general-kings-athletics-partners-with-sidearm-streaming-blueframe-technology.aspx (last visited on August 9, 2024).

[50] *Triton Regular Meeting of the Board of Trustees* (the "Triton Agreement"), page 39-40, paragraph 8, https://www.triton.edu/contentassets/789ed52a8e124a4db878cca7e312640a/2022_04_19_boardbook.pdf (last visited on August 9, 2024); *see also Sidearm Sports Renewal for Texas A&M University – Commerce* (the "Texas A&M Renewal Agreement"), p. 13 of 16, paragraph 6.2, https://appsprod.tamuc.edu/contracttransparency/ViewDoc.ashx?I=694&T=P (last visited on August 9, 2024).

84. Defendants effectively retain ownership of their Web Services.

85. Defendants require college teams to assign patents, copyrights, trade secrets, and proprietary rights, in connection with materials associated with the Web Services it provides.

86. The Defendants effectively own and have complete control over the Web Services and the websites it operates, including the Trojans Website.[51]

87. Defendants' Web Services include setup and operation of online service platforms and mobile applications with related functionality.[52]

88. Defendants also provide data storage and general video hosting services for all audio and video files for collegiate clients for a period of twenty-four (24) months.[53]

89. In addition to the services described above, Defendants provide and manage all of the technical backend and support services to end users, including subscribers, of the Team Website. This includes providing: (a) support representatives via phone, email, or ticketing system; (b) outside of hours 24/7 critical support; (c) software upgrades at no charge; (d) academic year support hours, normal and after hours; and (e) non-academic year support hours.[54]

90. By all accounts, there is no aspect of the websites run by the Defendants that is controlled by the college, university, or team itself. USC has

---

[51] In fact, to the extent that any Terms could be located on the Team Websites, the links directed users to Sidearm's Terms and Privacy Policy. *See, e.g.*, https://floridagators.com/, Terms of Service, linking to https://sidearmsports.com/sports/2022/12/7/terms-of-service (last visited on August 9, 2024); https://goheels.com/sports/mens-basketball, Terms of Service, linking to https://sidearmsports.com/sports/2022/12/7/terms-of-service (last visited on August 9, 2024).

[52] Triton Agreement, at page 39/78, paragraph 3, *available at* https://www.triton.edu/contentassets/789ed52a8e124a4db878cca7e312640a/2022_04_19_boardbook.pdf (last visited on August 9, 2024).

[53] *Id.* at page 42/78, paragraph 7.

[54] *Id.* at page 43/78, paragraph 10.

completely relinquished control to the Defendants and allowed them to run the Trojans Website without oversight.

91.    Demonstrating the control Defendants have over the operation, content, and overall management of the college team websites managed through the Defendants' Web Services, Defendants have the ability to unilaterally cut off or shut down college team websites.[55]

92.    Additionally, tracking pixels created by Sidearm are distributed to and utilized by the Team Websites, tracking user activity and search terms, feeding that data back to the Defendants.

93.    Defendants claim that they ensure compliance with the Web Content Accessibility Guidelines (WCAG) 2.0 requirements for all users. [56]

94.    In exchange for Defendants' Web Services, college teams agree to assign all web traffic to Defendants:

> Client agrees that the Client's website's traffic (e.g., the amount of data sent and received by Client's website's visitors) will be assigned to Sidearm for purposes of syndicated audience measurement reports, and

---

[55] *See Sidearm Sports Proposal for University of New Mexico*, p. 9 of 18, https://athleticscontracts.unm.edu/website-agreement/sidearm-sports---website-agreement---2015.pdf ("Failure to pay the fee within 30 days following the due date may result in suspension of Services") (last visited on August 9, 2024); *Texas A&M Renewal Agreement*, p. 11 of 16, https://appsprod.tamuc.edu/contracttransparency/ViewDoc.ashx?I=694&T=P (same) (last visited on August 9, 2024); *Sidearm Sports Proposal for University of Louisiana Lafayette*, p. 17 of 23, https://purchasing.louisiana.edu/sites/purchasing/files/Attachment%20L%20Sidearm%20contract.pdf (same) (last visited on August 9, 2024).

[56] Web Content Accessibility Guidelines (WCAG) 2 is developed through the W3C process in cooperation with individuals and organizations around the world, with a goal of providing a single shared standard for web content accessibility that meets the needs of individuals, organizations, and governments internationally. *See WCAG 2 Overview*, W3C WEB ACCESSIBILITY INITIATIVE WAI, https://www.w3.org/WAI/standards-guidelines/wcag/, (last visited on August 9, 2024).

Client will cooperate with Sidearm to effectuate such purpose, including executing all necessary and/or required assignment documents prepared by companies that provide syndicated audience measurement services.[57]

### b. Defendants exhibit actual control over and management of the Team Websites, including the Trojans Website

95. Defendants develop, operate, and own the Trojans Website. Defendants effectively retain complete control of the Trojans Website. Defendants have the ability to lock USC out of the Trojans Website; Defendants derive revenue from the Trojans Website through revenue sharing with advertisers; Defendants reserve their own advertising space on the Trojans Website; and Defendants set and implement its own code for generating and tracking user activity and advertising on the website, video hosting, subscription services, and website design. The same is true regarding the Defendants' complete control of the Team Websites.

96. Defendants consistently utilize and employ tracking tools (detailed below) on the Team Websites, including the Trojans Website, such as pixels (including Facebook's and its own), Google's suite of tools (including Google Analytics and DoubleClick Floodlight), comScore, Amazon's ad system, and The Trade Desk's pixel.

97. The Facebook Pixel is a toolset that allows websites to track user activity by monitoring for triggered events and then sharing that data with Facebook.

98. The Facebook Pixel is a tracking tool that allows website operators and Meta to track user activity by monitoring for specific actions and events. Such events include, but are not limited to, clicking on buttons specified by the website

---

[57] Triton Agreement, page 42/78, paragraph 9, https://www.triton.edu/contentassets/789ed52a8e124a4db878cca7e312640a/2022_04_19_boardbook.pdf (last visited on August 9, 2024).

operators on the webpage, submitting search terms, loading pages specified by website operators, and adding items to a cart.

99.   When those events are observed, the Pixel collects the users' activity information, as well as users' PII.  It then packages this data into an HTTP Request, and sends the data to Facebook through a GET or POST request.

100.   This data can be viewed via an internet browser's developer console as it is transmitted to Meta.

101.   Defendants' own pixel (the "Sidearm Pixel") is also used to monitor user activity on the Team Websites.  The Sidearm Pixel tracks user activity on a site, including which webpages a user visits, when those webpages were published, and which sport a user interacts with:



*Figure 1 - Sidearm Pixel captures sport, team, webpage location of video*[58]

102.   The Sidearm Pixel also tracks which embedded videos, pre-recorded and streaming, were watched on any given webpage:

---

[58] *USC Baseball Takes down UC San Diego, 4-3*, USC Trojans, *available at* https://usctrojans.com/news/2023/4/25/baseball-usc-never-trails-in-4-3-win-against-ucsd.aspx (last visited on June 2, 2023).

```
events: element=&elinstance=&category=All%20Access&name=play&label=Yo
uTube%3AzHFsnYRNtsI&value=1
traits:
r: huskers.com
server_name: 1129022-LB17
path_and_query: /showcase/embed.aspx?youtube=%2F%2Fyoutube.com%2Fwat
ch%3Fv%3DzHFsnYRNtsI&autoplay=true&controls=true&title=Mar.%2028%20
Nebraska%20Football%20Spring%20Availability%20with%20Coach%20Rhule%
20%26%20Players
```

*Figure 2 - Sidearm Pixel captures path of and title of embedded video watched by user[59]*

103.    This data is shared and sent to statcollector.sidearmsports.com.  The data Defendants collects from users, including users and subscribers of the Trojans Website, is shared with themselves, for their own use, and by all accounts is not shared with USC or utilized independently by USC.

104.    The Defendants set up and employed the tracking tools and mechanisms for improperly sharing subscribers' PII.  The Defendants can, at any time, stop the employment and use of the Facebook Pixel and other tracking tools.  The Defendants are capable, at any time, of stopping the tracking and sharing of subscribers' video watching activities on the Team Websites, including the Trojans website.

105.    Defendants also standardize, host, and control the video hosting services and the Team Website's video content, including the Trojans Website.  The video hosting for the Trojans Website, for example, is depicted below in connection with a CBS video:

---

[59] *Id.*

Figure 3 – USC Trojans Team Website uses CBS Player to stream video; viewed as of March 29, 2023[60]

106.  The Defendants also utilize the YouTube video player system on the Team Websites:



Figure 4 – USC Trojans Team Website uses CBS Player to stream video; in this instance, viewed as of April 26, 2023[61]

107.  Despite the existence of dozens of competing content delivery platforms,[62] tellingly, CBS or YouTube appear on each of the Team Websites, including the Trojans Website, managed by Defendants.

---

[60]    *Pac-12    Mental    Health*,    USC    TROJANS, https://usctrojans.com/showcase/embed.aspx?Archive=52&autoplay=false    (last visited on August 9, 2024).

[61] *USC Baseball Takes down UC San Diego, 4-3*, USC TROJANS, https://usctrojans.com/news/2023/4/25/baseball-usc-never-trails-in-4-3-win-against-ucsd.aspx (last visited on August 9, 2024).

[62] *See Content Delivery Networks*, CDN PLANET, *https://www.cdnplanet.com/cdns/* (last visited August 9, 2024).

108.    Defendants manage the advertising for the Team Websites, including the Trojans Website.  Defendants carve out their own advertising space and/or revenue of the advertising on the sites they operate, including the Trojan Websites.

109.    Defendants' control over the advertising facet of Team Websites is highlighted by the presence of CBS code even where CBS does not host the Teams' videos:

```
window.client_hostname = "usctrojans.com";window.client_title = "University of Southern California";
{"page_template":"home","sport_name":"0","sport_name_custom":"0","site":"usc","cbs_site_code":"usc",
"21708449227";window.img_dfp_unit_name = "";window.ad_full_unit_name = "Playfly/usc";window.block_df
{"safe_text_white":"#9d2235","safe_text_black":"#ffffff","primary_background":"#9d2235","primary_tex
= "";window.site_in_dev_mode = false;window.sidearm_header_bidding_enabled = false;
                    window.utagData = function() {
                        return {
                            embedPageUrl: location.href,
                            brandPlatformId: "sidearm_site_" + (document.documentElement.clientWidth
                            pageViewGuid: PageTargetting.getPageviewGuid(),
                            _pageViewGuid: PageTargetting.getPageviewGuid() // cbs says they need it
                        };
                    }; == $0
```

*Figure 5 – Defendants' cause use of CBS tracking on University of Southern California athletics website; in this instance, viewed as of May 31, 2023*

110.    On information and belief, CBS's continued presence on Team Website does not stem from a relationship between CBS and USC, but rather advertising rights it bargained for with Defendants and further indicates Defendants' control over the Team Website's advertising and data management.[63]

111.    The Defendants also make use of Google's Programmable Search Engine on their websites.

112.    The PSE enables websites to provide customizable search functionality to users and subscribers of the websites.

---

[63] *See e.g. CBS Interactive Advanced Media and Learfield's Sidearm Sports to Partner in College Sports*, LEARFIELD, https://www.learfield.com/2018/02/cbs-interactive-advanced-media-learfields-sidearm-sports-partner-college-sports/ (last visited August 9, 2024).

113.    The PSE affords the Defendants to have site users and subscribers (i) search first-party webpages, (ii) extend their web search to the internet generally, or (iii) serve ads and sponsored content to users.

114.    Users care about who has their information and have a strong interest in limiting who may or may not access their communications with websites. Sharing users' communications, Search Terms, and overall site activity is directly contrary to the privacy interests of website users, especially where sharing their information with one party will result in a chain reaction of data sharing with third-parties which users cannot anticipate. This is precisely what happens when Google obtains users' Search Terms.

115.    Once the Search Terms are entered into the PSE and sent to Google, visitors lose their ability to control who has access to their Search Terms; Google then uses those Search Terms, as detailed below, to request bids from advertisers based on those Search Terms, causing them to be shared with countless third parties, including advertising and marketing firms looking to develop effective advertising targeted at or a better-developed profile of users.

116.    After receiving the search results, visitors are further led to believe that they had run a search on the site and that should they wish to run a more expansive search they can additionally run a search on Google for their Search Terms by clicking a button made available to users *after* receiving their results, as depicted below:



117.    This ability to *later* search for the Search Terms on Google suggests to visitors that their current searches are *not* being handled by Google.

118.   The PSE, by default, displays the language "Enhanced by Google." This affords site users at least some form of notice that their searches are not merely communicating with the website operators; but, rather, extends to Google and its advertisers.   This "Enhanced by Google" language can be removed by making changes to the default code or where web developers use "their own search box or the custom Search JSON API, though the language attributing the search engine to Google may be added to the search bar via Google's Programmable Search Attribution API.[64]  The Defendants elected to use Google's PSE without letting site users know that their searches would go beyond the visited website and, instead would be captured and shared in the form of advertising, advertising sales and bidding, marketing profiles, and demographic databases.

119.   Google directs web developers to include the attribution to Google's search engine immediately adjacent to the search bar, search results, or included as a watermark within the search bar itself.[65]

120.   The Defendants do not adhere to this on any of the Team Websites, including the Trojans Website, they control.   Rather than include attribution to Google's PSE, visitors and subscribers of the Team Websites, including the Trojans Website, the Defendants conceal their use of the Google search engine and that visitors' search terms were being collected, shared, and used without their knowledge.

121.   The Defendants did not disclose to visitors or subscribers that third-parties were intercepting the Search Terms for non-search related functions.

---

[64] *Programmable Search Engine Help: Programmable Search Engine Branding Guidelines*, GOOGLE, https://support.google.com/programmable-search/answer/10026723?hl=en&sjid=2994855654026857701-NA (last visited August 9, 2024).
[65] *Id.*

Specifically, the Search Terms are used for advertising, advertising sales and bidding, marketing profiles, and demographic databases.

122.   The uniformity of the websites designed and operated by Defendants is achieved through the Defendants' copy-paste design and control over the Team Websites.

## C.   The Team Websites Utilize the Facebook Pixel to Gather and Transmit PII and Video Watching Data

123.   Facebook offers the Facebook Pixel, also known as the Meta Pixel (the "Pixel"), to web developers for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

124.   The Pixel is a marketing tool that can only be purposely added by website developers to a website.  A website operator must link a related Facebook account with its Pixel, and then add code to the website to make use of the Pixel.[66]

125.   The Defendants effectuated the steps to add the Pixel to The Team Websites, including the Trojans Website.

126.   The Pixel is employed by website operators to gather, collect, and then share user information with Facebook.[67]   Receiving this information enables Facebook and the web developers to build valuable personal profiles for users, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[68]

---

[66]   *How to set up and install a Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited on August 9, 2024).

[67] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited on August 9, 2024).

[68] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited on August 9, 2024).

127.  Web developers and website operators can choose to use the Pixel to share both user activity and user identity with Facebook.  Here, the Team Websites, including The Trojans Website, share both.

128.  The owner or operator of a website holds the decision-making authority over the placement of the Pixel on its site.

129.  The owner of a website may not hand-select every detail associated with the website, ranging from the use of certain font, colors, etc., to the employment of tracking tool, such as the Pixel, or a keystroking monitor, or which and whether terms and conditions should be associated with its website, newsletter, or any other aspect of its business.  The level of management or oversight by the owner does not alter, reduce, or eliminate its responsibility over the information displayed on its site, made available to visitors, or what is gathered about its user and then shared with third parties.

### a.    The Trojans' Website Implemented the Pixel

130.  To activate and employ a Facebook Pixel, a website owner must first sign up for a Facebook account, where specific "business manager" accounts are provided the most utility for using the Pixel.[69]  For instance, business manager accounts can: (i) create and utilize more simultaneous Pixels, (ii) manage multiple Facebook Ad Accounts and Pages from a centralized interface, (iii) access and manage multiple parties (which can then be given specific levels of access, including more easily revoking access to ex-employees), (iv) build custom audiences for multiple ad campaigns, and (v) eliminate privacy concerns related to using a personal profile for business purposes.[70]

---

[69] *How to set up your Meta Pixel with a business portfolio*, FACEBOOK, https://www.facebook.com/business/help/314143995668266?id=1205376682832142 (last visited on August 9, 2024).

[70] Jacqueline Zote, *A step-by-step guide on how to use Facebook Business Manager* (June 14, 2021), SPROUTSOCIAL, https://sproutsocial.com/insights/facebook-business-manager/ (last visited on August 9, 2024).

131.    To add an operational Pixel to a website, website operators take several affirmative steps, including naming the Pixel during the creation and setup of the Pixel.[71]

132.    Once the Pixel is created, the website operator assigns access to the Pixel to specific people for management purposes,[72] as well as connect the Pixel to a Facebook Ad account.[73]

133.    To add the Pixel to its website, the website operator can choose to add the Pixel code through the "event setup tool" via "partner integration" or by manually adding the code to the website.

134.    Manually adding base Pixel code to the website consists of a multi-step process, which includes: (i) creating the pixel; (ii) installing base code in the header of every webpage the Pixel is active, (iii) setting automatic advanced matching behavior, (iv) adding event code using an automated tool or manually,[74] (v) domain verification, and (vi) configuring web events.[75]

---

[71] *Id.; see also* Ivan Mana, *How to Set Up & Install the Facebook Pixel*, YOUTUBE, https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited August 9, 2024).
[72] *Add People to Your Meta Pixel in Your Meta Business Manager*, FACEBOOK, https://www.facebook.com/business/help/279059996069252?id=2042840805783715 (last visited on August 9, 2024).
[73] *Add an ad account to a Meta Pixel in Meta Business Manager*, FACEBOOK, https://www.facebook.com/business/help/622772416185967 (last visited on August 9, 2024).
[74] Some users claim that automated tools for adding event code provide inconsistent results and recommend adding event code manually. *See* Ivan Mana, *How to Set Up & Install the Facebook Pixel*, YOUTUBE, https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited on August 9, 2024).
[75] *How to set up and install a Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited on August 9, 2024); *see* Ivan Mana, *How to Set Up & Install the Facebook Pixel*, YOUTUBE, https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited on August 9, 2024).

135.    After following these steps, a website operator can start harvesting information using the Pixel.

136.    A Pixel cannot be placed on a website by a third-party without being given access by the site's owner.

137.    Once the Pixel is operational, it can begin collecting and sharing user activity data as instructed by the website developers.

138.    When a Facebook user logs onto Facebook, a "c_user" cookie – which contains a user's non-encrypted Facebook User ID number ("UID") – is automatically created and stored on the user's device for up to a year.[76]

139.    A Facebook UID can be used, by anyone, to easily identify a Facebook user.

140.    Any person, even without in-depth technical expertise, can utilize the UID to identify owners of the UID via their Facebook profile. Once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]). That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

### b.    The Pixel as a Tracking Tool

141.    The Pixel tracks user-activity on web pages by monitoring events which,[77] when triggered, causes the Pixel to automatically send data directly to

---

[76]    *Privacy Center: Cookies Policy*, FACEBOOK, *https://www.facebook.com/privacy/policies/cookies?subpage=subpage-1.1* (last visited on August 9, 2024).

[77]    *Meta Business Help Center: About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=12053766828321 42 (last visited on August 9, 2024).

Facebook.[78]

142.   Examples of events utilized by websites include: a user loading a page with (i) "microdata" tags (the "Microdata event"),[79] or (ii) with a Pixel installed (the "PageView event").[80]  The Team Website utilize both events.[81]

143.   When a PageView and/or Microdata event is triggered, a "HTTP Request" is sent to Facebook (through Facebook's URL www.facebook.com/tr/).[82] This confirms that the Pixel events sent data to Facebook.

144.   The HTTP Request includes a Request URL, embedded cookies such as the c_user cookie.  It may also include information in its Payload,[83] such as metadata tags.

145.   A Request URL, in addition to a domain name and path, typically contains parameters.  Parameters are values added to a URL to transmit data and

---

[78] *See generally Id.*

[79] *New Facebook Pixel Events*, PIXELYOURSITE, May 22, 2017, *available at* https://www.pixelyoursite.com/new-facebook-pixel-events-video  (last visited on August 9, 2024).

[80] *Meta Business Help Center: Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited on August 9, 2024).

[81] The presence of Pixel events, such as the Microdata and PageView events, can be confirmed by using the publicly available and free Meta Pixel Helper tool.  *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited on August 9, 2024).

[82] Surya Mattu, et al., *How We Built a Meta Pixel Inspector*, THE MARKUP (Apr. 28, 2022)  https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited on August 9, 2024).

[83] The "request payload" (or more simply, "Payload") is data sent by a HTTP Request, normally through a POST or PUT request, where the HTTP Request has a distinct message body.  Payloads typically transmit form data, image data, and programming data.  *See Request Payload Variation*, SITESPECT https://doc.sitespect.com/knowledge/request-payload-trigger  (last visited August 9, 2024).

direct a web server to provide additional context-sensitive services, as depicted below:



*Figure 6 – Mozilla's diagram of a URL, including parameters[84]*

### c. The Pixel Shares Users' and Subscribers' PII and Video Watching Data

146. When a Pixel event triggers, the parameters included in a Request URL provide websites and Facebook with additional information about the event being triggered.[85]

147. The URL itself contains information about user activity, such as which content is searched for or watched.

148. As Defendants note, they purposefully updated the URL structure for the Team Websites in 2019, replacing "the ID number with a full description so its obvious you are viewing [specific content]."[86]

149. Defendants reinforce this by providing links to Johns Hopkins', Rochester Institute of Technology's, Shippensburg University's, and Lycoming College's Team Websites to show how the new and old URL structure would provide additional context to anyone interpreting the URL.[87]

---

[84] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited on August 9, 2024).

[85] *Meta Pixel: Conversion Tracking*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited on August 9, 2024).

[86] *New URL Structure*, SIDEARM SPORTS, https://playbook.sidearmsports.com/features/new-url-structure/ (last visited August 9, 2024).

[87] *Id.*

150.    The parameters for a Request URL may include the title of a video being watched or the URL of the video.

151.    The Trojan Website, using Defendants' URL structure, does include the title of videos watched by users and the URL of those videos, as depicted below:



*Figure 7 - Microdata event firing, including video title and URL of video as parameters of Request URL[88]*

152.    While Microdata events can send data through the parameters, as depicted in *Figure 2*, the Microdata event also sends information through the Payload.

153.    Microdata events are triggered whenever a web page containing Microdata tags is loaded.[89]

154.    Microdata tags allow developers to embed metadata within the contents of a web page.[90]

155.    This metadata may include the title of a video – for example, here, "title": "Video: Pac-12 Mental Health – University of Southern California" – on the Team's website, as depicted below:

---

[88]      *Pac-12 Mental Health*, USC TROJANS, https://usctrojans.com/showcase/embed.aspx?Archive=52&autoplay=false    (last visited on August 9, 2024).

[89]  *New Facebook Pixel Events*, PIXELYOURSITE, May 22, 2017, *available at* https://www.pixelyoursite.com/new-facebook-pixel-events-video  (last visited on August 9, 2024).

[90]      *Guides:    Microdata    Tags*,    FACEBOOK, https://developers.facebook.com/docs/marketing-api/catalog/guides/microdata-tags/ (last visited on August 9, 2024).

Figure 8 - Microdata Event sends Microdata tag for video's title to Facebook.[91]

156.   When a Microdata event fires, it sends a request to Facebook containing data, including, but not limited to, the Microdata tags, as depicted in Figure 3, the developer's console, above.

157.   When a "c_user" cookie is in place, both the Microdata and PageView event requests include a user's c_user cookie and copy the c_user cookie into the Request Header, as depicted below:



Figure 9 - Embedded c_user cookie in Pixel Request transmitted to Facebook[92]

---

[91]    *Pac-12 Mental Health,* USC Trojans, https://usctrojans.com/showcase/embed.aspx?Archive=52&autoplay=false  (last visited on August 9, 2024).
[92] *Id.*

Case No.: 2:23-cv-04493-FLA-MAAx
AMENDED CLASS ACTION COMPLAINT

158.   Both the Microdata and PageView events, when triggered, independently and automatically result in the sharing of a user's website interactions (including Video Watching Data) and Facebook UID with Facebook.

159.   Thus, PII and Video Watching Data of Plaintiffs and members of the Subscriber Class (as defined below) have automatically been shared with Facebook as a result of Team's decision to add the Pixel to the Team Website.

**D.    E-Newsletters and E-Subscriptions, Even When Free to Users, Are a Value Exchange Between the Teams and Subscribers**

160.   Users visiting the Team Websites, including the Trojans Website, can navigate to the e-newsletter sign-ups.

161.   Users can reach the sign-up page by clicking on the main navigation button in the Team Websites' banner (highlighted in the screenshot below) followed by clicking the "Fans" tab, and then "Subscribe to Victory Mail."



*Highlighting the navigation bar menu on the Team Website*

*Navigating to Victory Mail Subscription*

162.   Users can similarly navigate to the Team Website's ticket account creation section of the Team Website by clicking the main navigation button in the Team Website banner, followed by clicking "Manage My Account," as shown below:



163.   Users are then prompted to sign-in, or if they do not have an account, create an account by entering their full name, email address, and their cell phone number.   The Trojans Website also allows site users to create an account that authorizes users to purchase, sell, and manage tickets to various USC Trojan sporting events. The Team Website e-ticket account creation screen appears below:

164.   Both the e-newsletter subscription and the ticket purchasing account ("e-subscription") provide unique benefits to the subscriber (and subscription-offeror) once subscribed.

165.   By subscribing to the e-newsletter, subscribers are given access to exclusive discounts, event promotions, ticket offers, fundraising, special event notifications, premium seating, and hospitality, along with other weekly newsletter content. Subscribing to an e-newsletter allows users to stay up to date on the latest news, scores, events, and promotions related to USC athletics. E-newsletter

subscribers may also receive exclusive discounts on USC Trojans gear and tickets allowing them to save significant money.[93]

166.    Subscribing to the e-newsletter provides users the convenience of receiving updates and information, including pre-recorded videos or links to them, directly to their email inbox, without having to visit the website directly.[94]  Finally, users may also find the e-newsletter's content entertaining and subscribe to the newsletter for that reason.[95]

167.    The Defendants also benefit from the value created through its use of free e-newsletters and its subscription-based service model.

168.    In addition to driving website traffic, e-newsletters and other email marketing tactics deliver the highest and most measurable return on investment of all marketing channels, with an average of $36 return for every $1 spent.[96] Sports related email marketing fare even better, with a  $45 return for every $1 spent.[97] Marketing through the use of email has the benefit of being trackable,[98] and e-newsletters offer website operators insight into subscribers' interests and bases for targeting subscribers for future marketing efforts.[99]

---

[93] *Why Consumers Subscribe and Unsubscribe from Email [New Data]*, HUBSPOT, https://blog.hubspot.com/marketing/why-consumers-subscribe-to-email    (last visited August 9, 2024).

[94] *Id.*

[95]  *7 Reasons People Subscribe to Email Newsletters*, EMAIL CRITIC, https://www.emailcritic.com/7-reasons-people-subscribe-to-email-newsletters/ (last visited August 9, 2024).

[96]  *What is the Average Email Marketing ROI?*, CONSTANT CONTACT, https://www.constantcontact.com/blog/what-is-the-roi-of-email-marketing/    (last visited August 9, 2024).

[97] *Id.*

[98]  *The 7 Advantages of Having an Email Newsletter*, COMPOSE.LY, https://compose.ly/content-strategy/advantages-of-having-a-newsletter (last visited August 9, 2024).

[99] *Id.*

169.    With 99 percent of users checking their email daily,[100] some as much as 20 times a day,[101] it is not surprising that websites seek to engage users regularly with emails through e-newsletters.

170.    Companies delivering e-newsletters can also boost trust in their brand, as through repeated exposure to informative and well written content within newsletters leads users to rely on that company as a source of knowledge, to find products, and services related to the brand.[102] Through this increased brand awareness, a newsletter can build on and enhance other content published by the website.[103]

171.    Users can also subscribe to the Team Websites to purchase and receive updates about sporting event tickets.

172.    By creating a ticket subscription account on the Team Website, users can easily purchase and manage tickets to various Team Website sporting events. Users then have access to a variety of options in managing their tickets including the options to transfer, exchange, reissue, or return tickets, along with allowing users to resell their tickets via StubHub.  Moreover, after a user creates a ticket subscription account, the website can collect additional data from the subscriber to further tailor their newsletters and other products to the Team Website's various users.

---

[100] Luisa Zhou, *Email Marketing ROI Statistics: The Ultimate List in 2023*, LUISA ZHOU (Apr. 13, 2024) https://www.luisazhou.com/blog/email-marketing-roi-statistics/ (last visited August 9, 2024).

[101] Jennifer Butler Keeton, *40+ Email Marketing Statistics You Need to Know for 2024*, OPTINMONSTER (Jan. 4, 2024) https://optinmonster.com/email-marketing-statistics/ (last visited August 9, 2024).

[102] *The 7 Advantages of Having an Email Newsletter*, COMPOSE.LY, https://compose.ly/content-strategy/advantages-of-having-a-newsletter (last visited August 9, 2024).

[103] *Id* at Section 4.

173.    The e-ticket account management options are shown below:



*Example of Team Website e-subscription management page on the Trojan's Website*

174.    In sum, a user with either a newsletter subscription or a ticket account subscription becomes a part of the Team Website's ecosystem and provides various benefits to the Team Website.

46

**E.    Sign-up for the Defendants' Subscriptions Lack Informed, Written Consent Pursuant to the VPPA**

175.    The Trojans Website does not seek nor obtain permission from subscribers, including Plaintiffs and the Class, to share the subscribers' PII or Video Watching Data with third-parties, including Facebook.  The same is true for the Team Websites.

176.    The sign-up process for the Trojans Website's newsletters does not seek nor obtain informed, written consent.  The sign-up processes for the Teams Websites' newsletters likewise do not seek nor obtain informed, written consent.

177.    To the extent information about any of the Team Website's data sharing can be located, the language (i) is not presented to users of the site in a transparent manner, or where it must be viewed by visitors to the website; (ii) is not made available as part of the sign-up process; (iii) is not offered to users as checkbox or e-signature field, or as any form of consent; and (iv) does not include terms that sufficiently warn users that their information, protected by the VPPA, will be shared with a third party.

178.    The Trojans Website includes a newsletter sign-up, which appears as:[104]

---

[104]    *Victory-Mail*, USC TROJANS, https://usctrojans.com/sports/2022/3/7/usc-trojans-victorymail-email-newsletter-subscription-sign-up-form.aspx (last visited on August 9, 2024).

179.   The sign-up process does not seek consent in any form. The sign-up process also does not refer or link subscribers to terms outlining the sharing of personal information, or of any data whatsoever.

**F.     Defendants Utilize Google's PSE for its Team Websites' Search Bars**

180.   Google provides website operators, or developers, with access to its Programmable Search Engine.

181.   The PSE (formerly the Customizable Search Engine or "CSE"), allows for the implementation of a search engine function within websites.

182.   In connection with adding the PSE to their websites, operators or developers can choose to limit searches to their own web pages or extend the reach of searches to third party sites.[105]

183.   The PSE can be added to websites by (i) using Programmable Search Engine Search Element ("PSE Element"), which renders the Search Bar and Search Results through a pre-made HTML coding, or (ii) custom solutions, achieved through custom made Search Bar or using Custom Search JSON API (the "Custom PSE").[106]

184.   Using the PSE Element to implement the PSE results in default attribution[107] -- in the form of branding, or some watermark – which provides notice to users that the Search Bar is run by Google.[108]  This attribution can be removed by website developers by changing the default code used to implement the PSE Element.[109]  A custom PSE implementation allows for flexibility as to the use of the attribution, whereby web developers can include attribution through the Programmable Search Attribution API.[110]

---

[105] *Creating a Programmable Search Engine*, GOOGLE, https://developers.google.com/custom-search/docs/tutorial/creatingcse (last visited August 9, 2024).

[106] *Programmable Search Engine Help: Programmable Search Engine Branding Guidelines*, GOOGLE, https://support.google.com/programmable-search/answer/10026723?hl=en&sjid=2994855654026857701-NA (last visited August 9, 2024).

[107] "Attribution" refers to conspicuous visual disclosures (also called "branding" by Google) as to the nature of Google's handling of searches through the PSE.

[108] *Id.*

[109] *Disable Google Branding in Go[o]gle custom search CSE*, EXPERTREC BLOG, https://blog.expertrec.com/how-to-disable-remove-google-branding-in-google-custom-search-cse/ (last visited August 9, 2024).

[110] *Programmable Search Attribution API*, GOOGLE, https://support.google.com/programmable-search/answer/10028634?hl=en (last visited August 9, 2024); *see also Announcing the Programmable Search Attribution API*, GOOGLE: PROGRAMMABLE SEARCH ENGINE BLOG,

49

185.   These attributions are directed by Google's Programmable Search Engine Branding Guidelines, which note that attribution, if used, must be appear in the following locations: (i) immediately adjacent to the Search Results that rely on data from PSE; (ii) immediately adjacent to the Search Bar that will execute a search that produces Search Results that rely on data from the PSE; or (iii) a watermark inside the Search Bar that will execute a search that produces Search Results that rely on data from the PSE.[111]

186.   Such attributions that appear adjacent to the Search Results or Search Bar would include the language "ENHANCED BY Google."

187.   Attribution which appears as a watermark within the Search Bar is depicted below:



*Figure 10 - Google Attribution appearing as watermark within Search Bar[112]*

188.   The Search Box that appears on the Trojans Website is an implementation of Google's PSE.

189.   An analysis of network transmissions demonstrates that after using the Search Bar on the Team Websites, the Search Terms are sent to Google's CSE URL through a HTTP Request, as depicted below:[113]

---

https://programmablesearchengine.googleblog.com/2020/10/announcing-programmable-search.html (last visited August 9, 2024).

[111] *Programmable Search Engine Help: Programmable Search Engine Branding Guidelines*, GOOGLE, https://support.google.com/programmable-search/answer/10026723?hl=en&sjid=2994855654026857701-NA (last visited June 2, 2023).

[112] *Id.*

[113] Here, a test search using the terms "blue jeans" was made.



190.   Search results are sent to Google's CSE URL (cse.google.com).  To determine where, geographically, these communications are routed, an analysis performed on behalf of Plaintiffs sent a test signal to the CSE URL to find the IP address associated with the CSE URL, as depicted below:

191.   Analysis performed for Plaintiffs determined that the CSE URL's IP Address represents a location in California, as depicted below:



192.    After Search Terms are submitted to Google through the PSE, advertisers using Google products can bid on search keywords, keywords that match the Search Terms, which lead to their ads showing up to relevant users in search results.[114]

193.    Google charges advertisers using various methods: cost-per-click or by setting a cost ceiling for a click.[115]  During the auction process, Google decides which ads appear and in which positions on the search results page.[116]

194.    Google further allows advertisers to target locations, languages, and audiences for its search results.[117]

195.    The PSEs implemented across the Team Websites behave identically, including the Trojans Website.[118]

196.    Neither of these attributions appear on the Search Bars as they appear on the Team Websites, and users are not notified that their search terms are being handled by a third party, as demonstrated below:

---

[114] Megan Graham and Jennifer Elias, *How Google's $150 billion advertising business works*, CNBC (Oct. 13, 2021) https://www.cnbc.com/2021/05/18/how-does-google-make-money-advertising-business-breakdown-.html (last visited August 9, 2024).

[115] *Id.*

[116] *Id.*

[117] *Id.*

[118] *See* **Exhibit A**, *Division1 xSidearmsports.*



*Figure 11 - USC Trojans' Search Box*

197.    Even after a search is run, and after the results screen appears, the Search Box on the Trojans Website – and for all of the Team Websites – still hides the presence of Google's PSE, as depicted below:

*Figure 12 - USC Trojans' Site Search Page Search Box*

198.    The Team Websites, including the Trojans Website, all lack Google attribution on the Search Bars.

199.    Website operators also monetize their use of the PSE by feeding ads to website users.[119]

200.    In addition to Google's monetization options, website operators or developers may also add additional tracking tools, such as Oracle's Eloqua,

---

[119] *Google AdSense Help: Add an AdSense search engine to your site*, GOOGLE, https://support.google.com/adsense/answer/160530?sjid=2994855654026857701-NA (last visited August 9, 2024).

53

Facebook's Pixel, Sidearm's Pixel, comScore's Scorecard, and The Trade Desk's Universal Pixel (the "TTD Pixel").

201.   After entering the Search Terms into the Search Bar, the tracking tools obtain the Search Terms and communicate those terms back to their respective servers.

202.   Akin to the VPPA violation disclosures described in paragraphs 141 through 159, the Facebook Pixel sends a URL request to facebook.com/tr with the search terms included as a parameter whenever users of the site use the Team Website's implementation of the PSE.

203.   These tracking tools are implemented by Sidearm across the Team Websites, including the Trojans Website.

204.   In short, visitors and subscribers to the Team Websites expect that they are communicating directly with the teams associated with the website.  Instead, however, users of the Team Websites have the communications they directed to the Teams intercepted, collected, read by the tracking entities and Defendants.

205.   The Defendants choose to monetize the search results provided by the PSE by including ads as well as sharing the Search Terms with tracking entities.

206.   The Defendants and USC profit separately from the marketing, with the Defendants receiving a percentage of the advertising revenue earned by advertising on the Team Websites.

**G.    Plaintiffs Have a Privacy Right in Their Search Terms**

207.   As Senator Leahy aptly foresaw, the time has come where companies can easily build profiles of customers based on their consumer habits.

208.   Communications shared between consumers and companies appear to be private but, in reality, the contents of those messages are regularly shared.

209.   Here, the Defendants share users' information, including Search Terms, with the tracking entities.

210.   Search terms are inherently private.  This is particularly true when the searches are communicated in confidence, or presumed to be private.  All search terms are personal in nature, but there is an obviously heightened want for the searches to be kept confidential when the Search Terms themselves contain private information.

211.   As described in paragraphs 43 through 53, descriptions and summaries of requested pre-recorded audio visual materials are private information worthy of federal protection.

212.   Users search for video materials on the Team Websites using Search Terms.  The Search Terms, when associated with descriptions or summaries of the pre-recorded videos, pertain to more than users' basic privacy.

213.   This private information is then shared with various advertising services, including Google, Amazon, and The Trade Desk.

**H.   Tracking entities Utilize Tracking Tools to Benefit From Users' Search Terms**

214.   As described in paragraphs 196 through 198, the Team Websites do not notify visitors that their Search Terms will be surreptitiously intercepted by Google's PSE when conducting a search on the Team Website. There is no watermark, or attribution, stating that the search is "Powered by Google" or "Enhanced by Google," the Search Bar or other notification below the Search Bar that would let visitors know that their searches were being tracked, stored, shared, and sold.

215.   Moreover, when a visitor conducts a subsequent search on the following page, a keylogger is activated, which results in the recording and interception of anything the visitor types into the Search Bar in real time.

216.   In addition to using the tracking built into the PSE, including for advertising purposes, Defendants implement the tracking tools to obtain Search Terms entered by visitors into the Search Bar after the search is commenced.

217.   This hidden implementation of the Google PSE by the Defendants on the Team Websites provides benefits to the tracking entities that is separate and in addition to the benefit to the Team Websites.

**a.   The Team Websites, including the Trojans Website, Utilize Google's Ad Products to monetize users' Search Terms**

218.   Recent data shows that Google's largest source of revenue comes from Google search ads, a Google  product called Google Ads (formerly AdWords), which accounted for $162.45 billion of Google's $279.81 billion of revenue in 2022.[120] As recently as 2020, almost 80 percent of Alphabet's revenue, Google's parent company, came from Google ad related products.[121] Google collects 30 cents for every dollar that advertisers spend through its various tools across the internet.[122] Google is the global leader in advertising revenue generation worldwide[123], surpassing both Facebook and Amazon.

---

[120]   *How Does Google Make Money?*, OBERLO, https://www.oberlo.com/statistics/how-does-google-make-money#:~:text=Google%20revenue%20breakdown%3A%20top%20five,billion%20came%20from%20search%20ads (last visited August 9, 2024).

[121]   Megan Graham and Jennifer Elias, *How Google's $150 billion advertising business works*, CNBC (OCT. 13, 2021) https://www.cnbc.com/2021/05/18/how-does-google-make-money-advertising-business-breakdown-.html (last visited August 9, 2024).

[122]   *Google accused of monopolizing $250B U.S. digital ad market*, POLITICO, https://www.politico.com/news/2023/01/24/new-doj-lawsuit-could-break-up-google-00079229 (last visited August 9, 2024).

[123]   *Ad revenue of major digital ad-selling companies worldwide in 2024*, STATISTA, https://www.statista.com/statistics/1202672/digital-ad-revenue-ad-selling-companies-worldwide/#:~:text=Ad%20revenue%20of%20major%20digital%20ad%20sellers%20worldwide%202022&text=In%202022%2C%20Google%20was%20forecast,leading%20digital%20ad%20sellers%20worldwide (last visited August 9, 2024).

### i. Google Ads

219.   Google has an array of advertising products, each serving a specific function in advertising portfolios. One product, Google Ads (formerly AdWords), is an advertising platform developed by Google, which allows advertisers to place bids to display advertisements, service offerings, product listings, or videos to web users.[124]

220.   The process advertisers using Google Ads to display ads within text-based search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the website to place within the Google search results; (ii) advertisers then choose keywords, usually related to their business or target audience, intended to trigger their ads to appear within the user's search results;[125] (iii) Google then allows advertisers to bid on those various keywords;[126] (iv) the advertiser with the highest bid wins the auction, and the ad is displayed on the search results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.

221.   Google AdSense, works in conjunction with the Google Ads bidding system, allowing website owners to show Google Ads on websites and earn a revenue share from each ad each time it is viewed or clicked on their own sites.[127] The search terms that various entities bid for through Google Ads are then used by websites owners using Google AdSense to allow  website owners to share in the profit Google generates from the advertising.

---

[124]   *Achieve all your goals in one place*, GOOGLE ADS, https://ads.google.com/home/goals/ (last visited August 9, 2024).

[125]   *Be Just a Google Search away*, GOOGLE ADS, https://ads.google.com/home/campaigns/search-ads/ (last visited August 9, 2024).

[126]   *Id.*

[127]   *Home*, GOOGLE ADSENSE, https://www.google.com/adsense/start/how-it-works/ (last visited August 9, 2024).

222.    AdSense for content or AdSense for search are methods by which AdSense functions.[128] AdSense for search allows website utilizing the Google PSE to host Google Ads on their websites and earn money each time a Google Ad is viewed or clicked.[129] AdSense for Content allows website owners to earn revenue by displaying targeted ads on their website outside of the Google PSE context. When a website owner utilizes Google AdSense, they are given computer code to place on their website that will display ads provided by Google. In either case, AdSense allows the website host to match ads to the website users based on the website's content and visitors.

223.    Various Google Ad products intercepted Plaintiffs' Search Terms, as depicted below:



*Figure 13 - Test search made on Trojans Website resulted in Request sharing Search Terms "blue jeans" with Google Page Ads*

---

[128]    *Google AdSense Help: AdSense revenue share*, GOOGLE, https://support.google.com/adsense/answer/180195?hl=en (last visited August 9, 2024).

[129]    *Google AdSense Help: How AdSense works*, GOOGLE, https://support.google.com/adsense/answer/6242051?hl=en (last visited August 9, 2024).

*Figure 14 - Test search made on Trojans Website resulted in Request sharing Search Terms "blue jeans" with Google Ads*

224.    Google benefits when website owners utilize the Google PSE, Google Ads, and Google AdSense in connection with their websites.

225.    First, as noted above, advertisers pay Google for the right to display their Google Ads when a user performs a search through the Google PSE. As the highest bidder for each keyword receives the optimal search result spot, bidders for keywords are incentivized to bid the highest for each keyword increasing Google's revenue.

226.    Additionally, through Google AdSense, Google derives revenue from users clicking or viewing the ads within their search results. [130] Advertisers can choose to pay Google in two ways: based on a pay-per-click (CPC)[131] or cost-per-thousand impressions (paying Google per one thousand views)[132]. Google Ads costs vary depending on the industry, customer lifecycle, current trends, and how

---

[130] *Google Ads Help: Cost-per-thousand impressions (CPM): Definition*, GOOGLE, https://support.google.com/google-ads/answer/6310?hl=en#:~:text=Announcements-,Cost%2Dper%2Dthousand%20impressions%20(CPM)%3A%20Definition,your%20ads%20can%20be%20seen (last visited August 9, 2024).
[131] *Google AdSense Help: Cost-per-click (CPC)*, GOOGLE, https://support.google.com/adsense/answer/32725?hl=en (last visited August 9, 2024).
[132] *Google AdSense Help: Revenue per thousand impressions (RPM),* GOOGLE, https://support.google.com/adsense/answer/190515?hl=en (last visited August 9, 2024).

each advertiser manages their account.[133] By allowing website owners to utilize the Google PSE bar on their websites, Google increases user's exposure to its Google Ads, increasing what it can charge for Google search term. Similarly, allowing website owners to utilize the PSE increases Google AdSense clicks and views further increasing Google's revenue.

227.    Another benefit Google derives from allowing companies to utilize the Google PSE into their own websites is the access it provides Google to a vast amount of search data – ranging from search queries to location data to user behavior once a search is completed.  Google benefits from the ability to aggregate the search data it collects from its users to improve its own services and provide more relevant search results. By understanding patterns and trends in user behavior, Google better understands and gains unencumbered insight into what users are searching for and what they are interested in, which helps Google improve its own services, develop new products and overall increase revenues.

228.    Google's collection and analysis of search results also allows it to improve its machine learning algorithms.[134] Google uses data on how users interact with search results to train its algorithms to provide more accurate and relevant search results.[135] For example, if a user clicks on a particular search result and spends more time on that page, Google learns that this page is likely more relevant to that search query.  By gathering this vast array of data on all users, Google can build an advertising portfolio for each user which includes their gender, age, job industry, and interests.[136]

---

[133] Kristen McCormick, *How Much Does Google Ads Cost in 2024?*, WORDSTREAM (Feb. 26, 2024)  https://www.wordstream.com/blog/ws/2015/05/21/how-much-does-adwords-cost (last visited August 9, 2024).

[134] *What Does Google Do With Your Data?*, AVAST, https://www.avast.com/c-how-google-uses-your-data (last visited August 9, 2024).

[135] *Id.*

[136] *Id.*

229.    Google profits in four main ways from the Team Websites, including the Trojans Website, use of the Google search engine on the websites: (i) advertisers bid and pay Google for the keywords that will result in their ads showing in Google PSE search results; (ii) through AdSense search, every time a user clicks or views an ad (depending on their chosen method), the advertiser will pay Google for that click or view; (iii) by allowing website owners to utilize the Google PSE, Google increases its exposure to web users, allowing them to get higher bids through Google Ads and increase the views and clicks of such ads through Google AdSense; and (iv) Google's ability to aggregate user search data allows them to further tailor their own products to advertisers and users alike by training its algorithms with vast amounts of search data.

### ii.    Google DoubleClick

230.    DoubleClick for Publishers ("DoubleClick"), now also known as Google Ad Manager, allows website owners to monetize their websites by selling ad space within their websites.[137] DoubleClick connects website owners with advertisers who want to buy ad space within the owners' website, and allows advertisers to track the performance of their ads across websites.[138] DoubleClick acts as a liaison between a website owner's ad inventory, relevant ad networks, and advertisers that are looking to purchase ad space on a website.[139]

231.    DoubleClick works in a similar way to Google Ads and Google AdSense in that it allows companies to buy impressions through the DoubleClick

---

[137] *DFP Glossary: An Easier Explanation for All the Jargon*, ADPUSHUP, https://www.adpushup.com/blog/dfp-glossary-easier-explanation-jargon/ (last visited August 9, 2024).

[138] *Id.*

[139] Brock Munro, *DoubleClick for Publishers: Everything You Need to Know*, PUBLIFT (June 28, 2024) https://www.publift.com/blog/what-is-googles-dfp-first-look (last visited August 9, 2024).

Ad Exchange.[140] A DoubleClick account requires the use of a corresponding Google AdSense account.[141]DoubleClick is typically used for large-scale advertising as the DoubleClick Ad Exchange connects and aggregates website owners and advertisers of over 100 Ad Exchanges.[142]

232.   The process for DoubleClick works as follows: (i) a website operator signs up for the platform by creating a Google Ad Manager account;[143] (ii) a third-party advertiser then creates an ad campaign using Google AdWords, which includes ad creatives, targeting options, and bid strategies; (iii) the advertiser then submits the ad to DoubleClick where it is reviewed and approved;[144] (iv) once approved, the website owner can put the ad on the DoubleClick Ad Exchange to find a buyer for the ad space.[145]

233.   Once implemented by the website operator, such as the Defendants, when users or subscribers visit a webpage with a DoubleClick Ad, the user

---

[140] Tina Arnoldi, *Programmatic advertising overview: DoubleClick by Google*, SUPERMETRICS (Dec. 8, 2017) https://supermetrics.com/blog/double-click-overview (last visited August 9, 2024).

[141] Shubham Grover, *DoubleClick for Publishers (DFP): Most Common Questions Answered*, ADPUSHUP (DEC. 31, 2022) https://www.adpushup.com/blog/google-dfp-doubleclick-for-publishers/#How_Does_DoubleClick_DFP_Work (last visited August 9, 2024).

[142] Tina Arnoldi, *Programmatic advertising overview: DoubleClick by Google*, SUPERMETRICS (Dec. 8, 2017) https://supermetrics.com/blog/double-click-overview (last visited August 9, 2024).

[143] Brock Munro, *DoubleClick for Publishers: Everything You Need to Know*, PUBLIFT (June 28, 2024) https://www.publift.com/blog/what-is-googles-dfp-first-look (last visited August 9, 2024).

[144] *Support: Creating ads on your website with Google DoubleClick for Publishers*, HOCKEYTECH, https://support.hockeytech.com/portal/en/kb/articles/creating-ads-on-your-website-with-google-doubleclick-for-publishers (last visited August 9, 2024).

[145] Shubham Grover, *DoubleClick for Publishers (DFP): Most Common Questions Answered*, ADPUSHUP (Dec. 31, 2022) https://www.adpushup.com/blog/google-dfp-doubleclick-for-publishers/#How_Does_DoubleClick_DFP_Work (last visited August 9, 2024).

experiences the web page on their browser as an integrated collage of text and images. A DoubleClick Ad, as displayed on the Trojans Website, is depicted below:



*Figure 65 - Screenshot of DoubleClick Ad Banner on Trojans Website*

234.   However, the content delivered to each webpage is, in reality, aggregated from multiple independent sources. The website owner leaves part of its webpage blank where the third-party advertisements will appear. When a website receives a request from a user visiting a particular webpage, the server for that webpage will respond to the browser, instructing the browser to send a request to the third-party company charged with serving the advertisements for that particular webpage. That third-party's advertising server responds to the user's request by sending the advertisement to the user's browser, which then displays it on the user's device. This entire process occurs within milliseconds and the third-party content appears to arrive simultaneously with the first-party content so that the user does not discern any separate GET requests from the third-parties.

235.   Additionally, DoubleClick tracks the performance of ads and provides data such as impressions, clicks, and conversions to the advertiser. That information

is then used to further optimize advertising campaigns. The DoubleClick's ad server uses targeting and bidding algorithms to determine which ad to display, based on factors such as the user's location, browsing history, and interest. [146]

236. Defendants send this information, including visitors' Search Terms, to Google via the URL doubleclick.net as depicted below:



*Figure 16 – Using Trojans' Search Bar results in Doubleclick intercepting and obtaining Search Terms*



*Figure 17 - Using Trojans' Search Bar results in Doubleclick intercepting and obtaining Search Terms*

237. The bidding system is similar to the Google Ads system. The benefits provided to Google from DoubleClick Ads are also similar to those provided by Google's search ads. First, Google Ad Manager has various fee structures that can

---

[146] Joanna Geary, *DoubleClick (Google): What is it and what does it do?*, THE GUARDIAN (Apr. 23, 2012) https://www.theguardian.com/technology/2012/apr/23/doubleclick-tracking-trackers-cookies-web-monitoring (last visited August 9, 2024).

be utilized including a percentage of spend plus a flat monthly fee; a flat monthly fee or percentage of spend, whichever is higher or a flat fee percentage based on the amount you spend every month.[147]    Regardless of the structure, Google earns revenue from allowing website owners to utilize its code to display ads purchased from the DoubleClick Ad Exchange.

238.    Google also aggregates data on what users are clicking on the website owner's sites to further improve their algorithms, develop their own products, and further drive revenue. [148]

239.    The Team Websites, including the Trojans Website, allow Google to integrate DoubleClick advertisements into their website to further monetize their subscribers and site visitors. The Team Website receives money for selling the ad space on their website, thus, directly benefits from the DoubleClick implementation.

240.    As the designer, programmer, and controller of the Team Websites, including the Trojans Website, the Defendants implemented the Google PSE into the Team Website. The implementation of the Google PSE allows users of the Team Websites to search the sites for relevant results. The Team Websites use of the PSE in conjunction with Google AdSense allows the Defendants, as the site owner, to receive a share of the revenue that Google receives from the AdSense ads placed within the Team Website's search results.[149] Users using the search function on the

---

[147] Joe Balestrino, *How Much Does Google Ads Management Cost?*, JOE BALESTRINO (Feb. 17, 2023)  https://www.joebalestrino.com/how-much-does-google-ads-management-cost (last visited August 9, 2024).

[148] *What Does Google Do With Your Data?*, AVAST, https://www.avast.com/c-how-google-uses-your-data (last visited August 9, 2024).

[149]    *Google AdSense Help: AdSense revenue share*, GOOGLE, https://support.google.com/adsense/answer/180195?hl=en (last visited August 9, 2024).

Team Website see sponsored ads – which, in reality, are Google Adsense ads – which appear above or below the organic Google search results, as depicted below:



*Figure 7 - Using Search Bar with Search Terms on Trojans Website yields advertised links*

241.  As explained above, Adsense ads are based on the Google Ads bidding process. In connection with searches using AdSense, publishers, such as Operators Defendants, receive 51 percent of the revenue recognized by Google.[150]

### iii.  Google Tags, and Tag Manager

242.  Defendants also make use of the Google Tag Manager system.

---

[150] *Google AdSense Help: AdSense revenue share*, GOOGLE, https://support.google.com/adsense/answer/180195?hl=en (last visited August 9, 2024).

243.    Google Tags enable websites to send data to linked Google product destinations (such as Google Analytics or Google Ads accounts) to help measure website and advertising effectiveness.[151]    The data sent from Google Tags are accessible and configurable from Google Ads and Google Analytics.[152]

244.    Website developers can use Google Tag IDs ("GID") to add Google Tags with specific Google products and services associated with the GID to websites.[153]    GIDs often include the prefixes GT-XXXXXX, G-XXXXXX, and AW-XXXXXX.[154]

245.    A single Google Tag can reference multiple GIDs.[155]    A single Google Tag can also be used to send data to multiple "destinations."[156]

246.    Google defines "destinations" as Google measurement product accounts that share configuration setting with and receive data from Google Tags.[157] Currently, only Google Ads accounts and Google Analytics 4 properties can be destinations for the data sent by tags.[158]

247.    Destinations can be added to a Google Tag to reuse the Tag's settings and simplify adding the Tag across multiple webpages.[159]

---

[151]    *Tag Manager Help: About the Google tag*, GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en    (last visited August 9, 2024).

[152] *Id.*

[153] *Id.*

[154]    *Tag Manager Help: Google tag ID: Definition*, GOOGLE, https://support.google.com/tagmanager/answer/12326985?hl=en&ref_topic=12403939&sjid=14124967584070639073-NA (last visited August 9, 2024).

[155] *Id.*

[156] *Id.*

[157]    *Tag Manager Help: Destination: Definition*, GOOGLE, https://support.google.com/tagmanager/answer/12324388?hl=en&ref_topic=12403939&sjid=14124967584070639073-NA (last visited August 9, 2024).

[158] *Id.*

[159] *Id.*

248.  Similarly, destination IDs are used as identifiers to represent the destination of data sent by the Google Tag.[160]  The Google Tag uses destination IDs to "load destination-specific settings and to route events."[161]

249.  Like the Facebook Pixel, Google Tags collect data about user interactions with a website, including: link clicks, button clicks, form submissions, conversions, shopping cart abandonment, adding items to carts, removing items from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.[162]

250.  The data collected by GIDs are sent to specific destinations associated with the GIDs.[163]  Notably, Google notifies web developers that developers should provide "users with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[164]

251.  In short, the GIDs represent specific data collection practices and settings and pre-determined destinations for that data.  Google itself is aware of the potential legal violations its data collection tools are capable of, and puts the onus of warning users onto the website developers, such as the Defendants.

252.  Here, the Defendants added a number of Google Tags to each of the Team Websites.

---

[160] *Tag Manager Help: Google tag ID: Definition*, GOOGLE, https://support.google.com/tagmanager/answer/12326985?hl=en&ref_topic=12403939&sjid=14124967584070639073-NA (last visited August 9, 2024).
[161] *Id.*
[162] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH: BLOG (Jan. 4, 2024) https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/ (last visited August 9, 2024).
[163] *Tag Manager Help: About the Google Tag*, GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited August 9, 2024).
[164] *Id.*

253.  The Defendants uniformly include two or more GIDs on each Team Website.

254.  The Team Websites uniformly contain two GIDs: GTM-K3TH4CC and GTM-TW6R675.

255.  Each of the individual GIDs represents a different communication to Google.

256.  On the Team Websites, the Search Terms are collected by the K3TH4CC tag and sent to Google Analytics, as depicted by the example taken directly from the Trojans Website below:



257.  Similarly, on the Team Websites, the Search Terms are separately collected by the TW6R675 tag and sent to Google Analytics, as depicted by the example taken directly from the Trojans Website below:



258.  The common usage of the GTM-K3TH4CC and GTH-TW6R675 tags across the Team Websites demonstrates that the Defendants collect the same data, monitor the same user activities, and send the collected data to the same "destinations."

259.  After arriving at those common destinations, the Google products provide analysis and feedback which help the Defendants to monetize the collected information as discussed above in paragraphs 218 through 239.

**b.  Defendants utilize The Trade Desk's adsrvr system to monetize users' Search Terms**

260.  The Trade Desk is a demand-side platform ("DSP") – meaning that the Trade Desk provides automation software to help advertisers buy advertisements.[165] The Trade Desk provides advertisement purchasers with tools to manage and optimize their digital advertising campaigns across various channels and inventory

---

[165] *What is a demand-side platform (DSP)*, ADJUST, https://www.adjust.com/glossary/demand-side-platform/ (last visited August 9, 2024).

sources.[166] As a DSP, the Trade Desk works with Supply Side platforms ("SSPs"), which are sell-side platforms used to manage the supply of ad inventories for publishers or those with advertising space on their website to sell[167]. The Trade Desk is integrated with many SSPs that rely on the advertising spend generated from The Trade Desk's advertisers.[168]

261.    The Trade Desk offers a range of technologies, products, and services that it touts as tailored to personalize the delivery of digital content to individual users.[169]    As for Trade Desk's personalized advertisements to users,  CEO Jeff Green described Trade Desk's Unified ID 2.0 marketing technology:: "[w]e will have effectively solved the identity matching challenge of the entire open internet on a scale well beyond anything cookies have ever accomplished, and all while providing consumers with much greater control over their privacy."[170]

262.    Among the tracking technologies offered by the Trade Desk, employed by the Team Website, for the purposes of tracking user behavior and

---

[166]    *Trackers:    The    Trade    Desk    (adsrvr.org)*,    BETTER.FYI, https://better.fyi/trackers/adsrvr.org/ (last visited August 9, 2024)
[167]    *What    is    a    Supply-Side    Platform?*,    PUBLIFT, https://www.publift.com/adteach/what-is-a-supply-side-platform    (last    visited August 9, 2024).
[168]    *Id.*
[169]    *News Details: The Trade Desk Reports Fourth Quarter and Fiscal Year 2022 Financial Results; Announces $700 Million Share Repurchase Program*, THETRADEDESK:    INVESTOR    RELATIONS    (Feb.    15,    2023) https://investors.thetradedesk.com/news-events/news-details/2023/The-Trade-Desk-Reports-Fourth-Quarter-and-Fiscal-Year-2022-Financial-Results-Announces-700-Million-Share-Repurchase-Program/default.aspx#:~:text=2022%20revenue%20increased%2032%25%20year%20over%20year%20to%20%241%2C578%20million    (last visited August 9, 2024).
[170] Chris Kelly, *Trade Desk revenue up 24% as advertisers continue shift to CTV, retail    media*,    MARKETINGDIVE    (FEB.    15,    2023) https://www.marketingdive.com/news/trade-desk-earnings-q4-ctv-retail-media/642825/ (last visited August 9, 2024).

gathering data to enable targeted advertising, is the Trade Desk Universal Pixel ("TTD Pixel").[171] Similar to the Facebook Pixel, the TTD Pixel is enabled by placing the TTD Pixel code within the website's code, which enables the capture of data on every page of the website and across multiple websites.[172] Trade Desk's TTD Pixel operates to enhance the effectiveness of programmatic advertising campaigns by giving marketers insight into user data.[173]

263.   The TTD Pixel, like other pixels, is  a tracking tool that can be integrated with the Trade Desk's platform (the "Platform").[174] The TTD Pixel is a technology that allows advertisers and site operators a way to "spend less time placing tags, gain more visibility into user data, and analyze reporting at a more granular level . . . all with the placement of a single tag."[175] The TTD Pixel collects

---

[171] *About The Trade Desk Universal Pixel*, TEALIUM, https://tealium.com/integrations/the-trade-desk-universal-pixel/ (last visited August 9, 2024).

[172] *Universal Pixel*, THE TRADE DESK, available at: https://www.lockheedmartin.com/content/dam/lockheed-martin/eo/documents/contact/TTD_UniversalPixel_Overview.pdf (last visited August 9, 2024).

[173] Mason Widmer, *4 Vital Best Practices for Using The Trade Desk + A Top Tip*, GRAPESEED MEDIA (Dec. 12, 2023), https://grapeseedmedia.com/blog/trade-desk-best-practices/ (last visited August 9, 2024)

[174] The Trade Desk platform refers to the Trade Desk's self-service technologies for buying and managing digital advertising campaigns across various channels and formats (the "Platform"). The Platform allows advertisers to use data to better target specific audiences using the TTD Pixel, along with other technologies. The Platform also provides real-time bidding, where advertisers bid on ad impressions, and can access insights into impressions, clicks, conversions, and audience engagement metrics. The Platform allows for cross-device advertising to smartphones, tablets, TVs, and desktop computers. Overall, the Platform provides advertisers with advertising capabilities, audience targeting, real-time bidding, data analytics, and control over their digital ad campaigns.

[175] *Universal Pixel*, THE TRADE DESK, available at: https://www.lockheedmartin.com/content/dam/lockheed-martin/eo/documents/contact/TTD_UniversalPixel_Overview.pdf (last visited August 9, 2024).

information such as demographics, browsing behavior, and conversion events: the exact information collected in our case will be discussed below.[176] The TTD Pixel is not limited to compute or browser-based browsing, it is capable of collecting information from mobile platforms, including how a user interacts with mobile applications and specific details regarding the mobile device being used to access the content and the applications.[177]

264.    An advertiser or website operator that uses the Trade Desk platform to run their campaigns, can leverage the TTD Pixel tracking capabilities to collect data on how users interact across various websites, mobile applications, television, and other technologies.[178] The TTD Pixel competes with other advertising and tracking technologies such as DoubleClick by Google, Facebook Ads, and Scorecard.

### i.  The Trade Desk benefits from the Team Website's use of the TTD Pixel

265.    Integration of the TTD Pixel by the Defendants provides numerous benefits to Trade Desk, the Team Website, and to Sidearm, as discussed below.

266.    The first benefit provided by the TTD Pixel to the Trade Desk is the data collection it provides. This data collection allows the Trade Desk to segment user information to create target audiences and track conversions enabling them to offer advertisers the best possible ad placement for their websites and use of their money.[179] For example, the TTD Pixel tracking enables the Trade Desk to collect user data utilizing the  TTD Pixel allowing the tacking of  user's demographic

---

[176] *What are Pixels and Why Do I Need to Use Them?*, AX INSIGHTS, https://audiencex.com/insights/what-are-pixels-and-why-do-i-need-to-use-them/ (last visited August 9, 2024).
[177] *Privacy and The Trade Desk Platform*, THETRADEDESK, https://www.thetradedesk.com/us/privacy (last visited August 9, 2024).
[178] *Id.*
[179] *What are Pixels and Why Do I Need to Use Them?*, AX INSIGHTS (Sept. 3, 2020) https://audiencex.com/insights/what-are-pixels-and-why-do-i-need-to-use-them/ (last visited August 9, 2024).

73

information, browsing behaviors, preferences, and interactions with websites.[180] This data is then sent to an SSP who analyzes the bids from multiple DSP, such as the Trade Desk, and enables the user to be targeted more effectively based on their information.[181] Essentially then, the Trade Desk is reliant on this information for its business to remain viable.

267.    The TTD Pixel also allows the Trade Desk to retarget users by creating lookalike audiences because the TTD Pixel is "essentially [] just storing a group of people and information about them."[182] A lookalike audience is a group of people who are likely to be interested in a business because they're similar to existing customers.[183] With the lookalike audiences developed, the Trade Desk can bid on for advertising space for advertisers from SSPs that are targeting a similar demographic with more confidence that those website users will get clicks or conversions.[184]

268.    Finally, given Trade Desk's main business is charging their clients or ad publishers a certain percentage of the gross spending on the Trade Desk platform, increasing the effectiveness of their ad campaign leads to increased revenues. This is because with the increased effectiveness of Trade Desk's advertising targeting by

---

[180] Andy Pitre, *Ad Tracking: What It Is & How to Do It*, HUBSPOT: BLOG (Mar. 10, 2022) https://blog.hubspot.com/blog/tabid/6307/bid/7249/a-marketer-s-guide-to-tracking-online-campaigns.aspx (last visited August 9, 2024).

[181] *Programmatic Advertising: Your Guide to DMPs, DSPs, and SSPs*, GROWTH MARKETING GENIE, https://growthmarketinggenie.com/blog/programmatic-advertising-dmps-dsps-ssps/ (last visited August 9, 2024).

[182] *What are Pixels and Why Do I Need to Use Them?*, AX INSIGHTS (Sept. 3, 2020) https://audiencex.com/insights/what-are-pixels-and-why-do-i-need-to-use-them/ (last visited June 2, 2023).

[183] *Facebook Lookalike Audiences & When to Use Them*, BLACKBOX, https://blackboxdms.com/leveraging-your-data-how-to-build-facebook-lookalike-audiences-when-to-use-them/ (last visited August 9, 2024).

[184] *Id*.

improving advertising conversion rates (the rate at which clicks turn to sales),[185] other advertisers will shift their business to Trade Desk, further increasing Trade Desk revenue derived from ad sales.[186]

269.   On the Team Websites, including the Trojans Website, the TTD Pixel intercepts the Search Terms after they are entered into the PSE and before the results of the search are received and loaded onto the visitor's device, as depicted below:[187]



*Figure 19* - Inputting Search Terms into Search Bar results in TTD Pixel Intercepting the Search Terms

### ii.  How implementation of TTD pixel tracking benefits Team Website and Defendants

270.   The main benefit to the Defendants is the ability to sell advertising space on the Team Websites and do so much more effectively. Utilizing the TTD Pixel provides the Defendants a way to the optimize their ad space on the Team Websites by only showing ads relevant to their users, based on the information shared through the TTD Pixel.[188]  This ensures that ad space on the Team Website is not wasted, and both the Team Website and Defendants respectively realize more

---

[185]   *What is a conversion rate?*, ADJUST, https://www.adjust.com/glossary/conversion-rate/ (last visited August 9, 2024).

[186]   Trevor Jennewine, *How Does The Trade Desk Make Money?*, THE MOTLEY FOOL (Oct. 27, 2021) *available at* https://www.nasdaq.com/articles/how-does-the-trade-desk-make-money-2021-10-27 (last visited August 9, 2024).

[187]   Here, a test search was made using "blue jeans" as the Search Terms.

[188]   Andy Pitre, *Ad Tracking: What It Is & How to Do It*, HUBSPOT: BLOG (Mar. 10, 2022)   https://blog.hubspot.com/blog/tabid/6307/bid/7249/a-marketer-s-guide-to-tracking-online-campaigns.aspx (last visited August 9, 2024).

revenue from the user clicks that turn into conversions based on their revenue sharing agreements.

271. Next, the Defendants benefit in the form of time savings in that they no longer need to seek out ad publishers. Traditionally, buying ads required manual negotiation between the buyer of an ad and the website host.[189]  Now, with the automated marketing enabled by the Trade Desk and TTD Pixel, the Team Websites can place the Pixel on their site and give their advertising space information to the Trade Desk – the rest of the process is completely automated.

272. Furthermore, by tracking user behavior across the Team Websites, the Defendants can determine which webpages to place additional ads on, allowing the Team Website to derive further revenue. [190] The Team Website tracks user behavior across various pages of its website, which enables them the Team Website to add certain elements or buttons to their website that increase users' exposure to ads across the website.[191]

273. With more ads on the Team Website, or by placement of ads in higher traffic areas, the Team Website has more ad impressions to sell to the highest bidding DSP (i.e., Trade Desk), leading to higher ad revenues from ad conversions from users clicking those ads.

### c. Defendants utilize comScore's ScorecardResearch system to monetize users' Search Terms

274. ScorecardResearch is a service of Full Circle Studios Inc., which is owned and operated by comScore. ScorecardResearch describes itself as "a leading

---

[189] Trevor Jennewine, *How Does The Trade Desk Make Money?*, THE MOTLEY FOOL (Oct. 27, 2021) *available at* https://www.nasdaq.com/articles/how-does-the-trade-desk-make-money-2021-10-27 (last visited August 9, 2024).
[190] *Id.*
[191] *What are Pixels and Why Do I Need to Use Them?*, AX INSIGHTS, https://audiencex.com/insights/what-are-pixels-and-why-do-i-need-to-use-them/ (last visited August 9, 2024).

global market research [company] that studies and reports on Internet trends and behavior."[192] ScorecardResearch states that they "conduct[] research by collecting Internet web browsing data and then use[] that data to help show how people use the Internet, what they like about it, and what they don't."[193] Scorecard Research offers two ways to collect data for website operators and others wishing to utilize their technology: (1) surveys; and (2) web tagging using the ScorecardResearch web beacons.[194]

275.    The ScorecardResearch web beacons are offered to users that wish to take part in the company's market research.[195] A company that elects to take part in such market research would place a ScorecardResearch web beacon into their website code, which allows comScore to observe "browser-level."[196] The ScorecardResearch privacy policy states that its web beacons will collect information including: (1) when your browser visited a website; (2) what page of the website you visited; (3) the title of the web page; and (4) your IP address.[197] After being aggregated, the data collected by ScorecardResearch may be kept for up to 90 days, and can be used for analytical purposes indefinitely.[198] Indeed when asked if a website asks for detailed research regarding a topic, comScore says that

---

[192] *Welcome*, SCORECARD RESEARCH, https://www.scorecardresearch.com/ (last visited August 9, 2024).

[193] *Id*.

[194] *Id*.

[195] Teodora Beleaga and Joanna Geary, *ScorecardResearch (ComScore): What is it and what does it do?*, THE GUARDIAN (Apr. 23, 2012) https://www.theguardian.com/technology/2012/apr/23/scorecardresearch-tracking-trackers-cookies-web-monitoring (last visited August 9, 2024).

[196] *Id*.

[197] *Id*.

[198] Teodora Beleaga and Joanna Geary, *ScorecardResearch (ComScore): What is it and what does it do?*, THE GUARDIAN (Apr. 23, 2012) https://www.theguardian.com/technology/2012/apr/23/scorecardresearch-tracking-trackers-cookies-web-monitoring (last visited August 9, 2024).

"selected anonymous records relating to that specific site may be maintained indefinitely."[199]

276.   Scorecard intercepts the Search Terms after the Search Terms are entered into the PSE and sent to sb.scorecardresearch.com, as depicted below:[200]



*Figure 20 - A request is sent to Scorecard containing the Search Terms after inputting them into the Search Bar*

277.   The main benefit provided to ScorecardResearch when sites utilize their web beacons is the revenue they derive from selling that data in their product offerings. As noted in their Privacy Policy, ScorecardResearch: "use[s] this data to create reports on digital consumption behavior and trends, and to provide research and information products to our clients that inform our clients about consumers' preferences and interests."[201] Scorecard further states that the information obtained is also used by comScore "whose data are routinely cited by major media outlets such as The New York Times®, The Wall Street Journal®, and CNN®. The data are extensively relied upon by some of the world's largest media companies, advertisers and film studios and its strategic partners include the most important players in the TV and digital media and advertising ecosystem."[202]

---

[199] *Id.*
[200] Here, a test search was made using "blue jeans" as the Search Terms.
[201]   *ScorecardResearch     Privacy     Policy*,    SCORECARD     RESEARCH, https://www.scorecardresearch.com/privacy.aspx (last visited August 9, 2024).
[202]   *ScorecardResearch     Privacy     Policy*,    SCORECARD     RESEARCH, https://www.scorecardresearch.com/privacy.aspx (last visited August 9, 2024).

278.   Indeed, this is further borne out their Privacy Policy, which states that:

> To the extent that our business model constitutes a "sale" under the CCPA, we "sold" the following categories of personal information in the last 12 months: online identifiers, Internet or other electronic network activity information, and inferences drawn from the above. We "sold" each category to advertising networks, data analytics providers, media platforms, brands, distribution partners, and social networks.[203]

279.   Scorecard's data tracking and sharing is also done with the aim to improve their products and services, along with helping to operate their business.[204] ComScore and ScorecardResearch are thus each able to improve their product offerings, which enable it to further invest in technologies related to its business of tracking user behaviors and selling that information to its partners.

280.   The information obtained, and then sold, from the Team Websites through the employment of ScorecardResearch tracking technologies is important to both ScorecardResearch and comScore. It enables both to provide helpful products and information to their clients and derive revenue.

281.   The main benefit provided by the ScorecardResearch tracking technologies to the Defendants is the ability to precisely measure user behavior on and across the Team Website, identify trends, and with that information, deliver targeted advertising more effectively.[205]   As stated in the Scorecard Research privacy policy, their web tags and cookies help websites count users who have visited and seen a webpage or various part of a webpage.[206]   Being able to more

---

[203] *Id.*

[204] *Id.*

[205] Stelian Pilici, *ScoreCardResearch - What Is It And What Does It Do?*, MALWARETIPS (Mar. 21, 2023) https://malwaretips.com/blogs/scorecardresearch/ (last visited August 9, 2024).

[206] *About*, SCORECARD RESEARCH, https://www.scorecardresearch.com/about.aspx (last visited August 9, 2024).

effectively target consumer via their website increases revenues for both the Team Website and Operator Defendant who, in accordance with online marketing practice, receive a portion of ad revenue derived from those ad conversions.

282.    Additionally, by utilizing these behavior tracking technologies, the Team Website and Defendants can optimize their website by placing additional ads in various locations across their websites from which they can derive even further revenue. Thus, it is clear why the Defendants chose to utilize the ScorecardResearch tracking technologies on the Team Website.

### d.    Defendants utilize their own Sidearm Pixel to monetize users' Search Terms

283.    The Defendants offer its customers access to a statistical tracking platform that was "developed in-house."[207]

284.    Sidearm uses the Stats platform to aggregate statistical data from across the Team Websites to provide "an engaging, interactive user experience[.]"[208]

285.    As Sidearm highlights in a quote from its customer, Pittsburgh State, Sidearm Stats "takes otherwise complex API and XML data from the client and transforms it into a clear and visually appealing platform.  From the integration of shot charts from NCAA LiveStats to pulling headshot photos from Sidearm-client schools . . . ."[209]

286.    In other words, some of the value from providing statistics and data management using Sidearm Stats is to "allow[] for seamless content sharing across official athletic websites . . . and other digital touch points."[210]

---

[207]    *Our Services: Deep Statistical Integration*, SIDEARM SPORTS, https://sidearmsports.com/stats/ (last visited August 9, 2024).

[208]    *Id.*

[209]    *Id.*

[210]    *About Us: Sidearm 101*, SIDEARM SPORTS,  https://sidearmsports.com/history (last visited August 9, 2024).

287.   To collect this data, there are two primary methods: data entered directly into the Sidearm Stats platform,[211] and data collected through the Sidearm Pixel.

288.   The Sidearm Pixel collects the name of the webpage being viewed, which server the webpage is hosted on, the path[212] of the webpage, the sport associated with the webpage, which Team is associated with the Team Website, and various other internally tracked ID number and information categories, as depicted below:



*Figure 21 - Sample of payload of "Sidearm Pixel"*

---

[211]   *Our Services: Deep Statistical Integration*, SIDEARM SPORTS, https://sidearmsports.com/stats/ (last visited August 9, 2024).

[212]   The location of the webpage within the various folders of documents contained in the server hosting the webpage. *See URL: pathname property*, MOZILLA, https://developer.mozilla.org/en-US/docs/Web/API/URL/pathname (last visited August 9, 2024).

289.   The Sidearm Pixel also intercepts a visitors' Search Terms when using the Search Bar, as depicted below:[213]



*Figure 22 - Sample of header of "Sidearm Pixel"*

290.   Rather than sending this collected information to the individual Teams, this information is sent to statcollector.sidearmsports.com and aggregated by the Defendants for its own purposes.

### e.    Defendants utilized Meta's Pixel to monetize users' Search Terms

291.   As described above, the Meta Pixel captures information and sends that information to Meta through triggered events.

292.   The Pixel passed this information through the URL Requests sent to facebook.com/tr.

293.   In addition to capturing and sharing subscribers' and users' video watching history (in violation of the VPPA) irrespective of how the subscriber reached the web watching page, the Pixel also intercepted and shared Search Terms entered       by       Plaintiffs,       as       depicted       below:

---

[213] Here, a test search was made using the terms "blue jeans."

*Figure 23 - Sample of Pixel intercepting search terms*

294. Such Search Terms, while independently confidential, may also include the capturing and sharing of searches associated with subscribers' and users' video watching history, resulting in simultaneous violation of the VPPA and CIPA.

295. The tracking tools appear across the Team Websites, as implemented by the Defendants.

296. When a subscriber or site visitor types and submits Search Terms into the search bar of one of the Team Websites, those Search Terms are intercepted and monetized by the tracking entities.

297. This same behavior occurs on all the Team Websites.

**I.    Plaintiffs Did Not Consent to Defendants' Sharing of Plaintiffs' Search Terms**

298. Plaintiffs were unaware of the tracking tools intercepting their confidential communications with the Trojans Website. The absent class members were equally unaware of the tracking tools intercepting their confidential communications with the Team Websites.

299. Plaintiffs reasonably believed that communications to the Trojans Website were made in confidence. Absent class members held the same expectation in connection with their own communications between themselves and the Team Websites.

Case No.: 2:23-cv-04493-FLA-MAAx
AMENDED CLASS ACTION COMPLAINT

300.   With no notice or warning as to who was intercepting and decoding the contents of their communications, Plaintiffs were not provided notice of or given an opportunity to provide consent to the **tracking tools** interceptions of Plaintiffs' Search Terms.

301.   Facebook and Google guide and caution website operators of the dangers of using their tracking tools without first providing notice of and then obtaining valid consent for invasively collecting Plaintiffs' protected data and either making that data available to third-parties or allowing third parties to intercept Plaintiffs' protected information.  The Defendants agreed to these terms, directly or as the effective owners of the Team Websites, in order to utilize and employ the tracking tools.

302.   To use Meta's Facebook Pixel, the owner or operator of the website must accept Meta's Commercial Terms and Business Tools Terms.  Meta explicitly states that the employment of the Pixel will result in data sharing, including with Meta[214] through the automatic sharing of Pixel Event information and contact information.  *Id.*  Meta directs parties implementing the Pixel – here, the Defendants – to encrypt request information[215] *before* data can be shared.  *Id.*  Meta even provides Pixel users' guidance on responsible data handling, which explains how data is acquired, used, and stored, including which information is shared with Meta.

---

[214]    *Meta    Business    Tools    Terms*,    FACEBOOK, https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNy hZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited August 9, 2024).

[215] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent.  Lee has specifically chosen the Pixel method which makes users' information visible.  *See Id.*

More significantly, Meta instructs Pixel users to ensure the acquisition of any rights, permissions, or consents, before sharing information with any third-party.[216]

303. Similarly, Google requires that websites implementing Google's PSE warrant to Google that the websites will not violate local, state, or federal laws.[217]

304. Google requires that websites implementing the PSE reflect use of Google's services and include a link to Google's privacy policies.[218]

305. Google also requires that websites implementing Google Analytics "disclose the use of Google Analytics and how it collects and processes data."[219] Google's Analytics terms also require websites to "inform users about the information being stored and give them the opportunity to grant or deny their consent."[220]

306. In contravention to Meta's and Google's terms and guidance, Plaintiffs were not given notice of the use of the tracking tools on the Team Websites, including Meta's and Google's tracking products and services.

307. As a result, Plaintiffs did not and could not provide consent to the collection and sharing of their data when subscribing to the Team Websites, watching videos on the Team Websites, or running searches on the Team Websites.

---

[216] *Meta Business Help Center: Best Practices for Privacy and Data Use for Meta Business Tools*, FACEBOOK, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited August 9, 2024).

[217] *Programmable Search Engine Help: Programmable Search Engine Terms of Service*, GOOGLE, https://support.google.com/programmable-search/answer/1714300?hl=en (last visited August 9, 2024).

[218] *Id.*

[219] *Analytics Help: Privacy Disclosures Policy*, GOOGLE, https://support.google.com/analytics/answer/7318509?hl=en&ref_topic=1008008 (last visited August 9, 2024).

[220] *Analytics Help: Safeguarding your data*, GOOGLE, https://support.google.com/analytics/answer/6004245?hl=en (last visited August 9, 2024).

**CALIFORNIA LAW APPLIES TO THE ENTIRE CIPA CLASS**

308.    California substantive law applies to every member of the Class. California substantive law may be constitutionally applied to the claims of Plaintiffs and the Classes under the Due Process Clause, 14th Amend. § 1, and the Full Faith and Credit Clause, Art. IV. § 1 of the U.S. Constitution.

309.    California has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and Class Members, creating state interests and ensuring that the choice of California state law is not arbitrary or unfair.

310.    Tracking entity Google's principal executive offices are located at 1600 Amphitheatre Parkway, Mountain View, California 94043. Google also maintains several offices in California and conducts substantial business in California, giving California an interest in regulating Google's conduct under its laws. Google's decision to have offices in California and avail itself of California's laws renders the application of California law to Plaintiffs' claims constitutionally permissible.

311.    Non-party USC's principal place of business isis located at 2250 Alcazar St, Los Angeles, California 90089 and conducts substantial business in California, giving California an interest in regulating the Trojans Website, which targets USC's fans,, and Defendants' conduct, under its laws.

312.    Tracking entity The Trade Desk is headquartered at 42 N. Chestnut Street, Ventura, California 93001 and conducts substantial business in California, giving California an interest in regulating The Trade Desk's conduct under its laws. The Trade Desk's decision to have offices in California and avail itself of California's laws renders the application of California law to Plaintiffs' claims constitutionally permissible.

313.    Tracking entity ComScore maintains an office in California, located at 5000 Van Nuys Blvd, Suite 300, Sherman Oaks, California 91403, and conducts

substantial business in California, giving California an interest in regulating comScore's conduct under its laws. ComScore's decision to have offices in California and avail itself of California's laws renders the application of California law to Plaintiffs' claims constitutionally permissible.

314. Defendant Sidearm is partnered with USC and at least 66 other California-based organizations[221] to target students and sports fans in California, giving California an interest in regulating Sidearm's conduct under its laws. Sidearm's decision to target users in California and avail itself of California's laws

---

[221] This list includes, Academy of Art University, Azusa Pacific University, Bay Area Panthers, Biola University, California Polytechnic – San Louis Obispo, California Polytechnic – Pomona, California State – Los Angeles, California State – San Marcos, California State – Monterey Bay, California Baptist University, California State University – East Bay, California State University – Bakersfield, California State University – Dominguez Hills, California State University – Northridge, California State University – San Bernardino, University of California – Riverside, Cardinal Newman High School, Capistrano Valley Christian School, Chico State, Concordia University – Irvine, Dominican University of California, Fresno Pacific University, Fresno State University, Holy Names University, Hope International University, Humboldt State University, Lake Tahoe Community College, Long Beach State University, Loyola Marymount University, Menlo College, Monte Vista Christian School, Pepperdine University, Point Loma Nazarene University, Sacramento State University, Saint Francis High School, Saint Mary's College, San Diego State University, San Diego Strike Force, San Francisco State University, University of San Francisco, San Jose State University, San Jose State University Club Sports, Simpson University, Soka University, Sonoma State University, Stanford University, Stanford Recreation, Stanislaus State, The Master's University, The Preuss School, University of California – Los Angeles, University of California – Los Angeles Club Sports, University of California – Berkeley, University of California – Davis, University of California – Irvine, University of California – Merced, University of California – San Diego, University of California – Santa Cruz, University of Saint Katherine, University of San Diego, University of the Pacific, USA Water Polo, Valley Christian Schools, Vanguard University, Westmont College, and William Jessup University. *See* https://sidearmsports.com/partners/.

87

renders the application of California law to Plaintiffs' claims constitutionally permissible.

315.  Tracking entity Meta is headquartered at 1 Hacker Way, Menlo Park, California 94025.  Meta also maintains an office in Los Angeles, California, and conducts substantial business in California, such that California has an interest in regulating Meta's conduct under its laws. Meta's decision to have offices in California and avail itself of California's laws renders the application of California law to Plaintiffs' claims constitutionally permissible.

316.  USC was the intended recipient of Plaintiffs' communications and is located in California.  The Operator Defendant re-routed Plaintiffs' Search Terms, along with those for all user and subscribers to the Trojans Website, meant for USC, to Google in California.[222]  As such, a CIPA § 631 claim can be pursued by all users of the Website nationwide.

## TOLLING

317.  The statutes of limitations applicable to Plaintiffs' and the Classes' claims were tolled by Defendants' conduct and Plaintiffs' and Class Members' delayed discovery of their claims.

318.  As alleged above, Plaintiffs and members of the Classes did not know and could not have known when they used the Team Websites that Defendants were disclosing their information and communications to third parties. Plaintiffs and members of the Classes could not have discovered Defendants' unlawful conduct with reasonable diligence.

319.  Defendants secretly incorporated the tracking entities' tracking tools into the Team Websites, including the PSE, providing no indication to subscribers and visitors that their communications would be disclosed to these third parties.

---

[222] *See* paragraph 191 above.

320.    Defendants had exclusive and superior knowledge that the tracking entities' tracking tools incorporated on its Team Websites would disclose visitors' protected and private information and confidential communications, yet failed to disclose to visitors that by interacting with the Team Websites that Plaintiffs' and Class Members' Search Terms, PII, and/or Video Watching Data would be disclosed to third parties.

321.    Plaintiffs and Members of the Classes could not with due diligence have discovered the full scope of Defendants' conduct because the incorporation of the tracking entities' tracking tools is highly technical and there were no disclosures or other indication that would inform a reasonable consumer or Team Website user that Defendants were disclosing and allowing the interception of such information to these third parties.

322.    The earliest Plaintiffs and Class Members could have known about Defendants' conduct was in connection with their investigation and the work done on their behalf in preparation of filing of this Complaint.

## CLASS ACTION ALLEGATIONS

323.    Plaintiffs bring this action individually and on behalf of the following Classes:

As against the Defendants:

> All persons in the United States with a subscription to the Team Websites that had their PII improperly disclosed to Facebook through the use of the Pixel while subscribers watched pre-recorded videos on the Team Websites (the "Subscriber Class").

> All persons in the United States whose searches and activity on the Team Websites were intercepted, stored, and shared through the use of the tracking tools (the "Site User Class").

> All persons in California whose communications with the Team Websites were intercepted by and had their contents learned as a result of the tracking tools (the "California Resident Class").

324.    Specifically excluded from the Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

325.    Plaintiffs reserve the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

326.    This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

327.    Numerosity (Rule 23(a)(1)): At this time, Plaintiffs do not know the exact number of members of the aforementioned Class. However, given the popularity of Defendants' Team Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

328.    Typicality of Claims (Rule 23(a)(3)): Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, subscribed to, and used, a Team Website to watch videos, and had their PII collected and disclosed by Defendants.

329.    Adequacy of Representation (Rule 23(a)(4)): Plaintiffs will fairly and adequately represent and protect the interests of the Class.    Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

330.    Superiority (Rule 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members is relatively

small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendants will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

331.    <u>Commonality and Predominance (Rule 23(a)(2), 23(b)(3))</u>: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

      a.    Whether Defendants collected Plaintiffs' and the Class's PII and Video Watching Data;

      b.    Whether Defendants unlawfully disclosed and continues to disclose the PII and Video Watching Data of subscribers of the Team Website in violation of the VPPA;

      c.    Whether Defendants' disclosures were committed knowingly; and

      d.    Whether Defendants disclosed Plaintiffs' and the Class's PII and Video Watching Data without consent.

332.    Information concerning Defendants' Team Website data sharing practices and subscription members is available from Defendants' or third-party records.

333.    Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

334.    The prosecution of separate actions by individual members of the Classes would run the risk of inconsistent or varying adjudications, and establish incompatible standards of conduct for Defendants.  Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

335.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

336.    Given that Defendants' conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

## COUNT I

**VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT**
**18 U.S.C. § 2710, *et seq.***
**(On Behalf of Plaintiffs and the Subscriber Class)**

337.    Plaintiffs hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this complaint.

338.    Plaintiffs bring this count on behalf of themselves and all members of the Subscriber Class.

339.    The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

340.    "Personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

341.    A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

342.    Defendants violated this statute by knowingly disclosing Plaintiffs', Subscriber Class Members' personally identifiable information to Facebook.

343.    Defendants, through the Team Websites, engage in the business of delivering video content to subscribers, including Plaintiffs and other members of

92

the Subscriber Class.  The Team Websites deliver electronically available videos to Plaintiffs and members of the Subscriber Class on the Team Websites.

344.    The Defendants are, individually and collectively, "video tape service providers" because they create, host, and deliver hundreds of videos on their websites, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

345.    Defendants solicit individuals to subscribe to the Team Website newsletters that advertise and promote videos and articles on the Team Website.

346.    Plaintiffs and members of the Subscriber Class are "consumers" because they subscribed to the Team newsletters. 18 U.S.C. § 2710(a)(1).

347.    Plaintiffs and members of the Subscriber Class viewed video clips on the Team Website.

348.    Defendants disclosed Plaintiffs', Subscriber Class Members' personally identifiable information to Facebook. Defendants utilized the Pixel which forced Plaintiffs' web browser to transfer Plaintiffs' identifying information, like their Facebook ID, along with Plaintiffs', Subscriber Class Members' event data, including the title of the videos they viewed.

349. Defendants knowingly disclosed Plaintiffs' and Subscriber Class Members' PII, which is triggered automatically through Defendants' use of the Pixel.  No additional steps on the part of the Defendants, Facebook, or any third-party are required.  And, once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]).  That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

350.   The VPPA provides that a videotape service provider may disclose personally identifiable information concerning a consumer as long as that person has provided "informed written consent . . . in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(A)(i).

351.   Plaintiffs and members of the Subscriber Class did not provide Defendants with any form of consent—either written or otherwise—to disclose their PII to Facebook.  Defendants failed to obtain "informed, written consent" from subscribers – including Plaintiffs and members of the Subscriber Class – "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

352.   Defendants' disclosure of Plaintiffs' and Subscriber Class Members' Video Watching Data and PII were not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendants' disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

353.   In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendants failed to provide an opportunity to opt out as required by the VPPA.

354.   On behalf of themselves and the Subscriber Class, Plaintiffs seek: (i) declaratory relief as to Defendants; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendants to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory

damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

### Injunctive Relief Of Defendants' Ongoing VPPA Violations

355.   An actual and immediate controversy has arisen and now exists between Plaintiffs and the putative classes they seek to represent, and Defendants, which parties have genuine and opposing interest in and which their interests are direct and substantial. Defendants have violated, and continue to violate, Plaintiffs' and Subscriber Class Members' rights to protect their PII under the VPPA.

356.   Plaintiffs have demonstrated that they are likely to succeed on the merits of their claims and are thus entitled to declaratory and injunctive relief.

357.   Plaintiffs have no adequate remedy at law to stop the continuing violations of the VPPA by Defendants. Unless enjoined by the Court, Defendants will continue to infringe on the privacy rights of Plaintiffs and the absent Subscriber Class Members and will continue to cause, or allow to be caused, irreparable harm to Plaintiffs. Injunctive relief is in the public interest to protect the PII of Plaintiffs, and other consumers that would be irreparably harmed through continued disclosure of their PII.

358.   USC operationally handed over control of its website to the Defendants.  The Defendants completely disregard their obligation under the VPPA by loading the tracking tools, including the Facebook Pixel, onto the Team Website and facilitating the sharing of subscribers' PII with third parties for any ordinary person to access and use.

359.   Despite brazenly violating the VPPA, subscribers were provided with no notice of the employment of the Pixel and no indication of how or how much of their information was shared with third parties.  Worse, in further violation of the VPPA, Defendants did not seek or obtain any form of consent from subscribers for the use of the tracking tools to share information improperly pulled from the Team Website.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

360.   This threat of injury to Plaintiffs and members of the Subscriber Class from the continuous violations requires temporary, preliminary, and permanent injunctive relief to ensure their PII is protected from future disclosure.

## COUNT II

### VIOLATION OF THE CALIFORNIA'S INVASION OF PRIVACY ACT
#### Cal. Penal Code § 631
#### (On Behalf of Plaintiffs and Site User Class)

361. Plaintiffs hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this complaint.

362. Plaintiffs bring this count on behalf of themselves and all members of the Site User Class.

363. CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code Section 631(a).

364. The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020). In dealing specifically with CIPA, the California Supreme court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the

97

line permits an outsider" to monitor the communication. *Ribas v. Clark*, 38 Cal. 3d 355, 363 (1985); *see Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

365.  The Team Websites, including the tracking tools placed upon them, are "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

366.  Within the relevant time period, Plaintiff and members of the Site User Class used the search function to communicate Search Terms to USC, with the expectation of receiving search results provided by USC.

367.  Within the relevant time period, Defendants, without the consent of all parties to the communication, or in any unauthorized manner, willfully read, or attempted to read, or learn the contents or meaning of electronic communications of Plaintiffs and the putative Site User Class Members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California.

368.  The information collected by the tracking entities was not for the sole benefit of the teams – here, USC.

369.  Within the relevant time period, Defendants also aided, agreed with, conspired with, and employed tracking tools to accomplish the wrongful conduct at issue here.

370.  Plaintiffs and members of the Site User Class did not authorize or consent to the tracking, interception, and collection of any of their electronic communications.

371.  The violation of section 631 constitutes an invasion of privacy sufficient to confer Article III standing.

## COUNT III

### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
#### Cal. Penal Code § 635
#### (On Behalf of Plaintiffs and Site User Class)

372. Plaintiffs hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this complaint.

373. Plaintiffs bring this count on behalf of themselves and all members of the Site User Class.

374. California Penal Code § 635 penalizes "[e]very person who manufactures . . . sells, offers for sale, advertises for sales, possesses . . . or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another . . . ."

375. At all relevant times, by implementing its own Sidearm Pixel in addition to the tracking tools, Defendants intentionally manufactured, assembled, sold, offered for sale, advertised for sale, possessed, transported, imported, and/or furnished a wiretap device that is primarily or exclusively designed or intended for eavesdropping upon the communication of another.

376. The tracking tools are "device[s]" that are "primarily or exclusively designed" for eavesdropping. The tracking tools accomplish this by taking the Search Terms from users' submitted searches and using them to tailor advertising and marketing to users.

377. Plaintiffs and members of the Site User Class did not consent to the implementation of the tracking tools.

378. Unless enjoined, Defendants will continue to commit the illegal acts alleged herein. Plaintiffs continue to be at risk because they frequently use the internet to find information on favored sports teams, and continues to desire to use the internet for that purpose. Defendants provide website design services, including the tracking tools, to many other websites like the Team Websites. For many websites that Plaintiffs may or are likely to visit in the future, Plaintiffs have no

practical way to know if their website communications will be intercepted, monitored, and or recorded by the tracking tools as a result of Defendants choice to implement the tracking tools.

379.    Plaintiffs and members of the Site User Class seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

## COUNT IV

### VIOLATION OF THE FEDERAL WIRETAP ACT
**18 U.S.C. § 2510,** *et seq.*
**(On Behalf of Plaintiffs and Site User Class)**

380.    Plaintiffs hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this complaint.

381.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Site User Class against the Defendants.

382.    Codified under 18 U.S.C. U.S.C. §§ 2510 *et seq.*, the Federal Wiretap Act (the "Wiretap Act") prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authorized party to the communication.

383.    The Wiretap Act confers a civil private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

384.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

385.    The Wiretap Act defines "contents" as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

386.    The Wiretap Act defines "person as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual,

partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

387.   The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

388.   The Defendants are persons for purposes of the Wiretap Act.

389.   The Facebook Pixel and other tracking tools constitute a "device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

390.   The confidential communications Plaintiffs and members of the Site User Class had with the Team Website, in the form of their Search Terms and browsing information, were intercepted by the tracking entities and such communications were "electronic communications" under 18 U.S.C. § 2510(12).

391.   Plaintiffs and members of the Site User Class had a reasonable expectation of privacy in their electronic communications with the Team Websites in the form of their Search Terms submitted to the Team Website and browsing information. Even if Plaintiffs and members of the Site User Class had no reasonable expectation of privacy in the electronic communications, Plaintiffs' and Site User Class Members' electronic communications with the Team Websites included descriptions and summaries of the pre-recorded video content they searched for along with their PII, giving rise to a reasonable expectation of privacy under the VPPA.

392.   Plaintiffs and members of the Site User Class reasonably expected that third parties were not intercepting, recording, or disclosing their electronic communications with the Team Website.

393.   Within the relevant time period, the electronic communications between Plaintiffs and members of the Site User Class and the Team Websites were intercepted during their transmission, without consent, and for the unlawful and wrongful purpose of monetizing their private information, which includes the purpose of using such private information to develop advertising and marketing strategies.

394.   Interception of Plaintiffs' and Site User Class Members' confidential communications with the Team Websites occur whenever a user uses the Google PSE Search Bar within the Team Website, and when navigating various webpages of the Team Website.

395.   At all times relevant to this Complaint, the tracking entities' conduct was knowing, willful, and intentional, as the tracking entities are sophisticated parties with full knowledge regarding the functionality of the Facebook Pixel and other tracking tools, including that allowing the tracking tools to be implemented on the Team Website would cause the private communications of their users to be shared with third parties.

396.   Plaintiffs and members of the Site User Class were never asked for their consent to share their confidential electronic communications from Team Website with third parties. Indeed, such consent could not have been given as none of the tracking entities, Defendants or Team Websites ever sought any form of consent from Plaintiffs or members of the Site User Class to intercept, record, and disclose their private communications with the Team Websites.

397.   As detailed above, the tracking entities' unauthorized interception, disclosure and use of Plaintiffs' and the Site User Class Members' confidential communications was only possible through the Defendants' knowing, willful, or intentional placement of the tracking tools on the Team Website. 18 U.S. Code § 2511(1)(a).

398.    Plaintiffs and members of the Site User Class have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications in violation of 18 U.S.C. § 2520. As such, Plaintiffs and members of the Site User Class are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and members of the Site User Class and any profits made by the tracking entities as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) appropriate equitable or declaratory relief; (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT V

### INVASION OF PRIVACY
### (On Behalf of Plaintiffs and California Resident Class)

399.    Plaintiffs hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this complaint.

400.    Plaintiffs bring this claim individually and on behalf of the members of the proposed California Resident Class against Defendants.

401.    Plaintiffs and members of the California Resident Class have an interest in: (i) precluding the dissemination and/or misuse of their sensitive and confidential information; and (ii) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various Internet sites without being subjected to wiretaps without Plaintiffs' and California Resident Class Members' knowledge or consent.

402.    Within the relevant time period, by implementing the tracking tools on the Team Websites, Defendants intentionally invaded Plaintiffs' and California Resident Class Members' privacy rights under the California Constitution, and procured the tracking entities to do so.

103

403.   Plaintiffs and members of the California Resident Class had a reasonable expectation that their communications and other data would remain confidential, and that Defendants would not install wiretaps on the Team Websites.

404.   Plaintiffs and members of the California Resident Class did not consent to any of Defendants' actions in implementing the tracking tools on the Team Websites.

405.   This invasion of privacy is serious in nature, scope, and impact.

406.   This invasion of privacy constitutes an egregious breach of the social norms underlying the privacy right.

407.   Plaintiffs and members of the California Resident Class seek all relief available for invasion of privacy claims under California's Constitution.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

(a)    For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Classes and their counsel as Class Counsel;

(b)    For an order declaring that the Defendants' conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d)    Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendants to immediately (i) remove the Pixel and tracking tools from the Team Websites or (ii) add, and obtain, the appropriate consent from subscribers and other general users and visitors to the Team Websites; For damages in amounts to be determined by the Court and/or jury;

(e)    An award of statutory damages or penalties to the extent available;

(f)     For Defendants to pay $2,500.00 to Plaintiffs and members of the Subscriber Class, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(g)     For pre-judgment interest on all amounts awarded;

(h)     For an order of restitution and all other forms of monetary relief;

(i)     An award of all reasonable attorneys' fees and costs; and

(j)     Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated: August 9, 2024            **LAW OFFICES OF**
                                  **TODD M. FRIEDMAN**

                                  By: */s/ Adrian R. Bacon*
                                      Adrian R. Bacon, Esq. (SBN 280332)
                                      21031 Ventura Blvd, Suite 340
                                      Woodland Hills, CA 91364
                                      Tel.: (323) 306-4234
                                      Facsimile: (866) 633-0228
                                      Email: abacon@toddflaw.com

                                      Adam M. Apton (SBN 316506)
                                      **LEVI & KORSINSKY, LLP**
                                      445 South Figueroa Street, 31st Floor
                                      Los Angeles, CA 90071
                                      Telephone: (213) 985-7290
                                      Facsimile: (212) 363-7171
                                      Email: aapton@zlk.com

                                      Mark S. Reich (admitted *pro hac vice*)
                                      **LEVI & KORSINSKY, LLP**
                                      55 Broadway, 4th Floor, Suite 427
                                      New York, NY 10006
                                      Telephone: (212) 363-7500
                                      Facsimile: (212) 363-7171
                                      Email: mreich@zlk.com
                                      *Counsel for Plaintiffs*

## PROOF OF SERVICE

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and not a party to the above-entitled cause. On August 9, 2024, I electronically filed with the Court through its CM/ECF program and served a true copy through the same program the following documents: **AMENDED CLASS ACTION COMPLAINT**

on interested parties in said case as follows:

[x]    ELECTRONICALLY, Pursuant to the CM/ECF system, registration as a CM/ECF user constitutes consent to electronic service through the Court's transmission facilities.  The Court's CM/ECF system sends an email notification of the filing to the parties and counsel of record listed above who are registered with the Court's CM/ECF system.

Place of Filing: 21031 Ventura Blvd., Suite 340, Woodland Hills, CA 91364.

Executed on August 9, 2024, at Woodland Hills, CA

[x] I hereby certify under the penalty of perjury that the foregoing is true and correct.

By: s/ Adrian R. Bacon
        Adrian R. Bacon

Case No.: 2:23-cv-04493-FLA-MAAx
AMENDED CLASS ACTION COMPLAINT